# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF MASSACHUSETTS

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
80 F Street N.W.,
Washington, D.C. 20001,

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO,
1625 L Street, N.W.
Washington, D.C. 20036,

and

NATIONAL ASSOCIATION OF
GOVERNMENT EMPLOYEES, INC.,
159 Thomas Burgin Parkway
Quincy, MA 01269,

                          Plaintiffs,

        v.

SCOTT KUPOR, in his official capacity as
Director of the Office of Personnel
Management,
1900 E Street, N.W.
Washington, D.C. 20415,


OFFICE OF PERSONNEL MANAGEMENT,
1900 E Street, N.W.
Washington, D.C. 20415,

and

THE UNITED STATES OF AMERICA

                          Defendants.

Case No.

## COMPLAINT

Plaintiffs American Federation of Government Employees, AFL-CIO ("AFGE"), American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME"), and National Association of Government Employees, Inc. ("NAGE") bring this action against the Office of Personnel Management ("OPM"), the Director of OPM, and the United States and allege as follows:

1.      One of the cornerstones of American democracy is a nonpartisan, career civil service based on merit, not political loyalty. With the passage of the Pendleton Act of 1883, the Civil Service Reform Act of 1978, and other laws, Congress has created, strengthened, and repeatedly reaffirmed America's commitment to a professional civil service system. The civil service system prioritizes ability, efficiency, and quality throughout the federal government, as it provides vital services that improve the daily lives of all Americans. The merit-based civil service system is vital to both Congress's design and the First Amendment rights of federal workers.

2.      In May 2025, the White House and the Office of Personnel Management ("OPM") undermined a century of bipartisan policy and Congressional mandate, issuing a so-called "Merit Hiring Plan" ("MHP") that threatens the nonpartisan, merit-based civil service. As relevant here, the MHP mandates the inclusion of four open-ended essay questions in federal civil service job applications. While some of these questions relate to job performance—such as work ethic or efficiency—one question has nothing to do with "Merit." It instead elicits the political views of applicants and political agreement with the current President. Question 3 (the "Loyalty Question") asks:

> How would you help advance the President's Executive Orders and policy priorities in this role? Identify one or two relevant Executive Orders or policy initiatives that are significant to you, and explain how you would help implement them if hired.

3.      The inclusion of this Loyalty Question serves to identify applicants whose political views align with *this President's* Executive Orders and policy initiatives. It does so by seeking information about which such orders and policies the applicant personally supports and desires to advance. For many Americans who aspire to serve in this country's nonpartisan, merit-based civil service, being required to express a view in support of the President's political objectives, to attest that one of the President's Executive Orders is personally "significant," or to share their political views or beliefs at all, is antithetical to their values. The present Administration has issued a series of highly politicized executive orders and policy initiatives reshaping many aspects of the federal government and American life. In the last ten months, executive orders have attempted to "repeal" the constitutional right of birthright citizenship, terminated funding for highly popular and essential public media services, ended protection for certain classes of refugees, rolled back health and environmental protections, targeted law firms and lawyers—along with their constitutional rights and those of their clients—for opposing the Administration, ordered the closure of numerous agencies, including the Department of Education and USAID, eliminated collective bargaining rights for federal workers, and purged the government of tens of thousands of dedicated civil servants.

4.      Potential federal job applicants who want to serve the United States but do not personally support the President's executive orders and policy initiatives—or simply prefer not to share their political beliefs and views when applying for a career federal job—will be compelled to speak in the form of a written essay praising the President's orders and policies (in order to better their chances of employment), risk being punished for answering honestly, or be chilled from speaking at all.

5.      That is by design. The current Administration has a stated goal of removing civil servants it deems to be disloyal and replacing them with loyalists. By directing the use of the Loyalty Question in job applications for most career positions and instructing politically appointed agency leaders to review applicant responses, the Administration appears to be trying to fill nearly every level of the civil service with political loyalists.

6.      The White House and OPM faced immediate backlash to the MHP. In response, OPM issued "updated guidance" in June 2025 ("MHP Guidance"). But the MPH Guidance only compounds the problems with the Loyalty Question. It states that the essay questions are not mandatory for applicants to answer but are "encouraged," that they should not be used as a political litmus test, and that answers are not to be scored or ranked. But the guidance also provides that answers "will be reviewed" by hiring managers and political appointees, making clear that the answers will play some unknown and unspecified role in the hiring process. Of course the Loyalty Question will play some role in hiring: otherwise, why include it at all?

7.      Indeed, government officials have publicly stated that the Loyalty Question is necessary to fulfill "a very specific priority" for the Administration in hiring decisions. And regardless of the scoring methods used, or the suggestion that blank responses will not lead to "disqualification"—and, importantly, regardless of whether the Administration intends to use the Loyalty Question to screen candidates—the very inclusion of the question on applications compels applicants to voice certain viewpoints and opinions, to self-censor, or to decline to apply for positions they are otherwise interested in.

8.      The essay questions, including the Loyalty Question, have already appeared on over 5,800 federal job listings for career civil service positions that have nothing to do with politics or personal sympathy for the President's Executive Orders. They are included on applications for

3

jobs as varied as Meatcutting Worker (Dept. of Defense), Research Biologist (Dept. of Agriculture), Laundry Worker (Dept. of Veterans' Affairs), Practical Nurse (Dept. of Justice), Air Traffic Control Specialist (Dept. of the Air Force), and Recreation Specialist – Institutional (Dept. of Justice). An applicant's ability to perform these and other career civil service roles competently is entirely unrelated to the applicant's personal political views.

9.      The MHP, including the MHP Guidance interpreting it, violates the First Amendment in several ways. First, it imposes an unconstitutional condition on employment, creating a hiring system where applicants are identifiable by and selected on the basis of professed political beliefs and loyalties. In so doing, the MHP essentially establishes a system of unconstitutional political patronage. Second, the MHP unconstitutionally compels speech. It effectively requires applicants to disclose thoughts and beliefs on political topics and coerces them into voicing allegiance to this administration's political agenda, regardless of their views. Third, it chills the speech of potential applicants who are interested in new job postings but refuse out of principle to profess support for the administration or to voice political views at all. These chilled applicants either engage in self-censorship or do not apply at all. Fourth, it encourages and facilitates viewpoint discrimination, allowing the Trump Administration to weed out those who do not voice sufficient support for President Trump and reward those who do. And it provides no standard for assessing responses to the Loyalty Question, giving Administration officials unfettered discretion in deciding how to use applicants' personal political beliefs in the hiring process.

10.      The MHP, including the MHP Guidance, is a final agency action by OPM. As a final agency action subject to the Administrative Procedure Act, the MHP must comply with the Constitution and federal statutes. But the Loyalty Question is contrary to the constitutional rights

of federal job applicants, for whom federal employment is conditioned on professed political belief, whose political speech is compelled, whose speech is chilled by the very inclusion of the question, and who are subject to viewpoint discrimination.

11.     The MHP is also arbitrary and capricious. It is both substantively unreasonable and not reasonably explained. It makes an applicant's personal political views about the President part of the civil service hiring process, contrary to the merit-based system Congress created. It also seeks information—the applicant's personal views on the President's Executive Orders and policy initiatives—that is entirely irrelevant for civil service jobs. OPM also failed to consider the impact that factoring political loyalty into civil service hiring decisions will have on the operation of the government and the delivery of public services. And OPM's MHP Guidance only affirms the arbitrary nature of the Loyalty Question: it does not explain how the responses will be scored, how they will be factored in with merit-based considerations, or how failure to respond—or provision of a response not in line with the Administration's priorities—will affect current or future employment. This lack of transparency gives hiring managers unfettered discretion to make decisions based on political loyalty or viewpoint, rather than merit.

12.     Finally, by collecting and maintaining irrelevant and unnecessary information about job applicants' political views, the Loyalty Question and its implementation are contrary to the Privacy Act of 1974, 5 U.S.C. § 552a. The Privacy Act requires that personal information about individuals collected by the government, including through federal hiring, "is limited to that which is legally authorized and necessary" and "is maintained in a manner which precludes unwarranted intrusions upon individual privacy" and "the exercise of First Amendment rights."[1] The Loyalty

---

[1] U.S. Office of Mgmt. and Budget, Privacy Act Implementation: Guidelines and Responsibilities, 40 Fed. Reg. 28,948, 28,948, 28,965 (1975) ("OMB Guidelines"); 5 U.S.C. § 552a(v).

Question collects and maintains information about job applicants that is irrelevant, unnecessary, and intrudes on core First Amendment activity.

13.    Plaintiffs are three labor organizations that collectively represent millions of union members, including hundreds of thousands of members who are currently federal civil servants ("Union Plaintiffs"). The Union Plaintiffs bring these claims on behalf of their members. The Union Plaintiffs' missions include protecting and vindicating the rights of the workers they represent, and advocating for those workers, in matters related to federal employment; increasing employment opportunities for their members; and assisting their members in making informed decisions about potential employment opportunities. Eliminating the Loyalty Question from federal job applications is germane to the Union Plaintiffs' missions to protect and advocate for the workers they represent.

14.    Plaintiffs' members—employees across multiple federal agencies, including many who are currently seeking new positions or promotions across the federal civil service—are suffering ongoing injuries from the MHP and its wide-ranging implementation across the federal workforce. Many members have been compelled to answer the Loyalty Question for fear their application will be disadvantaged or incomplete if they do not answer—or if they answer in a manner that does not adequately support the current Administration—and have been compelled to voice private political views and beliefs that should be shielded from government inquiry. Other members have been deterred entirely from applying to federal jobs in which they are interested due to the use of the Loyalty Question in the job application because they do not want to speak their true viewpoints.

15.     Accordingly, the Court should declare that the Loyalty Question is unlawful and unconstitutional; and vacate the MHP's Loyalty Question to ensure that federal civil service hiring programs comply with the Constitution and federal law.

## PARTIES

16.     The American Federation of Government Employees, AFL-CIO ("AFGE") is a labor organization and unincorporated association headquartered at 80 F Street N.W., Washington, D.C. 20001. AFGE, the largest federal employee union, represents approximately 800,000 federal civilian employees through its affiliated councils and locals in every state in the United States, including Massachusetts.

17.     AFGE members include nurses caring for our nation's veterans, border patrol agents securing our borders, correctional officers maintaining safety in federal facilities, scientists conducting critical research, health care workers serving on military bases, civilian employees in the Department of Defense supporting our military personnel and their families, and employees of the Social Security Administration making sure retirees receive the benefits they have earned.

18.     AFGE was founded in 1932 by federal employees seeking to create a right to fair employment and pay during the Great Depression. As the union grew, it advocated for and secured numerous victories for career civil servants, including the passage of the Civil Service Reform Act in 1978.

19.     AFGE is dedicated to fighting for dignity, safety, and fairness on the job for its members, and promoting efficiency and the improvement of government service so that government can more effectively serve the American people.

20.     The American Federation of State, County & Municipal Employees, AFL-CIO ("AFSCME") is a national labor organization and unincorporated membership association

headquartered at 1625 L Street N.W., Washington, D.C. 20036. AFSCME is the largest trade union of public employees in the United States, with approximately 1.4 million members organized into approximately 3,400 local unions, 58 councils, and other affiliates in 46 states (including Massachusetts), the District of Columbia, and Puerto Rico. AFSCME, through its affiliate District Council 20 and its constituent local unions, represents federal civilian employees in agencies and departments across the federal government.

21.    AFSCME was founded in 1932 by civil servants seeking to combat state efforts to replace a competitive civil service system with political patronage, united by a simple idea: that a professional civil service is essential to a strong democracy, and public service should be delivered by individuals dedicated to serving their communities, not those with connections to particular politicians. This idea has sustained AFSCME through nearly nine decades, as the union has succeeded in its efforts to pass or strengthen civil service laws across the United States.

22.    AFSCME members include nurses, corrections officers, childcare providers, emergency medical technicians, sanitation workers, school bus drivers, civil engineers, policy analysts, and more, all with one thing in common: dedication to making our communities stronger, healthier, and safer. Its members working for the federal government make our communities stronger, healthier, and safer by working to ensure aviation safety at the Federal Aviation Administration, agricultural sustainability at the Department of Agriculture, criminal justice through the Department of Justice, and more.

23.    The National Association of Government Employees, Inc. ("NAGE") is a national labor organization and is affiliated with the Service Employees International Union. NAGE is incorporated in the state of Delaware, with its principal place of business at 159 Thomas Burgin Parkway, Quincy, MA 02169. NAGE and its local units are the certified exclusive bargaining

representatives of approximately 125,000 employees, including nearly 75,000 federal employees in 43 states, including Massachusetts.

24.     NAGE members, many of whom are veterans, include health care workers, police officers, scientists, office workers, researchers, childcare providers, janitorial staff, drivers, and more, working at many federal agencies such as the Department of Defense, the Department of Veterans Affairs, the Department of Transportation, and the National Park Service.

25.     Founded in 1961, NAGE is an organization of members united by the belief in the dignity and worth of workers and the services they provide, dedicated to improving the lives of workers and their families, and creating a more just and humane society.

26.     AFGE, AFSCME, and NAGE bring this action on behalf of their members.

27.     Defendant Office of Personnel Management ("OPM") is a federal agency that serves as the chief human resources agency and personnel policy manager for the federal government.

28.     Defendant Scott Kupor is the Director of OPM. He is sued in his official capacity.

29.     Defendant United States of America is responsible for the exercise of executive action by the named defendants and all other departments and agencies that have positions for which the Loyalty Question is part of the application process.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, and the Administrative Procedure Act, 5. U.S.C. §§ 701 *et seq*.

31.     Venue is proper in the District of Massachusetts pursuant to both 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official

capacities. Plaintiff NAGE is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within the District of Massachusetts, where many of the Union Plaintiffs' members live, work, and have been affected by the Loyalty Question, and where dozens of jobs have been posted with the Loyalty Question.

## FACTUAL ALLEGATIONS

***America's merit-based, nonpartisan civil service is a cornerstone of our country's democracy.***

32.     For nearly 150 years, the merit system has attracted highly qualified individuals who wish to serve the federal government in a wide array of fields, across presidential administrations, as nonpolitical public servants. From its beginning in 1883, when about 10 percent of the workforce was set aside for merit-based hiring, the merit-based civil service has grown to include all but about 4,000 of the executive branch's 2.2 million federal workers.[2] Congress and the Supreme Court have repeatedly recognized the importance of selecting government employees who are the most talented—not the most politically loyal or sympathetic to a particular administration—and the First Amendment protects these public servants' political opinions and beliefs.

33.     Though the first presidential administrations hired at will, they largely made hiring decisions on merit, albeit based on a conception of merit that differs from the modern view and with occasional use of political patronage.[3] Political patronage did not truly roar to life until the

---

[2] *Donald Trump has picked 381 nominees to fill key roles in his administration so far*, Wash. Post (updated Sep. 16, 2025), https://www.washingtonpost.com/politics/interactive/2025/trump-appointee-tracker/ ("President Donald Trump has the ability to fill roughly 4,000 politically appointed positions in the executive branch and independent agencies, including more than 1,300 that require Senate confirmation.").

[3] Lorenzo Castellani, The History of the United States Civil Service 36-38 (Routledge 2021); Paul P. Van Riper, History of the United States Civil Service 18-28 (Row, Peterson and Co. 1958).

administration of President Andrew Jackson, after which it deepened its roots through the middle of the Nineteenth Century.[4] To the victor went the spoils: Presidential administrations rewarded political supporters with government positions, an approach known as the "spoils system." Under this system, "a victorious president, in conjunction with the party's elites, would appoint political supporters to positions throughout the government, from cabinet secretaries to mail carriers."[5] During this time "[f]ederal employment was boldly based on partisan political service; it served as a reward for campaign work and political loyalty."[6] As described in 1870:

> Every four years, the whole machinery of the Government is pulled to pieces. The country presents a most ridiculous, revolting, and disheartening spectacle. The business of the nation and the legislation of Congress are subordinated to the distribution of plunder among eager partisans. Presidents, secretaries [of departments], senators, representatives are dogged, hunted, besieged, besought, denounced, and they become mere office brokers. The country seethes with intrigue and corruption. Economy, patriotism, honesty, honor, seem to have become words of no meaning.[7]

34.    As the federal government grew, the flaws and abuses of this system—and the resulting corruption—became apparent. But it was a tragedy that brought about change. In 1881,

---

[4] Castellani 38-41; Van Riper 30-56; *see also Elrod v. Burns*, 427 U.S. 347, 353 (1976) (plurality) ("Patronage practice is not new to American politics. It has existed at the federal level at least since the Presidency of Thomas Jefferson, although its popularization and legitimation primarily occurred later, in the Presidency of Andrew Jackson.").

[5] Sean M. Theriault, *Patronage, Political Parties, the Public, and the Pendleton Act of 1883*, THE POWER OF THE PEOPLE 29 (2005), https://muse.jhu.edu/pub/30/oa_monograph/book/28304/pdf.

[6] Joseph Gebhardt, William Dobrovir, & Thomas Devine, *Blueprint for Civil Service Reform: An Analysis of How Politics Have Made a Mockery of the Civil Service Merit System, with Proposals for Reform*, Fund for Constitutional Gov't 9 (Oct. 27, 1976), https://whistleblower.org/wp-content/uploads/2024/09/Blueprint-for-Civil-Service-Reform.pdf; *see also* Gov't Accountability Project, *Corrected Testimony of Thomas Devine: Sen. Hearing on "Replacing Non-Partisan Civil Servants with Political Hires"*, WHISTLEBLOWER.ORG 5 & n.18 (Sept. 17, 2024), https://whistleblower.org/wp-content/uploads/2024/12/091624-Corrected-Tom-Devine-Testimony-HSGAC-Schedule-F-Hearing.pdf (citing "Blueprint" and noting the report was prepared in 1976 and footnote documents are no longer available).

[7] U.S. Office of Pers. Mgmt., *Biography of an Ideal: A History of the Federal Civil Service* (2003 ed.), at 16 (quoting George William Curtis, 1870).

attorney Charles Guiteau, believing he was entitled to a federal position for his political patronage of President James A. Garfield, assassinated President Garfield in retribution when he failed to procure federal employment. In response, Congress passed the Pendleton Act of 1883, formally titled An Act to Regulate and Improve the Civil Service of the United States, ch. 27, 22 Stat. 403 (Jan. 16, 1883). The Pendleton Act set aside about ten percent of federal positions for non-political, merit-based hiring—determined on the basis of competitive exams, rather than the applicant's history of partisanship. This established the foundation for a merit-based civil service that would eventually ban the exchange of federal employment for political favors as well as the firing of federal employees for their political views.

35.     Between 1883 and 1978, Congress repeatedly passed and amended legislation strengthening the federal civil service as a merit-based system and expanding procedural protections for career civil service positions. Among other statutes, in 1912, Congress enacted the Lloyd-LaFollette Act, which legislated a for-cause removal standard for employees in the "classified service" (today, the "competitive service"). Lloyd-LaFollette Act, § 6, 37 Stat. 555 (1912). This statute also established procedural protections for federal workers, including requiring written notice of the reasons for an employee's removal and an opportunity to respond.

36.     The merit-based civil service system continued to grow along with the federal government in the New Deal years, during World War II and the post-war era, and in the Great Society years. The size of the civilian federal workforce peaked at nearly 3.4 million employees, excluding the Postal Service, during World War II.[8] During the war years, Congress passed the Veterans' Preference Act of 1944 to give veterans and their families hiring advantages and the

---

[8] U.S. Office of Pers. Mgmt., *Executive Branch Civilian Employment Since 1940*, https://tinyurl.com/mvhxzpar (last visited Oct. 6, 2025).

right to appeal adverse actions.[9] In the 1960s, the executive branch extended adverse action appeal rights to all competitive service employees and added collective bargaining rights;[10] in 1978, Congress enacted the Civil Service Reform Act, which codified those existing statutory and regulatory rights to notice, opportunity to respond, and appeal in response to certain adverse employment actions and made collective bargaining, subject to binding arbitration, mandatory;[11] and, in 1990, Congress further extended adverse action appeal rights, covering for the first time most excepted civil service employees.[12] For the last seven decades, the number of civilian federal employees, excluding the Postal Service, has fluctuated by a few hundred thousand above and below two million federal employees.[13] The federal merit system has taken firm root in American life, protecting the public against the rampant corruption, inefficiency, and ineffectiveness of the Nineteenth Century spoils system.

37.    Attempts to politicize the civil service during the Nixon presidency (1968–1974) brought about the more recent Congressional reforms described above. "Promptly after his inauguration . . . Richard M. Nixon displayed an immediate, energetic interest in establishing a personnel system" loyal to his political whims.[14] The Nixon Administration created a political

---

[9] Veterans' Preference Act of 1944, Pub. L. No. 78–359, § 14, 58 Stat. 387, 390, as amended by Pub. L. 80-325, 61 Stat. 723 (1947).

[10] Exec. Order No. 10,988 (Jan. 17, 1962), *reprinted in* 27 Fed. Reg. 551 (Jan. 19, 1962); Exec. Order no. 10987 (Jan. 17, 1962), *reprinted in* 27 Fed. Reg. 550 (Jan. 19, 1962).

[11] *Civil Service Reform Act*, Pub. L. 95-454, 92 Stat. 1111 (Oct. 13, 1978).

[12] *Civil Service Due Process Amendments*, Pub. L. 101-376, 104 Stat. 461 (1990).

[13] *See* U.S. Office of Pers. Mgmt., *Executive Branch Civilian Employment Since 1940* (covering 1940-2014), https://tinyurl.com/mvhxzpar (last visited Oct. 6, 2025); U.S. Office of Pers. Mgmt., FEDscope (covering 2015-2019), https://tinyurl.com/mtrhhkyc (last visited Oct. 6, 2025); U.S. Office of Pers. Mgmt., FEDscope (covering 2020-2024), https://tinyurl.com/yvfuky53 (last visited Oct. 6, 2025).

[14] Gebhardt, *supra* n.6, at 14.

hiring system known as "Operation Talent Search," which utilized a database of thousands of job candidates referred by Republican members of Congress, political officials, and political organizations supporting the President to install loyalists at various levels of government positions.[15] The system worked as follows: when any job opened at the General Schedule (GS)-14 or GS-15 levels, the hiring agency was required to check the political referral bank for applicants before anyone else could be promoted or hired.[16] In other cases, the White House itself identified the candidates who should be hired.[17] Once hired, the new employees were required to undergo "orientation" with White House staff about the Administration's policy and public relations goals. This process existed for higher level political appointees as well as career workers at GS-15 and below.[18] In at least one agency, the Nixon Administration implemented "test[s]" tracking applicants' responses to certain politically oriented statements.[19] In another agency, the Nixon Administration simply abolished the jobs of non-loyalists.[20]

38.    The Watergate scandal and the revelation of the abuses of the Nixon years led to Congressional determination to keep politics out of the civil service for good. Congress strengthened these principles by passing the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. 95-454, 92 Stat. 1111.

---

[15] Ernest Holsendolph, *H.E.W. Is Reported to Have Operated a Job Referral System in '69 in Violation of Civil Service Rules*, N.Y. Times (May 9, 1975), https://www.nytimes.com/1975/05/09/archives/hew-is-reported-to-have-operated-a-job-referral-system-in-69-in.html.

[16] *See id.*; *see also* Gebhardt, *supra* n.6 at 16–18.

[17] *See, e.g.*, Holsendolph, *supra* n.15 (noting referrals for agency positions would come straight from the White House "talent recruiter").

[18] Gebhardt, *supra* n.6 at 28–32, 35.

[19] *Id.* at 70–71 (For example, applicants' response to the statement: "Richard Nixon's election constituted a mandate for closing down OEO and other social welfare programs.").

[20] *Id.* at 69.

39.     Through the CSRA, Congress directed that federal personnel management should be implemented consistent with merit system principles. 5 U.S.C. § 2301; *see also* Pub. L. 95-454, § 3, 92 Stat. 1111, 1112-13 (1978) (5 U.S.C. § 1101 note). These principles include, among others: "selection and advancement should be determined solely on the basis of relative ability, knowledge, and skill, after fair and open competition which assures that all receive equal opportunity," *id.* 2301(b)(1); "[a]ll employees and applicants for employment should receive fair and equitable treatment in all aspects of personnel management without regard to political affiliation," *id.* 2301(b)(2); "[a]ll employees should maintain high standards of integrity, conduct, and concern for the public interest," *id.* 2301(b)(4)l; and "[e]mployees should be protected against arbitrary action, personal favoritism, or coercion for political purpose," *id.* 2301(b)(8)(A).

40.     In the CSRA, Congress also established certain prohibited personnel practices, employment-related activities that are banned in the federal workplace because they violate merit-system principles. 5 U.S.C. § 2302. Prohibited personnel practices include, among others: discriminating against an applicant for employment or an employee based on political affiliation, as prohibited under any law, rule, or regulation, 5 U.S.C. § 2302(b)(1)(E); "coerc[ing] the political activity of any person," *id.* 2302(b)(3); "grant[ing] any preference or advantage not authorized by law, rule, or regulation to any employee or applicant for employment," *id.* 2302(b)(5); or taking any personnel action that violates merit system principles, *id.* 2302(b)(12).

41.     These merit system principles and prohibited personnel practices, along with other protections in the CSRA, make clear Congress' design that hiring and personnel decisions in the civil service should be based on merit, not politics.

42.    Today, there are more than 2 million federal employees in the civil service.[21] These public servants provide services to the American people that range from nursing care for veterans and scientific research for the space program, to rooting out Medicare fraud and helping family farmers secure markets for their products. Nearly one third of federal civil servants are veterans.[22] More than eighty percent of federal workers are stationed outside of Washington D.C., and they perform duties in every state and every congressional district.[23]

43.    Career federal civil service positions are generally classified into one of three "services": the competitive service, the excepted service, and the Senior Executive Service. Each has different hiring processes and requirements—but a unifying factor is that hiring for each service is based on merit.

44.    Congress made the competitive service the default; all executive branch civil service positions are presumed to be part of the competitive service unless specifically excluded. *See* 5 U.S.C. § 2102(a)(1); 2103. Roughly two-thirds of all federal workers are in the competitive service.[24] To be hired into the competitive service, an individual must go through a competitive process, open to all, known as competitive examination. That process may consist of a written test, an assessment of the individual's education and experience, and/or an assessment of the

---

[21] Eileen Sullivan, *Year Will End With 300,000 Fewer Federal Workers, Trump Official Says*, N.Y. Times (Aug. 22, 2025), https://www.nytimes.com/2025/08/22/us/politics/trump-federal-workers.html.

[22] Drew Desilver, *What we know about veterans who work for the federal government*, Pew Research Ctr. (Apr. 10, 2025), https://www.pewresearch.org/short-reads/2025/04/10/what-we-know-about-veterans-who-work-for-the-federal-government/.

[23] *Beyond the Capital: The Federal Workforce Outside the D.C. Area*, P'ship for Pub. Serv., https://ourpublicservice.org/fed-figures/beyond-the-capital-the-federal-workforce-outside-the-d-c-area/ (last visited Oct. 6, 2025).

[24] Cong. Res. Serv., *Categories of Federal Civil Service Employment: A Snapshot*, CONGRESS.GOV (March 26, 2019), https://www.congress.gov/crs-product/R45635 (last visited Oct. 6, 2025).

individual's knowledge, skills, and abilities that are necessary for successful performance in the job.

45.     The excepted service includes all positions in the executive branch that are not in the Senior Executive Service and are specifically exempted from competitive service by statute, Executive Order, or OPM regulation. 5 U.S.C. § 2103(a). Typically, career positions are in the excepted service when competitive examination is not practicable, such as for attorney positions. While excepted service hiring is generally more flexible than competitive service hiring, agencies must select "from the qualified applicants in the same manner and under the same conditions required for the competitive service." 5 U.S.C. § 3320.

46.     The Senior Executive Service consists of senior government officials, both career civil servants and noncareer (i.e. political) appointees, who share a broad set of responsibilities to help lead the work of the Federal Government and "to ensure that the executive management of the Government of the United States is responsive to the needs, policies, and goals of the Nation and otherwise is of the highest quality." 5 U.S.C. § 3131. Congress has laid out a detailed "merit staffing process" that each agency must follow when filling career SES positions, and it has limited the number of noncareer SES members to no more than 10% of the total number of SES positions. 5 U.S.C. §§ 3393, 3134(b).

47.     As described above, Congress has made clear, in the merit system principles, that all applicants for the career civil service—regardless of whether they are in the competitive, excepted, or Senior Executive services—are to be selected based on merit, "solely on the basis of relative ability, knowledge, and skills, after fair and open competition which assures that all receive equal opportunity." 5 U.S.C. § 2301(b)(1).

48.     Most civil service job openings are posted to USAJOBS.gov, a government website operated by OPM. USAJOBS is "the federal government's official employment site" and "serves as the central place to find opportunities in hundreds of federal agencies and organizations."[25] USAJOBS is the mechanism through which OPM satisfies its statutory obligation to "establish and keep current a comprehensive list of all announcements of vacant positions in the competitive service within each agency." 5 U.S.C. § 3330(b).

49.     Each posting on USAJOBS states (1) to whom the job is open, (2) its duties, (3) its requirements, (4) how candidates will be evaluated, (5) required documents for application, and (6) instructions on how to apply. Many job postings include an "assessment questionnaire"— which now includes the Loyalty Question.

50.     The modern civil service is designed to be apolitical. Federal civil servants take an oath of loyalty to the U.S. Constitution, not to any person, president, or political party. 5 U.S.C. § 3331.

51.     Civil servants are distinct from political appointees. Political appointees can be hired and fired at will, including because of their political views, party affiliation, or even past statements. They are not entitled to civil service protections. And political appointees typically resign at the end of a presidential administration, when a new president with new priorities and policy goals comes to power.

52.     In contrast, the First Amendment protects civil servants' freedom of speech, belief, and expression. Across a long line of cases, the U.S. Supreme Court has confirmed the First

---

[25] *About USAJobs*, USAJobs, https://help.usajobs.gov/about (last visited Oct. 6, 2025).

Amendment rights of civil servants to be free from discrimination or adverse employment action on the basis of their speech or perceived political beliefs.

- In *Elrod v. Burns*, the Court held that the First Amendment was violated when Republican employees of a sheriff's office were discharged or threatened with discharge because they were not members of the Democratic Party. 427 U.S. 347, 351 (1976) (plurality). The Court affirmed that "political belief and association constitute the core . . . activities protected by the First Amendment" and threatening to discharge or implementing "patronage dismissals" through "the denial of public employment" is an unconstitutional "inducement." *Id.* at 356.

- In *Branti v. Finkel*, the Court held unconstitutional a newly-appointed Democratic public defender's firing of Republican assistant public defenders "solely because of their political beliefs." 445 U.S. 507, 510 (1980). The Court explained, "[i]f the First Amendment protects a public employee from discharge based on what he has said, it must also protect him from discharge based on what he believes." *Id.* at 515.

- In *Rutan v. Republican Party of Illinois*, petitioners challenged the Illinois governor's operation of a patronage system through executive order by freezing hiring statewide and approving hiring, promotion, and transfer applications for only political loyalists. 497 U.S. 62, 65 (1990). The Supreme Court held that *Elrod's* and *Branti's* prohibition on patronage dismissals "extends to promotion, transfer, recall, and ***hiring decisions*** based on party affiliation and support." *Id.* at 79 (emphasis added). "Under our sustained precedent," the Court wrote, "conditioning hiring decisions on political belief and association . . . plainly constitutes an unconstitutional condition, unless the government has a vital interest in doing so." *Id.* at 78.

- More recently, in *Heffernan v. City of Paterson, N.J*, the Supreme Court considered a First Amendment challenge where a New Jersey mayor fired a government employee based on the mistaken belief that the employee had supported the mayor's political rival. 578 U.S. 266, 268 (2016). The Court held that the First Amendment protects against hiring and firing on the basis of even ***perceived*** political activity and belief. *Id.*

53.     These decisions affirm that the Constitution itself prohibits the federal government from hiring or not hiring or otherwise penalizing civil servants based on political considerations, perceived or true. And this is exactly the system that Congress has created, because a non-partisan civil service ensures that federal employees act in the best interests of the country and in support of the Constitution to carry out the laws that Congress passes. *See* Pub. L. 95–454, § 3, Oct. 13, 1978, 92 Stat. 1112 ("It is the policy of the United States that in order to provide the people of the United States with a competent, honest, and productive Federal work force reflective of the Nation's diversity, and to improve the quality of public service, Federal personnel management should be implemented consistent with merit system principles and free from prohibited personnel practices."). A merit-based civil service provides continuity of employment, enables the development of agency expertise, and minimizes corruption and inefficiency, allowing the Executive Branch to perform the increasingly complex tasks Congress assigns to it with the necessary skills and experience, regardless of the political administration currently in power.

*In contravention of these fundamental principles, the Trump Administration has executed on a campaign promise to replace apolitical civil servants with political loyalists.*

54.     President Trump and his administration have made it clear that they intend to dismantle the career civil service and install a federal workforce of loyalists, notwithstanding the well-established statutory and constitutional protections for the civil service.

55.    This effort began during the first Trump Administration, when President Trump issued an executive order that would have stripped adverse action protections from tens of thousands of federal career employees. E.O. 13957 (Oct. 21, 2020) (creating Schedule F in the Excepted Service). (That executive order was ultimately rescinded by President Biden before any positions were rescheduled.)[26] Likewise, President Trump's head of White House personnel instructed federal agencies to root out supposedly "disloyal" employees.[27]

56.    The commitment to installing loyalists in the federal government continued as President Trump planned his return to office. He disparaged career civil servants as "crooked" and "dishonest," vowing to hold them "accountable" if he were re-elected.[28] He promised to "pass critical reforms making every executive branch employee fireable by the president of the United States," proclaiming "[t]he deep state must and will be brought to heel."[29] Future Vice President J.D. Vance advised the president to "fire every single mid-level bureaucrat, every civil servant in the administrative state, replace them with our people."[30] Project 2025, a blueprint that the Trump

---

[26] *See* Exec. Order 14003, *Protecting the Federal Workforce* (Jan. 21, 2021); *Civil Service: Agency Responses and Perspectives on Former Executive Order to Create a New Schedule F Category of Federal Positions*, GAO (Sep. 28, 2022), https://www.gao.gov/products/gao-22-105504 ("We found that no agency placed positions into Schedule F before the executive order that created it was revoked in Jan. 2021—although a few considered doing so.").

[27] Diamond, Acosta, *President's new personnel head tells agencies to look out for disloyal staffers*, CNN Politics (Feb. 21, 2020), https://www.cnn.com/2020/02/21/politics/john-mcentee-disloyal-white-house-staffers/index.html.

[28] Eric Wagner, Defense One, *Trump calls federal workforce 'crooked,' vows to hold them 'accountable,'* DefenseOne (Aug. 28, 2024), https://www.defenseone.com/policy/2024/08/trump-calls-federal-workforce-crooked-vows-hold-them-accountable/399147/.

[29] Eric Katz, *If Trump Is Reelected, His Aides Are Planning to Purge the Civil Service*, Gov. Exec. (July 22, 2022), https://www.govexec.com/workforce/2022/07/trump-reelected-aides-plan-purge-civil-service/374842/.

[30] J.D. Vance on Jack Murphy Live, JML #070, YouTube (Sept. 17, 2021), https://www.youtube.com/watch?v=PMq1ZEcyztY.

Administration has followed and implemented in its second Administration,[31] called for creating a personnel database of loyalists—akin to Nixon's Operation Talent Search[32]—to replace tens of thousands of federal government civil servants.[33] The Director of the Office of Management and Budget ("OMB"), Russell Vought, publicly stated in 2024: "We want bureaucrats to be traumatically affected. When they wake up in the morning, we want them to not want to go to work because they are increasingly viewed as the villains."[34]

57.    Once in office, President Trump and his Administration set these plans into motion. He signed Executive Order 14,171, which seeks to strip civil service protections from a wide swath of career civil servants, making them easier to fire. As he signed the Order, the President referred to these dedicated public servants as a "cancer."[35] President Trump and his Administration have fired dozens of federal employees who have expressed concerns or made whistleblower allegations about the internal workings of their agencies.[36] The Trump Administration has also illegally fired

---

[31] Franco Ordonez & A Martinez, *Trump enacts Project 2025 policies, which he distanced himself from while campaigning*, NPR (Jan. 31, 2025), https://www.npr.org/2025/01/31/nx-s1-5280364/trump-enacts-project-2025-policies-which-he-distanced-himself-from-while-campaigning; William Brangham & Harry Zahn, *The Project 2025 policies the Trump administration is already implementing*, PBS News (Feb. 22, 2025), https://www.pbs.org/newshour/show/the-project-2025-policies-the-trump-administration-is-already-implementing.

[32] *See* Holsendolph, *supra* n. 15.

[33] Michael Sozan & Ben Olinsky, *Project 2025 Would Destroy the U.S. Sytem of Checks and Balances and Create an Imperial Presidency*, Ctr. For Am. Progress (Oct. 1, 2024), https://www.americanprogress.org/article/project-2025-would-destroy-the-u-s-system-of-checks-and-balances-and-create-an-imperial-presidency/.

[34] Molly Redden, Andy Kroll, & Nick Surgey, *"Put Them in Trauma": Inside a Key MAGA Leader's Plans for a New Trump Agenda*, ProPublica (Oct. 28, 2024), https://www.propublica.org/article/video-donald-trump-russ-vought-center-renewing-america-maga.

[35] Alan Rappeport, *Federal Employees Union Sues Trump Over Worker Protections*, N.Y. Times (Jan. 21, 2025), https://www.nytimes.com/2025/01/21/us/politics/trump-schedule-f-federal-workers.html.

[36] Luke Bar, *FEMA employees who signed letter Monday critical of admin placed on leave*, ABC

thousands of probationary workers,[37] encouraged career employees to quit,[38] and reduced the total size of federal civil service workforce by hundreds of thousands of workers.[39] In an unprecedented move, President Trump has also used the recent government shutdown to illegally attempt to fire thousands of federal workers.[40] And he has done so in service of his desire to rid the federal government of non-loyalists, declaring, "It will be Democrat oriented, because we figure, you know, they started this thing, so they should be Democrat-oriented. It'll be a lot. . . . These are largely people that the Democrats want. Many of them will be fired."[41]

58.    This is all happening at the same time that the Trump Administration is systematically attacking the institutions created by Congress to protect the merit-based civil service and prevent illegal abuses. President Trump has—multiple times—fired members and leaders of the Merit Systems Protection Board ("MSPB"), the federal adjudicative body for most

---

News, (Aug. 27, 2025), https://abcnews.go.com/Politics/fema-employees-signed-letter-monday-critical-admin-leave/story?id=125014793; Assoc. Press, *EPA fires employees who publicly criticized agency policies under Trump*, CNN, (Aug. 30, 2025), https://www.cnn.com/2025/08/30/politics/epa-fires-employees-who-publicly-criticized-agency-policies-under-trump.

[37] Chris Arnold & Emily Feng, *Thousands of fired federal workers must be offered reinstatement, a judge rules*, NPR (Mar. 13, 2025), https://www.npr.org/2025/03/13/nx-s1-5325959/federal-employees-court-firing.

[38] Benjamin Siegel & Cheyenne Haslett, *Federal governmental paying 154,000 people not to work*, ABC News (Jul. 31, 2025), https://abcnews.go.com/Politics/federal-government-paying-154000-people-work/story?id=124249462.

[39] Eileen Sullivan, *Year Will End With 300,000 Fewer Federal Workers, Trump Official Says*, N.Y. Times (Aug. 22, 2025), https://www.nytimes.com/2025/08/22/us/politics/trump-federal-workers.html.

[40] Josh Gerstein, Carmen Paun & Hassan Ali Kanu, *Judge extends order barring mass firings of federal workers during shutdown*, Politico (Oct. 28, 2025), https://www.politico.com/news/2025/10/28/government-shutdown-federal-workers-rifs-ruling-00626042; Tony Romm, *Trump Threatens to Fire 'a Lot' of Federal Workers as Shutdown Looms*, N.Y. Times (Sept. 30, 2025), https://www.nytimes.com/2025/09/30/us/politics/trump-shutdown-layoffs.html.

[41] Raquel Coronell Uribe, *Trump says mass government layoffs will be 'Democrat-oriented'*, NBC News (Oct. 10, 2025), https://www.nbcnews.com/politics/politics-news/live-blog/trump-medical-checkup-government-shutdown-israel-gaza-live-updates-rcna235749.

federal personnel claims, 5 U.S.C § 1204; the Federal Labor Relations Authority ("FLRA"), which adjudicates federal labor relations issues, 5 U.S.C §7104; and the Office of Special Counsel ("OSC"), which protects applicants and federal employees from prohibited personnel practices, 5 U.S.C § 1211. These independent agencies are dedicated to protecting the rights of federal workers. The firings have prevented these agencies from functioning as intended by Congress.[42]

### *The Trump Administration adds the "Loyalty Question" to the civil service application.*

59.    The Administration is also seeking to reshape the federal workforce in its own ideological image. On the first day of his second term, President Trump put in motion the unconstitutional plan at issue in this case. On January 20, 2025, President Trump issued an executive order instructing White House officials and the Director of OPM, within 120 days, to "develop and send to agency heads a Federal Hiring Plan that brings to the Federal workforce only highly skilled Americans dedicated to the furtherance of American ideals, values, and interests." Exec. Order No. 14170, 90 Fed. Reg. 8621 (Jan. 30, 2025). The stated purpose of EO 14170 is to "mak[e] our recruitment and hiring processes more efficient and focused on serving the Nation."

60.    On May 29, 2025, OPM and the White House responded by issuing the MHP, which instructed the heads and acting heads of all departments and agencies on new hiring

---

[42] In a recent decision, a district court held that these administrative bodies are so nonfunctioning that they cannot fulfill their statutory mission of deciding challenges to personnel actions. *See AFGE v. U.S. Office of Pers. Mgmt.*, No. 3:25-cv-01780-WHA, Dkt. No. 261 (N.D. Cal. Sept. 12, 2025). The district court order noted that the government has repeatedly argued that each of these boards are "constitutionally defective," rendering any government argument that these boards should hear personnel actions "disingenuous." *See also* Eric Katz, *Court allows Trump to fire appeals board member, which could 'trap in legal limbo' feds fighting terminations and RIFS*, Gov't Exec. (Mar. 28, 2025), https://www.govexec.com/workforce/2025/03/court-allows-trump-fire-appeals-board-member-which-could-trap-legal-limbo-feds-fighting-firings-and-rifs/404147/.

requirements in the federal workforce. U.S. OFFICE OF PERSONNEL MGMT., *Merit Hiring Plan*, https://www.opm.gov/chcoc/transmittals/2025/Merit%20Hiring%20Plan%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%20FINAL.pdf (last visited Sept. 12, 2025), attached as **Exhibit A**.

61.    Among other provisions, the MHP directs that "all Federal job vacancy announcements graded as GS-05 or above ***will include*** four short, free-response essay questions." *Id.* at 9 (emphasis added). The third of these essay questions, the Loyalty Question, asks applicants to answer:

> 3. How would you help advance ***the President's Executive Orders and policy priorities*** in this role? Identify one or two relevant Executive Orders or policy initiatives ***that are significant to you***, and explain how you would ***help implement them*** if hired.

*Id.* at 9–10 (emphasis added).

62.    The MHP has clear and immediate consequences. It requires that, beginning on June 30, 2025 and continuing monthly, agencies must submit a report to OPM and OMB on the progress of the implementation of the hiring plan, which includes adding the Loyalty Question to job postings, within each agency. *Id.* at 11–12. OPM's federal dashboard tracks each agency's compliance with the MHP. *Id.* at 12.

63.    The MHP also requires that "agency leadership, or their designees, will be involved throughout the full hiring process," thereby ensuring that politically appointed agency leaders will review applications, including essay responses, and approve hiring decisions. *Id.* at 9.[43]

---

[43] A July 7, 2025, presidential memorandum clarifies that all career hires must ultimately be approved by political appointees, who must notify OPM in every instance: "hires that have been approved in writing by the executive department or independent establishment head, the executive department or independent establishment chief of staff, or an officer appointed by the President may proceed one business day after such official has transmitted a copy of such approval to OPM." Memorandum on Ensuring Accountability and Prioritizing Public Safety in Federal Hiring, 2025 Daily Comp. Pres. Doc. 753 (July 7, 2025), https://www.whitehouse.gov/presidential-actions/2025/07/ensuring-accountability-and-prioritizing-public-safety-in-federal-hiring/.

***Defendants offer updated MHP Guidance, which only compounds the illegality of the Loyalty Question.***

64.     On June 11, 2025, Public Employees for Environmental Responsibility ("PEER")[44] sent a letter to the Acting Special Counsel for OSC, requesting an advisory opinion on the Loyalty Question.[45] The PEER letter explained that the Loyalty Question appeared to be "blatant[ly]" illegal because it constituted a prohibited personnel practice by discriminating in hiring on the basis of political affiliation and other factors unrelated to performance, in violation of 5 U.S.C. §§ 2302(b)(1) and (b)(10), and is contrary to the merit system principles, in violation of 5 U.S.C. § 2302(b)(12). "The principal point of the civil service system," PEER wrote, "is to have a workforce insulated from political influences, which can serve presidents of different parties with different priorities equally well. The [OPM] Hiring Plan obviously undermines this foundation of a non-partisan civil service." PEER urged OSC to issue a formal advisory opinion that OPM should withdraw and rewrite the Hiring Plan to conform to the requirements and principles of the CSRA.

65.     On June 30, 2025, OSC, under the leadership of an acting Special Counsel who replaced the Senate-confirmed Special Counsel fired by President Trump, responded to PEER's request, asserting that the MHP did not constitute a prohibited personnel practice under the CSRA.[46] OSC's response relied on guidance OPM issued on June 23, 2025—after PEER had submitted its letter—entitled "Additional Merit Hiring Plan Guidance on Using the Four Short

---

[44] PEER is an organization that "supports current and former public employees who seek a higher standard of environmental ethics and scientific integrity within agencies." PEER, *About PEER*, https://peer.org/about-us/.

[45] Letter from Timothy Whitehouse, PEER Executive Director, to Jamieson Greer, Acting Special Counsel (June 11, 2025), https://peer.org/wp-content/uploads/2025/06/6_11_25-OSC-Advisory-Request-Final.pdf.

[46] Letter from Charles Baldis to Timothy Whitehouse (June 30, 2025), https://osc.gov/Documents/Public%20Files/Press%20Release/OSC%20Response%20to%2006.11.2025%20PEER%20Letter.pdf.

Essay Questions" ("MHP Guidance"), attached as **Exhibit B**. OSC—operating under new political leadership—wrongly claimed that this subsequent guidance resolved the legal concerns with the MHP.

66.    The MHP Guidance reaffirms that "[a]ll Federal competitive service job vacancy announcements graded at GS-05 or above *will* include" the four essay questions, though it exempts "teachers, Wage Grade employees, and seasonal workers." The guidance also purports to clarify that answers to the essay questions "are not scored or rated" and "must not be used to impose an ideological litmus test on candidates. If an applicant does not answer the questions along with their application, they will not be disqualified or screened out." This clarification is cold comfort because, of course, there are many ways in which such answers can be used against a candidate that are short of an "ideological litmus test," immediate disqualification, or screen-out, and the guidance provides no indication as to how answers will be used or scored. Moreover, and as directed by the guidance, the instructions accompanying the essay questions, which states, "we encourage you to thoughtfully address each question," suggests that the content of the response will be relevant to the applicant's job prospects.

67.    The MHP Guidance further states that "answers to the four essay questions will be reviewed only by the hiring manager and agency leadership (or a designee), as part of an application packet forwarded to the manager and later to agency leadership if the candidate is recommended for selection." In other words, the administration's political appointees will be able, and indeed are required, to make final hiring decisions—after having reviewed Loyalty Question responses or non-responses. The message is clear: if applicants do not answer the question, or do not submit a response expressing political views that align with the administration, political appointees will see and review that response or non-response before making a final hiring decision.

68.     Indeed, OPM's communication to agencies belies the assertion that answering the Loyalty Question is optional. In an August 14, 2025 training session led by Roseanna Ciarlante, the Director of OPM's Hiring Experience Group, Ms. Ciarlante reiterated that hiring managers and agency leaders (i.e., political appointees) will review the essay responses when "finalizing selections" stating, "[T]his is a very specific priority for this administration to have this information, prior to making a final offer to a candidate."[47] She emphasized that answers to the Loyalty Question are "additional information that we want the hiring manager to consider as part of the selection process, and for the agency leader or designee [to consider] when they're signing off."[48] Ms. Ciarlante elaborated that under the MHP, "agency leadership or their designees really sign off on any selectees. This is . . . different from how agencies have functioned in the past, but this is a very key component of the [MHP] . . . We'll be looking to monitor that—let's just put it that way."[49] This top-down directive from OPM makes clear that applicants' answers to the Loyalty Question can and must be considered by political appointees and hiring managers before extending an offer.

69.     And under the terms of the MHP and MHP Guidance, the Loyalty Question is the consummate black box. Because responses are not scored or rated, there is no mechanism to monitor how applicants' answers to these questions are factored into hiring decisions. That ambiguity insulates political appointees from accountability for unconstitutionally politicizing the career employee hiring process. There is no conceivable purpose for this question except to compel

---

[47] U.S. Office of Pers. Mgmt., *Merit Hiring Learning Series: Merit Hiring Plan Overview & Guidance*, YOUTUBE (Aug. 14, 2025), https://www.youtube.com/watch?v=b6CAij6HU5k.
[48] *Id.*
[49] *Id.* Although the MHP permits agencies to exclude certain positions from the Loyalty Question, Ms. Ciarlante "highly recommend[ed]" that agencies include a reason for this exemption in the case file because they would be asked about the exemption "on audit." *Id.*

political speech and consider political affiliation in hiring and to penalize those who do not answer or who answer in a way that is inconsistent with the Trump Administration's political agenda.

### *The Loyalty Question appears on job applications nationwide.*

70.     To date, the Loyalty Question has appeared on over 5,800 federal job postings and continues to appear on more each day. *See* "'Merit Hiring Plan' Essay Tracker," https://usajobsloyaltytests.netlify.app/ (documenting the number of federal job vacancy postings that include the Loyalty Question).[50]

71.     There appears to be no rhyme or reason to which job listings include the Loyalty Question. As is true for every civil service position, all of the affected job postings are positions for which an applicant's views on one of the President's Executive Orders or policy initiatives are wholly irrelevant to their qualifications for the job.

72.     For example, the Loyalty Question is part of the application for an open position to become an Electrical Engineering Patent Examiner with the Department of Commerce in Arlington, VA.[51] The duties include examining patent applications and prior art to determine if inventions meet patentability standards.[52]

73.     The Loyalty Question is also included on a posting for Agricultural Commodity Graders in Gadsden, Alabama and Stuart, Iowa.[53] An Agricultural Commodity Grader is

---

[50] This Tracker does not purport to capture all federal job postings that include the Loyalty Question; this number is a floor, not a ceiling.

[51] Patent Examiner (Electrical Engineering), Patent & Trademark Office, https://apply.usastaffing.gov/ViewQuestionnaire/12752337 (last visited Oct. 3, 2025).

[52] Patent Examiner (Electrical Engineering), USA Jobs, https://www.usajobs.gov/job/839346700 (last visited Oct. 3, 2025).

[53] Agricultural Commodity Grader, Dep't of Agric., https://apply.usastaffing.gov/ViewQuestionnaire/12766304 (last visited Oct. 3, 2025).

responsible for grading poultry products and eggs, for example, by examining "product to determine adherence with contracts, such as grade, weight, packing and quantity."[54]

74.    The Loyalty Question is also included in the job listing for a Botanist in Washington, D.C. for the Animal and Plant Health Inspection Service.[55] The responsibilities of this job include identifying weed seeds, analyzing pest risk, curating herbaria, and collaborating with scientists, health regulators and others, worldwide.[56]

75.    In a recent and particularly troubling development, the Department of Education is including the Loyalty Question on job postings that are open only because of recent mandatory reductions in force (i.e., mass layoffs). In other words, after firing hundreds of Department of Education employees, the agency simply re-posted the same jobs, now with the requirement to answer the Loyalty Question.[57] In order to even attempt to recover their old jobs, civil servants must subject themselves to the Loyalty Question, regardless of their political beliefs, or remain out of work.

76.    The Loyalty Question has even appeared on applications for federal blue-collar jobs outside the GS-scale, many of which are critical to *preserving public safety*. For example, the Loyalty Question has appeared on a posting for a Department of Transportation Crane Operator in Benicia, California, a job that involves accurately and safely operating cranes with telescoping and

---

[54] Agricultural Commodity Grader, USA Jobs, https://www.usajobs.gov/job/840957400 (last visited Oct. 3, 2025).

[55] Botanist, Dep't of Agriculture, USA Jobs, https://apply.usastaffing.gov/ViewQuestionnaire/12757542 (last visited Oct. 3, 2025).

[56] Botanist, USA Jobs, https://www.usajobs.gov/job/839967400 (last visited Oct. 3, 2025).

[57] *See, e.g.*, Education Research Analyst, USA Jobs, https://www.usajobs.gov/job/844948000 (last visited Oct. 15, 2025).

lattice booms to load, unload, move and position heavy material and equipment.[58] Similarly, the Loyalty Question has appeared on postings for Power Plant Shift Operator,[59] Nuclear Materials Courier,[60] and Aircraft Mechanic.[61] And it has appeared on *over 200* job listings for wildland firefighters,[62] wildland firefighting fuel managers,[63] wildland firefighter dispatchers,[64] wildland firefighting aviation positions,[65] all of which are jobs related to preventing and addressing wildfires on federal lands. Filling these public-safety jobs, like all civil service jobs, should not depend on the applicants' political expression and affiliation.

77.     These postings are just examples of the thousands of job postings for nonpartisan, apolitical civil service jobs on which the Loyalty Question is now appearing. Attached as **Exhibit C** hereto is a list of all federal positions, including their department and pay grade, known to have included the Loyalty Question through November 4, 2025.

---

[58] Crane Operator, USA Jobs, https://www.usajobs.gov/job/840423200 (last visited Oct. 3, 2025).

[59] Power Plant Shift Operator, USA Jobs, https://www.usajobs.gov/job/847343700 (last visited Oct. 3, 2025).

[60] Nuclear Materials Courier, USA Jobs, https://www.usajobs.gov/job/846951800 (last visited Oct. 3, 2025).

[61] Aircraft Mechanic, USA Jobs, https://www.usajobs.gov/job/846559700 (last visited Oct. 3, 2025).

[62] Supervisory Wildland Firefighter – Helitack, USA Jobs, https://www.usajobs.gov/job/844014700 (last visited Oct. 3, 2025).

[63] Wildland Firefighter (Fuels Management), USA Jobs, https://www.usajobs.gov/job/844334600 (last visited Oct. 3, 2025).

[64] Forestry Technician - Dispatch GACC Logistics (Wildland Firefighter), USA Jobs, https://www.usajobs.gov/job/844014900 (last visited Oct. 3, 2025).

[65] Wildland Firefighter – Aviation (ATGS), USA Jobs, https://www.usajobs.gov/job/844042900 (last visited Oct. 3, 2025).

78.     Although some of these specific positions may be filled by the time relief is granted, the injuries here are capable of repetition and indeed are being replicated and rolled out across roles in the government, as new positions with the Loyalty Question are posted daily.

79.     The use of the Loyalty Question will only increase. In September, OPM released additional MHP guidance in the form of a series of Questions and Answers, attached as **Exhibit D**. One question asked, "Do the four short essay questions [one of which is the Loyalty Question] have to be included in every job opportunity announcement?" The response: "The four short essay questions…must be used on all competitive service job opportunity announcements open to the public graded at GS-05 or above, except for job announcements for teacher, Wage Grade, and seasonal positions."

80.     Another question asked, "Are all agencies, to include small and independent agencies, covered by the Merit Hiring Plan?" The response: "Yes. All agencies, including independent agencies, are required to comply with the requirements and implementation of the Merit Hiring Plan."

81.     And yet another question asked, "How soon do the requirements of the Merit Hiring Plan . . . have to be implemented?" The response: "Agencies should begin implementing the requirements of the Merit Hiring Plan immediately and follow any guidance issued by OPM on these features. Specifically, agencies should immediately . . . [u]se the four short essay questions."

82.     OPM's September guidance affirms what is already clear: agencies must include the Loyalty Question in federal job postings—as they indeed are already doing.

83.     Moreover, the recent government lapse in appropriations has not stalled the use of the Loyalty Question. Since October 1, 2025, the date the lapse began, *over 1,900* federal job postings have gone up that include the Loyalty Question. *See* Exhibit C at 53-79. This is more

federal job postings with the Loyalty Question in October 2025, after the lapse, than in August 2025, prior to the lapse. *Id.* at 8-23.

84.     In case there was any doubt that the Administration remains committed to moving full steam ahead with the Loyalty Question, the President recently confirmed this in an Executive Order. On October 20, 2025, President Trump issued *Ensuring Continued Accountability in Federal Hiring*. Exec. Order No. 14356, 90 Fed. Reg. 48387 (Oct. 20, 2025). The Executive Order directs that "[a]ny Federal hiring shall be consistent with the Merit Hiring Plan," and it directs "each agency head [to] establish a Strategic Hiring Committee to approve the creation or filling, as applicable, of each vacancy within their agency." This Committee "shall include the deputy agency head and the chief of staff to the agency head, along with such other senior officials as the agency head may designate."

85.     A few weeks later, on November 5, 2025, OMB and OPM issued guidance on this Executive Order to all agency heads, attached as **Exhibit E**. The guidance doubles down on the role of senior political leadership in agency hiring decisions. "Federal hiring must comply with the Merit Hiring Plan . . . . Agency leadership should also function as a hiring committee in the candidate selection process." *Id.* at 1 (cleaned up). The Strategic Hiring Committee—consisting of agency deputy secretaries, chiefs of staff, and other senior leadership—"must ensure that agency hiring is consistent with the national interest, agency needs, and administration priorities." *Id.* at 2. It "should not ministerially ratify or routinely defer to the recommendations of others in reviewing and approving new hires, but should instead use its independent judgment." *Id.*

86.     The directive is clear: the Loyalty Question must appear on civil service job applications, the highest levels of political leadership will review applicants' responses, and the highest levels of political leadership will independently review all hiring decisions.

***The Loyalty Question imposes unconstitutional conditions on government employment, compels speech, chills speech by deterring non-loyalists from applying, and allows agencies to exercise viewpoint discrimination to weed them out if they do.***

87.    The Loyalty Question is a thinly veiled test of an applicant's political views and allegiances. This Administration's executive orders and policy initiatives are highly politicized: among other things, they have attempted to repeal birthright citizenship, end public media funding, target lawyers who oppose or have opposed the administration, impound Congressionally appropriated funds, shut down federal agencies, eliminate collective bargaining rights for union workers, and purge the government of thousands of career employees. In asking civil service job applicants to identify some of *this President's* Executive Orders and policy initiatives that are "significant to you" and asking how the applicant will advance them, the Loyalty Question compels applicants to speak out on highly politicized issues; conform their viewpoints to what the Administration wants to hear, in order to improve employment prospects; speak their minds at the risk of retaliation; or remain silent, at the risk of missing out on job opportunities. None of those outcomes is acceptable under the U.S. Constitution. The Loyalty Question violates the First Amendment in at least four ways.

88.    First, the Loyalty Question improperly conditions federal employment on espousal of policy viewpoints favorable to President Trump, creating an illegal and unconstitutional system of political patronage. The First Amendment protects career civil servants from discriminatory personnel actions—including discriminatory hiring decisions—on the basis of political affiliation or political belief, and on the basis of *perceived* political affiliation and belief. The MHP advances precisely this type of prohibited discrimination: through the Loyalty Question, the MHP brings an applicant's actual or perceived political views, beliefs, and allegiances into the hiring process and allows agency heads and hiring personnel to consider these views in coming to a decision on hiring.

In short, the Loyalty Question imposes an unconstitutional condition on federal employment by essentially establishing a system of political patronage.

89.    Second, the Loyalty Question compels speech. The Government may not constructively require or coerce civil service applicants to voice protected political views and beliefs. By asking applicants to explain how they would "help advance *the President's* Executive Orders" and policy initiatives and explain how these Executive Orders and policy initiatives are "*significant to you*," the Loyalty Question compels applicants' protected speech on their political beliefs. For applicants who disagree with the administration's executive orders but reasonably feel they need to offer an answer for their application to be competitive, the Loyalty Question compels them to speak a particular message and alter the content of their speech. For those applicants who are agnostic or neutral as to partisan politics, they are still constructively required to voice support for a particular political administration's orders and agenda. And for others who simply do not wish to speak on political topics, the Loyalty Question nonetheless compels them to engage in protected speech, all in contravention of the First Amendment.

90.    Third, the Loyalty Question chills the speech of civil service applicants who would like to apply for federal positions but fear they will be disqualified or suffer adverse employment consequences if they answer the Loyalty Question in a manner consistent with their true beliefs. These civil service applicants, including Plaintiffs' members, are chilled from speaking honestly, or chilled from speaking at all because they refuse to profess support for the administration or otherwise express their political thoughts and beliefs. Other members are deterred from applying for these jobs entirely because they fear their application and current federal employment would be threatened were they to speak their mind. The results are the same: Plaintiffs' members' speech is chilled, and they are forced to forego jobs for which they are otherwise qualified.

91.    Fourth, the MHP's Loyalty Question encourages and facilitates unconstitutional viewpoint discrimination. The Loyalty Question allows the Trump Administration to identify political loyalists (real or professed) and weed out candidates who disagree with the current President or are simply unwilling to state their political views, and then reward the most avid supporters with federal civil service jobs. And it provides no standard for evaluating answers, giving government officials unfettered discretion in deciding how to use an applicant's personal political beliefs to disqualify them from a position. This is necessarily a subjective judgment and will be applied arbitrarily, as managers decide whether an applicant's answer is sufficiently complimentary to the President, and the supervisors themselves work to comply with the President's demands of loyalty. That was the purpose and intent of the Loyalty Question: it is a proxy for a political viewpoint test and facilitates viewpoint discrimination.

92.    Importantly too, the Loyalty Question by its terms elicits pro-Trump responses, *regardless* of an applicant's views on the President or his policies, *regardless* of whether an applicant is a political supporter of the President, *regardless* of whether an applicant has a prior opinion or belief on the question, and *regardless* of whether an applicant wishes to express that opinion or belief when applying for a civil service position. In doing so, the Loyalty Question disadvantages and turns away not only applicants who do not support the President's agenda, but also those who simply have no opinion about the President's policies or their "significance" or who prefer not to share whatever political views they may hold.

93.    Indeed, *even if* the intent behind the Loyalty Question were unrelated to political loyalty, the Loyalty Question remains problematic and illegal because job applicants reasonably believe that their answers to the Loyalty Question will affect their hiring prospects. Otherwise, *there would be no point in including the question in a job posting*.

94.    Therefore, potential job applicants, including Plaintiffs' members, who disagree with the current administration, who have no view on the administration, or who simply wish to avoid disclosing their personal political beliefs to the government, are forced to make a decision: proclaim support for President Trump's policies, or refuse to do so, submit an incomplete application, and take the risk that they will harm their employment prospects.

### *Plaintiffs' members are harmed by the Loyalty Question.*

95.    Plaintiffs' members are harmed in multiple ways by the insertion of the Loyalty Question into federal job applications.

96.    Plaintiffs' members are compelled to speak when they apply for jobs where the Loyalty Question is part of the application, because they are compelled to voice a political stance to be considered for a federal job for which they are otherwise qualified.

97.    For example, Federal Worker 1, an AFGE member who previously worked as a statistician with the Department of Education, lost her job due to a Reduction in Force earlier this year. She recently saw a job posting for a substantially identical position and applied. She felt compelled to answer the Loyalty Question because she reasonably believed that failing to do so, and submitting an incomplete application, would harm her prospects. She reviewed all 198 Executive Orders that had been issued by President Trump at the time of her application. She did not think any were relevant to the position to which she was applying, but she identified one related to charter schools and school choice that she believed she could write about in a way that the Administration would find acceptable. She does not, however, support the policy the Executive Order advances, so she felt like she could not express her full opinion about the Executive Order and had to limit her answer to only parts of the Executive Order that she could write about in a manner that was likely to curry favor.

98.     Likewise, Federal Worker 4, an AFGE member who is employed in the Department of Veterans' Affairs, has been applying to new federal jobs to move closer to family. She felt compelled to answer the Loyalty Question, and thus speak on political issues, to enhance her chances of employment. She combed through Executive Orders issued by the current Administration—almost all of which she strongly opposed—until she could find one that she could at least partially express a favorable opinion toward. She feared that if she did not answer the question with a response favorable to the current Administration, she would not get a job.

99.     Plaintiffs' members are chilled from speaking and deterred from applying to federal jobs for which they are otherwise qualified and which they would like to hold.

100.    For example, Federal Worker 3 is a NAGE member who works at the Department of Veterans Affairs. Although he enjoys his job, prior to the introduction of the Loyalty Question, he had applied to many federal positions in hopes of higher pay and greater job stability. When Federal Worker 3 first saw the Loyalty Question in a job posting, he was taken aback. He believes the Loyalty Question is a violation of his free speech rights and American values, and he did not want to share his political views in a job application. The Loyalty Question deterred Federal Worker 3 from applying for several jobs he believes he was qualified for and that he otherwise would have applied for. Federal Worker 3 has continued to see the Loyalty Question appear on more federal job postings by the day. Out of desperation, he submitted an application for a position at the Department of Defense that included the Loyalty Question. He answered by stating that the question was optional, but that answer has left him feeling uneasy. By not identifying one of the President's Executive Order or policies, Federal Worker 3 believes that his lack of a response will be held against him because the government is looking for candidates who will express loyalty to President Trump.

101.    Federal Worker 2, a veteran and AFGE member, is currently employed at the Department of Education. She loves her job, but knows that she needs to find a new one because the Trump Administration is attempting to dismantle the Department of Education. She enjoys working for the federal government, has a great deal of experience with federal government functions, and has a strong sense of civic duty. But she has not applied to any federal government positions because she believes the Loyalty Question violates American principles—principles she fought for as a veteran—and is therefore unwilling to answer it.

102.    The Loyalty Question violates the First Amendment rights of each of these individuals and similarly-situated members of Plaintiff Unions. For some, it compels their speech by effectively requiring them to disclose thoughts and beliefs on political topics and coercing them into voicing support for President Trump's political agenda. For others, it chills their speech because they cannot answer the question honestly and therefore are deterred from applying. And for all, it exposes them to viewpoint discrimination and places an unconstitutional condition on federal employment, because their professed political beliefs and loyalties are made part of the civil service hiring process.

### *The MHP is a final agency action that is arbitrary and capricious.*

103.    The MHP and MHP Guidance constitute final agency action. Together they represent the culmination of decision-making by OPM and the White House Domestic Policy Council, as instructed by Executive Order 14,170. The MHP and MHP Guidance direct agencies to include the Loyalty Question on federal job applications. And that is exactly what has happened: the Loyalty Question is already on thousands of job applications and appears on more each day.

104.    The MHP and MHP Guidance determine the rights and obligations of hiring agencies to add the Loyalty Question to job applications and of hiring managers and political

agency leaders to assess the responses to the Loyalty Question in making hiring decisions and they are doing so.

105.    The MHP and MHP Guidance also determine the employment and economic rights of federal job applicants, including Plaintiffs' members, who are forced to decide whether to answer the question, leave it blank and risk not being hired, or simply not apply to a job at all to avoid being coerced into political speech. The MHP and MHP Guidance have clear legal consequences and are currently impacting the lives, decisions, and First Amendment and statutory rights of federal job applicants, including Plaintiffs' members. In particular, the First Amendment rights of federal job applicants, including Plaintiffs' members, are violated by the mere inclusion of the Loyalty Question on applications, regardless of how the answers are ultimately used by any particular agency.

106.    There is no other adequate remedy available in court that would preclude review of the MHP and MHP Guidance under the APA.

107.     The Loyalty Question is arbitrary and capricious many times over, both because it is substantively unreasonable and because it is not reasonably explained.

108.    First, it makes an applicant's personal political views part of the civil service hiring process. Not only is this a factor that Congress did not intend OPM to consider in the federal hiring process, but it is in fact *the opposite* of what Congress has legislated regarding federal employment and information collection generally.

109.    Second, the Loyalty Question not only enables, but requires, agencies to consider information that is entirely irrelevant for civil service jobs. A civil servant's duty is to follow lawful orders, regardless of their personal political views, so a civil servant's personal views of an EO or policy initiative are categorically irrelevant. Moreover, the vast majority of federal jobs—

including those on which the Loyalty Question appears—have nothing to do in practice with implementing the President's EOs or signature policy initiatives. Applicants' personal knowledge of or commitment to the President's EOs or policy initiatives simply has no bearing on the job to which they are applying.

110.    Third, there is no rhyme or reason as to which job postings include the Loyalty Question. For example, on October 2, 2025, the Department of Defense posted a job opening for a GS-7 Uniform Business Technician in the Naval Medical Center in Portsmouth, Virginia, that includes the Loyalty Question. That same day, the Department of Defense posted a different job opening for a GS-13 Supervisory Customer Relationship Specialist in Seal Beach, California, *without* the Loyalty Question. This is the very definition of arbitrary—and there are hundreds of analogous examples.

111.    Fourth, the MHP and MHP Guidance fail to offer a reasoned explanation—and in fact offer conflicting explanations—for the consequences to a candidate who fails to answer the Loyalty Question. On the one hand, the guidance instructs that "if an applicant does not answer the questions along with their application, they will not be disqualified or screened out." But on the other hand, applicants are told that they are "encourage[d]…to thoughtfully address each question" and that responses will be reviewed "by the hiring manager and agency leadership." Applicants—including Plaintiffs' members—reasonably feel compelled to provide responses so as to have a complete and competitive application.

112.    Fifth, and relatedly, the MHP and MHP Guidance fail to offer a reasoned explanation—and again in fact offer conflicting explanations—as to how answers to the Loyalty Question will be used in the hiring process. The guidance claims that responses "will not be scored or rated." But the responses will go to agency leadership, and the MHP indeed requires agency

leadership to "function as a hiring committee in the candidate selection process," to "approve the selectee's candidate packets"—including "answers to application questions"—before "offers being extended," and to "conduct a final 'executive interview' to confirm organizational fit and commitment to American ideals." So, how then will responses to the Loyalty Question be used by agency leadership? OPM never says. But the Loyalty Question must have some purpose; otherwise, why include it at all?

113.    Sixth, this lack of explanation, clarity, and transparency all but assures that applicants will be subjected to arbitrary treatment because their responses will be used differently by different agencies and even within agencies, depending on the whims of the hiring manager and political leadership.

114.    Seventh, Defendants have failed to explain the utility of the Loyalty Question in the hiring process—and no valid basis for the question exists. If it will be used as a political litmus test, it is unlawful; if it will be used for any other purpose, it is unnecessary and irrelevant. The MHP Guidance tells agencies that the Loyalty Question "must not be used to impose an ideological litmus test on candidates." But the Trump Administration has been clear about its plan to fill the civil service with loyalists and to break down the nonpartisan civil service. Plaintiffs' members understand the purpose of the Loyalty Question to be a test of political allegiance to President Trump. And if it is not, there is no evident purpose it could serve.

115.    Eighth, OPM failed to consider how the Loyalty Question violates applicants' First Amendment and privacy rights by compelling them to speak on and share their political views.

116.    Ninth, OPM failed to explain, much less justify, why it has departed from decades of prior policy and practice of *not* inquiring into applicants' personal political views in hiring for

the career federal civil service, a policy and practice of merit-based hiring on which the public—including Plaintiffs and their members—have relied.

117.    Tenth, and finally, OPM failed to consider how including the Loyalty Question would harm the government's ability to attract, recruit, and retain well-qualified candidates. And, most importantly, OPM failed to consider how the Loyalty Question would harm the American public from the degradation of a professional, nonpartisan, merit-based civil service.

**The MHP and its implementation are final agency actions that are contrary to the Privacy Act.**

118.    The MHP and its implementation by OPM and other agencies also violate federal privacy laws designed to protect individuals from federal agency attempts to collect personal information that is unnecessary, irrelevant, and chills First Amendment activity.

119.    In particular, the Privacy Act of 1974 regulates the federal government's handling of personal information, including its collection, maintenance, use, and dissemination. *See Doe v. Chao*, 540 U.S. 614, 618 (2004). The Privacy Act ensures that personal information about individuals collected by the government, such as in federal job applications, "is limited to that which is legally authorized and necessary" and "is maintained in a manner which precludes unwarranted intrusions upon individual privacy" and "the exercise of First Amendment rights."[66]

120.    As relevant here, the Privacy Act directs a covered agency to "maintain in its records *only* such information about an individual as is *relevant and necessary* to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President," 5 U.S.C. § 552a(e)(1) (emphasis added), and to "maintain *no* record describing how any individual *exercises rights guaranteed by the First Amendment* unless expressly authorized by

---

[66] OMB Guidelines, *supra* n.1; 5 U.S.C. § 552a(v).

statute or by the individual about whom the record is maintained or unless pertinent to and within

the scope of an authorized law enforcement activity," *id.* § 552a(e)(7) (emphasis added). These

restrictions apply broadly to the government's handling of protected information, including to its

collection, maintenance, use, and dissemination. *Id.* § 552a(a)(3) (defining "maintain" to

"include[] maintain, collect, use, or disseminate").

121.    These restrictions apply to Defendants in their operation and use of USAJOBS, the

official employment site of the federal government that connects job seekers with federal job

opportunities and is a platform for the federal government's recruitment and hiring processes for

all government positions.[67] USAJOBS is housed within Defendant OPM and used by federal

agencies hiring for federal positions.[68] Individual job seekers also use the site, including to find

and apply for federal employment opportunities containing the Loyalty Question.

122.    USAJOBS "collect[s], maintain[s] and disseminate[s] personally identifiable

information about job applicants."[69] The information collected on USAJOBS is used for federal

hiring processes and can also be put to other "routine uses," including "releasing information to"

a wide range of federal, state, and local government agencies and actors for a variety of purposes.[70]

123.    If individuals, including Plaintiffs and their members, submit job applications

through USAJOBS, those job applications and their contents become "record[s]" and part of a

"system of records." 5 U.S.C. §§ 552a(a)(2), (a)(5).

---

[67] OPM, *About USAJOBS*, https://help.usajobs.gov/about (last visited Sept. 22, 2025); OPM, *Privacy Impact Assessment for USAJOBS*, USAJOBS (July 15, 2015) ("OPM PIA"), *available at* https://www.opm.gov/information-management/privacy-policy/privacy-policy/usajobs.pdf.

[68] *Id.* at 1; USA Jobs, https://www.usajobs.gov/ (last visited Oct. 6, 2025).

[69] OPM PIA, *supra* n.67, at 1.

[70] OPM, *Privacy Policy*, https://help.usajobs.gov/privacy (last visited Oct. 6, 2025).

124.    The Loyalty Question seeks information about job applicants that is not "relevant and necessary" to any purpose "required" by any statute or executive order. On the contrary, as explained at length already, the Loyalty Question seeks information about job applicants that is *irrelevant* and *unnecessary* to the job in question and is *unlawful* under the First Amendment and federal law. The inclusion of the Loyalty Question in any federal civil service job posting, and the government's collection, maintenance, use, or dissemination of applicants' responses to the Loyalty Question, is contrary to § 552a(e)(1).

125.    The Loyalty Question asks job applicants to communicate their personal views and beliefs about political topics, in a written essay submitted to the government that reflects an applicant's expression and thought about core First Amendment-protected topics. The Loyalty Question and records of responses to it are not expressly authorized by statute or by the individual, nor are they related to law enforcement activity. Thus, the inclusion of the Loyalty Question in any federal civil service job posting, and the government's collection, maintenance, use, or dissemination of applicants' responses to the Loyalty Question, is contrary to § 552a(e)(7).

126.    Defendants are violating 5 U.S.C. § 552a(e)(1) and (e)(7) through several of their actions. By directing federal agencies to include the Loyalty Question in job applications and hiring processes, and therefore to collect, maintain, use, and disseminate information that the Privacy Act prohibits agencies from maintaining, OPM's MHP is final agency action that effectively directs agencies to violate the Privacy Act. Further, the inclusion of the Loyalty Question in job postings on USAJOBS, and the collection, maintenance, use, and dissemination of responses to the Loyalty Question submitted in job applications, are final agency actions by OPM and federal agencies that violate the Privacy Act.

CLAIMS FOR RELIEF

**COUNT ONE**

**Violation of the First Amendment**

**(Against All Defendants)**

127.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

128.    OPM's imposition of the Loyalty Question violates the First Amendment in a number of ways. First, it improperly conditions federal employment on espousal of political viewpoints favorable to President Trump, creating an illegal and unconstitutional system of political patronage. Second, it compels speech pertaining to President Trump's agenda by people who might disagree with this President's agenda, or simply prefer not to share their political views. Third, it chills speech critical of the President's executive orders and agenda. And, fourth, by requiring the Loyalty Question for apolitical jobs, mandating review of the answers by political appointees in the hiring agency and allowing them to utilize answers to the Loyalty Question with unfettered discretion, the MHP enables, and in fact facilitates, viewpoint discrimination.

129.    The Loyalty Question is improper to include in any and all career civil service job applications because it is not related to, much less narrowly tailored to further, any legitimate government interest. It is not related to the performance of the roles being filled, or the tasks and responsibilities of those roles; it does not assess the applicants' merit qualifications; and it does not promote efficiency or effectiveness of government service. There is no conceivable government interest—besides unconstitutional patronage goals—in asking this question.

130.    The use and implementation of the Loyalty Question, and the MHP and MHP Guidance's requirement that agencies use it, violates the First Amendment and has harmed and continues to harm Plaintiffs' members.

## COUNT TWO

### Administrative Procedure Act – Arbitrary and Capricious

### (Against All Defendants)

131.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

132.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

133.    Plaintiffs' members are subject to the legal consequences of the MHP and the Loyalty Question. Plaintiffs' members have suffered legal wrong from and have been adversely affected or aggrieved by Defendants' actions under 5 U.S.C. § 702.

134.    OPM is subject to the APA. 5 U.S.C. § 701.

135.    The United States may be named as a defendant in an action under the APA. 5 U.S.C. § 702.

136.    The MHP and MHP Guidance constitute final agency action under the APA. 5 U.S.C. § 704.

137.    The MHP and Loyalty Question are arbitrary and capricious and an abuse of discretion for a host of reasons.

138.     First, the Loyalty Question inserts into federal hiring a factor—applicants' personal and political views—that Congress has directed shall not be used in federal employment and information collection.

139.     Second, the Loyalty Question not only enables, but requires, agencies to consider information that is wholly irrelevant to civil service jobs.

140.     Third, the Loyalty Question is implemented arbitrarily; there is no rhyme or reason as to which positions are posted with the Loyalty Question.

141.     Fourth, the MHP and MHP Guidance fail to offer a reasoned explanation—and in fact offer conflicting explanations—for the consequences of declining to answer the Loyalty Question.

142.     Fifth, the MHP and MHP Guidance also fail to offer a reasoned explanation—and again offer conflicting explanations—as to how the Loyalty Question will be used in hiring.

143.     Sixth, the lack of clear and consistent explanation for how the Loyalty Question will be used means applicants will be subjected to arbitrary treatment because their responses (or refusal to respond) will be used differently by different agencies and even within agencies.

144.     Seventh, Defendants have failed to explain what purpose the Loyalty Question serves in the hiring process, and no valid use of the question exists.

145.     Eighth, OPM failed to consider how the Loyalty Question violates applicants' First Amendment and privacy rights by subjecting them to a system of political patronage, compelling them to speak on and share their political views, chilling their speech, and subjecting them to viewpoint discrimination.

146.    Ninth, OPM failed to explain or justify why it has departed from decades of prior policy and practice of not inquiring into applicants' personal views in hiring for the career federal service.

147.    Tenth, OPM failed to consider the adverse effect of the Loyalty Question on the government's ability to attract, recruit, and retain well-qualified candidates, and the harm caused to the American people by the loss of professional, nonpartisan, merit-based civil service.

148.    The arbitrary and capricious nature of Defendants' actions has harmed Plaintiffs and their members.

## COUNT THREE

### Administrative Procedure Act – Contrary to Constitutional Right

### (Against All Defendants)

149.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

150.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

151.    For the same reasons that the Loyalty Question violates the First Amendment rights of Plaintiffs' members, *supra* ¶¶ 127–130, the Loyalty Question is contrary to constitutional rights, in violation of the APA.

## COUNT FOUR

**Administrative Procedure Act – Not In Accordance with Law (Privacy Act, 5 U.S.C. §§ 552a(e)(1), (e)(7))**

**(Against All Defendants)**

152.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

153.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

154.    The MHP and the collection, maintenance, use, and/or dissemination of job applicants' responses to the Loyalty Question by OPM and federal agencies, are each "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

155.    The Loyalty Question's inclusion in any federal civil service job posting, and the government's collection, maintenance, use, or dissemination of applicants' responses to the Loyalty Question, are contrary to 5 U.S.C. §§ 552a(e)(1) and (e)(7).

156.    Defendants' actions violate the Privacy Act and are therefore not in accordance with law in violation of the APA.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court:

A.   Declare that the MHP, to the extent it directs the inclusion and use of the Loyalty Question in federal civil service hiring, and agencies' use of the Loyalty Question violates the First Amendment;

B.  Declare that the MHP, to the extent it directs the inclusion and use of the Loyalty Question in federal civil service hiring, and agencies' use of the Loyalty Question violates the Administrative Procedure Act;

C.  Hold unlawful, set aside, vacate, and stay the MHP, to the extent it directs the inclusion and use of the Loyalty Question, under 5 U.S.C. §§ 705 and 706;

D.  Enter a preliminary and permanent injunction prohibiting Defendants and their officers, employees, servants, agents, appointees, and successors from implementing, requiring, or using the Loyalty Question in federal civil service employment; from relying on answers to the Loyalty Question in any manner; and from retaining the contents of applicants' answers to the Loyalty Question;

E.  Award Plaintiffs their costs, reasonable attorneys' fees, and other disbursements as appropriate for this action; and

F.   Grant any other relief this Court deems just and proper.

DATED this 6th day of November, 2025.

By:    */s/ Tsuki Hoshijima*
Tsuki Hoshijima (BBO # 693765)
Elena Goldstein* (NY Bar No. 4210456)
Webb Lyons** (D.C. Bar No. 1035458)
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Telephone: (202) 991 0159
thoshijima@democracyforward.org
egoldstein@democracyforward.org
wlyons@c.democracyforward.org**
***Of Counsel*
*Counsel for Plaintiffs*

Warren A. Braunig* (CA Bar No. 243884)
Sara Fitzpatrick* (CA Bar No. 337360)
Charlotte J. Kamai* (CA Bar No. 344786)
Cara R. Meyer* (CA Bar No. 348877)
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: (415) 391 5400
wbraunig@keker.com
sfitzpatrick@keker.com
ckamai@keker.com
cmeyer@keker.com
*Counsel for Plaintiffs*

Ori Lev* (D.C. Bar No. 452565)
Jacek Pruski* (D.C. Bar No. 888325144)
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Avenue NW Suite #163
Washington, D.C. 20006
Telephone: (202) 579-4582
ori.lev@protectdemocracy.org
jacek.pruski@protectdemocracy.org
*Counsel for Plaintiffs*

Rushab B. Sanghvi* (D.C. Bar No. 1012814)
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street, NW
Washington, DC 20001
Telephone: (202) 639-6426
SanghR@afge.org
*Counsel for Plaintiff American Federation
of Government Employees, AFL-CIO (AFGE)*

Matthew S. Blumin* (D.C. Bar No. 1007008)
AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO
1625 L Street NW, Washington DC, 20036
Telephone: (202) 775-5900
mblumin@afscme.org
*Counsel for Plaintiff American Federation of
State, County, and Municipal Employees,
AFL-CIO (AFSCME)*

Sarah Suszczyk* (MD Bar No. 0512150240)
NATIONAL ASSOCIATION OF
GOVERNMENT EMPLOYEES, INC.
159 Burgin Parkway
Quincy, MA 01269
Facsimile:(617) 376-0285
Ssuszczyk@nage.org
*Counsel for Plaintiff National Association of
Government Employees, Inc. (NAGE)*

*pro hac vice forthcoming*