## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, and NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> SCOTT KUPOR, in his official capacity as Director of the Office of Personnel Management, OFFICE OF PERSONNEL MANAGEMENT, and THE UNITED STATES OF AMERICA, <br><br> Defendants. | Case No.  1:25-cv-13305-GAO |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR STAY UNDER 5 U.S.C. § 705 AND FOR PRELIMINARY INJUNCTION

3117700

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................1

II.    BACKGROUND ........................................................................................................4

    A.     For 150 Years, Congress Has Strengthened and Affirmed a Nonpartisan, Merit-Based Civil Service........................................................................................4

    B.     The Merit Hiring Plan's Loyalty Question Undermines the Merit-Based Civil Service System.................................................................................................5

    C.     The Loyalty Question Harms Plaintiffs and Their Members.................................9

III.   ARGUMENT ...........................................................................................................12

    A.     Plaintiffs are Likely to Succeed on the Merits......................................................12

        1.     The Loyalty Question Violates the First Amendment. .............................12

            a.     The Loyalty Question Unconstitutionally Conditions Federal Employment on Political Patronage...................................13

            b.     The Loyalty Question Promotes and Enables Unconstitutional Viewpoint Discrimination. .................................16

            c.     The Loyalty Question Unconstitutionally Compels Speech..........18

             d.     The Loyalty Question Chills Speech. ...........................................20

            e.     The Loyalty Question Fails Strict or Exacting Scrutiny...............21

        2.     The MHP and the MHP Guidance Violate the Administrative Procedure Act.............................................................................................22

            a.     The MHP and MHP Guidance Together Are Final Agency Action...............................................................................................22

            b.     Use of the Loyalty Question is Arbitrary and Capricious.............23

            c.     The Loyalty Question is Contrary to Constitutional Right...........26

    B.     Plaintiffs Face Irreparable Harm Absent Injunctive Relief. .................................27

    C.     The Balance of Equities and the Public Interest Favor a Preliminary Injunction. ..............................................................................................................28

D.      This Court Has Jurisdiction Over Plaintiffs' First Amendment and APA
        Claims. ...........................................................................................................28

E.      A Stay and Preliminary Injunction Are Necessary and Appropriate
        Remedies..........................................................................................................33

IV.     CONCLUSION...........................................................................................................35

3117700

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023)............................................................................................18

*AFGE v. Trump*,
2025 WL 1482511 (N.D. Cal. May 22, 2025), *aff'd*, 2025 WL 1541714 (9th
Cir. May 30, 2025)..............................................................................................29

*AFGE v. U.S. Off. of Pers. Mgmt.*,
2025 WL 900057 (N.D. Cal. Mar. 24, 2025).....................................................29

*AFGE v. U.S. Off. of Pers. Mgmt.*,
No. C 25-01780 WHA, 2025 WL 2633791 (N.D. Cal. Sept. 12, 2025)....................... *passim*

*AFSCME v. U.S. Off. of Mgmt. & Budget*,
No. 25-CV-08302-SI, 2025 WL 3018250 (N.D. Cal. Oct. 28, 2025)......................................6

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013)..............................................................................19, 31, 34

*Akebia Therapeutics, Inc. v. Azar*,
976 F.3d 86 (1st Cir. 2020)................................................................................12

*Am. Ass'n of Univ. Professors v. Rubio*,
2025 WL 2777659 (D. Mass. Sept. 30, 2025) ...................................................17

*Am. Ass'n of Univ. Professors v. Rubio*,
780 F. Supp. 3d 350 (D. Mass. 2025) ................................................................20

*Am. Fed'n of Gov't Emps. v. Trump*,
139 F.4th 1020 (9th Cir. 2025) ....................................................................29, 33

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021)............................................................................................21

*Ass'n of Am. Univs. v. Dep't of Def.*,
792 F. Supp. 3d 143 (D. Mass. 2025) ..........................................................12, 34

*Atieh v. Riordan*,
727 F.3d 73 (1st Cir. 2013)................................................................................26

*Axon Enter., Inc. v. Fed. Trade Comm'n*,
598 U.S. 175 (2023)......................................................................................32, 33

iii

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963) ................................................................................................20, 21

*Bennett v. Spear*,
   520 U.S. 154 (1997) ...................................................................................................22

*Branti v. Finkel*,
   445 U.S. 507 (1980) ..............................................................................................13, 21

*California v. Kennedy*,
   No. CV 25-12019-NMG, 2025 WL 2807729 (D. Mass. Oct. 1, 2025) ...................34

*Chicago Women in Trades v. Trump*,
   No. 25 C 2005, 2025 WL 3034056 (N.D. Ill. Oct. 30, 2025) ..................................35

*Counterman v. Colorado*,
   600 U.S. 66 (2023) ................................................................................................20, 21

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) ...................................................................................................24

*Dorce v. Wolfe*,
   506 F. Supp. 3d 142 (D. Mass. 2020) .......................................................................28

*Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.*,
   2025 WL 1865971 (D. Md. July 7, 2025) ........................................................6, 29, 32

*Elgin v. Dep't of Treasury*,
   567 U.S. 1 (2012) .......................................................................................................28

*Elrod v. Burns*,
   427 U.S. 347 (1976) ..........................................................................................12, 13, 21

*F.C.C. v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ...................................................................................................24

*Harris v. Quinn*,
   573 U.S. 616 (2014) ...................................................................................................19

*Heffernan v. City of Paterson*,
   578 U.S. 266 (2016) ...................................................................................................13

*HM Florida-ORL, LLC v. Governor of Florida*,
   137 F.4th 1207 (11th Cir. 2025) ...............................................................................18

*Iancu v. Brunetti*,
   588 U.S. 388 (2019) ...................................................................................................16

iv

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
  92 F.3d 1248 (D.C. Cir. 1996) ...................................................................25

*Janus v. AFSCME, Council 31*,
  585 U.S. 878 (2018)..................................................................18, 19, 21

*Lakewood v. Plain Dealer Publishing Co.*,
  486 US 750 (1988).............................................................................17

*Meese v. Keene*,
  481 U.S. 465 (1987)...........................................................................20

*Melone v. Coit*,
  100 F.4th 21 (1st Cir. 2024)..................................................23, 25, 26

*Nat'l Ass'n of Immigr. Judges v. Owen*,
  139 F.4th 293 (4th Cir. 2025) ...............................................................32

*Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*,
  779 F. Supp. 3d 149 (D.N.H. 2025).......................................................26

*Nat'l Instit. of Family & Life Advocates v. Becerra*,
  585 U.S. 755 (2018).........................................................................18, 19

*New York v. Kennedy*,
  155 F.4th 67 (1st Cir. 2025)..................................................................29

*Nken v. Holder*,
  556 U.S. 418 (2009)........................................................................12, 28

*Ohio v. EPA*,
  603 U.S. 279 (2024).........................................................................23, 24

*Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trs.*,
  235 F.3d 1243 (10th Cir. 2000) .............................................................19

*Reed v. Town of Gilbert, Ariz.*,
  576 U.S. 155 (2015)........................................................................16, 21

*R.I. Latino Arts v. Nat'l Endowment for the Arts*,
  777 F. Supp. 3d 87 (D.R.I. 2025)...........................................................27

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020).................................................................3, 27, 33, 34

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995)........................................................................16, 17

v

*Rutan v. Republican Party of Ill.*,
  497 U.S. 62 (1990) ...................................................................................13, 14, 15, 21

*Sindicato Puertorriqueno de Trabajadores v. Fortuno*,
  699 F.3d 1 (1st Cir. 2012) .........................................................................................27

*Somerville Pub. Sch. v. McMahon*,
  139 F.4th 63 (1st Cir. 2025), *administratively stayed sub. nom.*, *McMahon v.
  New York*, 125 S.Ct. 2643 (2025) ............................................................................29

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 .............................................................................................30, 31, 32, 33

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025)...................................................................................................34

*Turner v. U.S. Agency for Glob. Media*,
  502 F. Supp. 3d 333 (D.D.C. 2020) ..........................................................................30

*United States v. Fausto*,
  484 U.S. 439 (1988)...................................................................................................31

*United States v. Nat'l Treasury Emps. Union*,
  513 U.S. 454 (1995)...................................................................................................30

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Hum. Servs.*,
  985 F.3d 472 (5th Cir. 2021) .....................................................................................25

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
  587 F.3d 464 (1st Cir. 2009)......................................................................................12

*Virginia v. Black*,
  538 U.S. 343 (2003)...................................................................................................20

*W. Va. State Bd. Of Educ. v. Barnette*,
  319 U.S. 624 (1943) (Murphy, J., concurring) .....................................................18, 19

*Weaver v. U.S. Info. Agency*,
  87 F.3d 1429 (D.C. Cir. 1996)...................................................................................30

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001)...................................................................................................22

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)..................................................................................................12, 27

**Federal Statutes**

5 U.S.C. § 71 ..................................................................................................................31

5 U.S.C § 704 ................................................................................................22

5 U.S.C. § 705 ..........................................................................................*passim*

5 U.S.C. § 706 ....................................................................................23, 26, 27

5 U.S.C § 1214 ..............................................................................................31

5 U.S.C § 2102 ................................................................................................4

5 U.S.C. § 2103 ...............................................................................................4

5 U.S.C. § 2301 ...................................................................................4, 21, 25

5 U.S.C. § 3131 ...............................................................................................4

5 U.S.C. § 3134 ...............................................................................................4

5 U.S.C. § 3320 ...............................................................................................4

5 U.S.C. § 3330 ...............................................................................................5

5 U.S.C. § 3331 ...............................................................................................5

5 U.S.C. § 3393 ...............................................................................................4

5 U.S.C. § 7103 .............................................................................................31

5 U.S.C. § 7111 .............................................................................................31

5 U.S.C. § 7512 .............................................................................................31

28 U.S.C. § 1331 ...........................................................................................28

Pendleton Act of 1883 ....................................................................................4

Privacy Act.......................................................................................................3

**Regulations**

Exec. Order No. 14170, 90 Fed. Reg. 8621 (Jan. 30, 2025)...........................6, 24

Exec. Order No. 14356, 90 Fed. Reg. 48387 (October 15, 2025) ...................7

## I.    INTRODUCTION

A cornerstone of American democracy is a nonpartisan, career civil service system based on merit, not political loyalty. But in May 2025, the Trump Administration took another dangerous step toward dismantling that system. The U.S. Office of Personnel Management ("OPM") and the White House issued a so-called Merit Hiring Plan ("MHP") that is anything but merit-based: it directs that federal job applications include an essay question that prompts candidates to express and detail their support for President Trump and his policies. Specifically, the essay question—the Loyalty Question—asks candidates to explain how they would "help advance the President's Executive Orders and policy priorities," and tells them to identify which of the President's EOs and policies "are significant to you." OPM has instructed hiring managers and political appointees to review applicants' responses to these questions before making any hiring decisions. There is no purpose to the Loyalty Question other than to try to enforce federal employee allegiance to President Donald Trump.[1]

None of this is surprising. The Trump Administration has been clear about its desire to upend the merit-based civil service and instead fill the federal workforce with people loyal to President Trump. The Loyalty Question carries out this clear intent. But the Loyalty Question, and OPM's implementation of it, violates the First Amendment and the Administrative Procedure Act ("APA").

The First Amendment problems with the Loyalty Question are manifold. First, the Loyalty Question is a form of prohibited political patronage, conditioning employment on applicants' actual or perceived political beliefs. Second, it is a tool for viewpoint discrimination,

---

[1] On November 17, 2025, Plaintiffs filed a Consent Motion for Leave to File Excess Pages and a Motion for Leave to File Nonparty Declarations Under Pseudonyms in relation to this filing. ECF Nos. 32 & 33. These motions are pending before the Court.

3117700

because government officials—who have unfettered discretion to utilize the answers to the Loyalty Question in hiring—are likely to use it to identify and hire candidates based on the candidates' political views toward President Trump. Third, even if the Trump Administration does not use the Loyalty Question to test for loyalty, it still violates the First Amendment because it both compels and chills protected speech. The Loyalty Question compels speech by prompting applicants to share their political beliefs in response to a question that has no bearing on their job, and to answer this question in a way that applicants believe will be appealing to the Administration. The Loyalty Question chills speech by deterring applicants from speaking their truthful opinions or from applying to federal jobs altogether.

Plaintiffs here—three unions acting on behalf of their members, many of whom have encountered the Loyalty Question in federal job applications—have been harmed in each of these ways. The Loyalty Question therefore violates Plaintiffs' First Amendment rights.

Plaintiffs also challenge the MHP because it violates the APA. It is arbitrary and capricious several times over, both because it is substantively unreasonable and because it lacks adequate explanation. In fact, OPM provides no explanation at all for why it has made an applicant's *personal* political views part of the civil service hiring process; not only are such views irrelevant for civil service jobs but their consideration in federal employment is the opposite of what Congress has mandated. OPM's subsequent guidance related to the MHP and the Loyalty Question only adds to the arbitrariness. The guidance claims that an applicant's response to the Loyalty Question will not be scored and that agencies cannot use it to screen out applicants or to "impose an ideological litmus test." But the guidance also says that applicants are "encouraged to thoughtfully address" the Loyalty Question and that responses will be reviewed by the agency's political leadership as part of the hiring process. So, how will agency

2

political leadership evaluate and utilize responses to the Loyalty Question, and what possible purpose does it serve if it is not a test of allegiance to President Trump? Unsurprisingly, OPM never says. That is the embodiment of an arbitrary and capricious rule.[2]

Plaintiffs respectfully ask this Court to stay the MHP's implementation and use of the Loyalty Question and grant preliminary injunctive relief in order to provide complete relief to Plaintiffs and their members. This Court has jurisdiction over Plaintiffs' claims, which challenge the constitutionality of OPM's government-wide program, not any personnel decision or labor action. And each of the preliminary injunction factors—which are the same factors for evaluating a requested stay of agency action—weighs in Plaintiffs' favor. The Loyalty Question plainly violates the First Amendment and the APA. And there is no real question that Plaintiffs are suffering irreparable harm, because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)). Finally, the balance of equities favors relief because not only is there no government interest in continuing an unconstitutional and unlawful hiring practice, but Defendants themselves have never articulated *any* purpose of the Loyalty Question, much less a lawful one. This Court should exercise its authority under 5 U.S.C. § 705 to stay the MHP to the extent it directs and permits the inclusion and use of the Loyalty Question, and further should enter preliminary injunctive relief to ensure that Plaintiffs' members are protected from the Loyalty Question.

---

[2] Plaintiffs also allege that the Loyalty Question violates the Privacy Act but are not moving for preliminary relief on that claim.

3

## II.    BACKGROUND

### A.    For 150 Years, Congress Has Strengthened and Affirmed a Nonpartisan, Merit-Based Civil Service.

For nearly 150 years, the merit-based career civil service has attracted highly qualified individuals who serve the federal government in an array of fields, across presidential administrations, as nonpolitical public servants. But this was not always the case: in the nineteenth century, political patronage and a "spoils system" was the norm, with federal employment doled out as a reward for campaign work and political loyalty. The flaws and abuses of the system reached a boiling point when Charles Guiteau assassinated President James A. Garfield because the new administration had not rewarded Guiteau with a federal job for supporting Garfield's campaign. In response, Congress passed the Pendleton Act of 1883, which laid the foundation for today's civil service system.[3]

Over the next 100 years, Congress repeatedly passed and amended legislation to strengthen the federal civil service as a *merit*-based system, emphasizing that civil service hiring and personnel decisions should be based on merit alone, not politics. *See, e.g.*, 5 U.S.C. § 2301(b)(1) ("selection and advancement should be determined solely on the basis of relative ability, knowledge, and skill, after fair and open competition").

Today, there are more than two million federal employees in the civil service,[4] nearly a third of whom are veterans. These public servants provide the American people services that range from nursing care for veterans to research on the space program, from rooting out

---

[3] The Act was formally titled An Act to Regulate and Improve the Civil Service of the United States, 22 Stat. c. 27, p. 403 (Jan. 16, 1883).

[4] Most career federal civil service positions are generally classified into one of three "services": (1) competitive service, 5 U.S.C § 2102; (2) excepted service, *id.* § 2103; and (3) Senior Executive Service, *id.* § 3131. While each has different hiring processes and requirements, hiring for each is based on merit. *See, e.g.*, *id.* §§ 2301(b)(1), 3393, 3134, 3320.

3117700

healthcare fraud to helping family farmers. Each takes an oath of loyalty to the Constitution, not to any president or political party. *See* 5 U.S.C. § 3331.

Most civil service job vacancy announcements are posted to USAJOBS.gov, a website operated by OPM that is "the federal government's official employment site" and "serves as the central place to find opportunities in hundreds of federal agencies."[5] OPM uses USAJOBS to satisfy its statutory obligation to "establish and keep current a comprehensive list of all announcements of vacant positions in the competitive service within each agency." 5 U.S.C. § 3330(b). Each vacancy announcement on USAJOBS identifies to whom the job is open, its duties, its requirements, how candidates will be evaluated, required documents for application, and instructions on how to apply. Many announcements include an "assessment questionnaire"— and, because of the MHP, this questionnaire often now includes the Loyalty Question.

### B.    The Merit Hiring Plan's Loyalty Question Undermines the Merit-Based Civil Service System.

The Trump Administration has been explicit in its desire to dismantle the career civil service and install a federal workforce of loyalists. The examples are legion: President Trump has disparaged career civil servants as "crooked" and "dishonest" and proclaimed that the "deep state must and will be brought to heel"; future Vice President J.D. Vance advised President Trump to fire "every civil servant in the administrative state, replace them with our people"; and the Director of the White House Office of Management and Budget Russell Vought, prior to assuming his current role, stated that "[w]e want bureaucrats to be traumatically affected." Meyer Decl. Exs. B–E. The Trump Administration has followed this rhetoric with action. Executive orders have tried to strip civil service protections from a wide swath of career civil

---

[5] Declaration of Cara Meyer ("Meyer Decl."), Ex. A. Most civil service jobs listed on USAJOBS are open to anyone in the general public. Applicants do not have to be, and often are not, current federal workers or members of a government employees' union.

servants, illegally fired thousands of probationary workers (who are typically in their first year or two of federal service), executed significant reductions in force, and stripped collective bargaining rights from over one million employees. *Id.* Exs. F–K.[6]

President Trump has focused not only on ridding the federal workforce of existing civil servants, but also on remaking it in his own ideological image. On his first day in office, President Trump issued Executive Order 14170, which directed the Director of OPM and White House officials to develop a federal hiring plan "that brings to the Federal workforce only highly skilled Americans dedicated to the furtherance of American ideals, values, and interests." Exec. Order No. 14170, 90 Fed. Reg. 8621 (Jan. 30, 2025). On May 29, 2025, OPM and the White House responded by issuing the MHP. As relevant here, the MHP directs that "all Federal job vacancy announcements graded at GS-05 or above will include four short, free-response essay questions." ECF No. 1-1 (MHP) at 9. The third essay question, the Loyalty Question, asks:

> How would you help advance *the President's* Executive Orders and policy priorities in this role? Identify one or two relevant Executive Orders or policy initiatives *that are significant to you*, and explain how you would help implement them if hired.

*Id.* at 9-10 (emphasis added). The MHP also requires that agency leadership—*i.e.*, political appointees—be involved throughout the full hiring process, including reviewing essay responses and approving hiring decisions. *Id.* at 9.

On June 23, 2025, OPM issued guidance entitled "Additional Merit Hiring Plan Guidance on Using the Four Short Essay Questions" ("MHP Guidance"). ECF No. 1-2. But the MHP

---

[6] Courts across the country have enjoined many of these actions. *See, e.g., AFGE v. U.S. Off. of Pers. Mgmt.*, No. C 25-01780 WHA, 2025 WL 2633791 (N.D. Cal. Sept. 12, 2025) (enjoining mass terminations of probationary employees); *Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.*, 2025 WL 1865971 (D. Md. July 7, 2025) (ordering reinstatement of Americorps funding and workers); *AFSCME v. U.S. Off. of Mgmt. & Budget*, No. 25-CV-08302-SI, 2025 WL 3018250 (N.D. Cal. Oct. 28, 2025) (enjoining mass terminations of employees during the federal shutdown).

Guidance only compounds the problems with the Loyalty Question. It first states that applicants who do not answer the question "will not be disqualified or screened out," that responses "are not scored or rated," and that responses "must not be used to impose an ideological litmus test." *Id.* at 2. But then the MHP Guidance says the job application should tell candidates that "we encourage you to thoughtfully address each question," and that answers to the Loyalty Question will be reviewed "by the hiring manager and agency leadership (or a designee), as part of an application packet forwarded to the manager and later to agency leadership." *Id.*

Subsequent guidance has only emphasized the importance of the Loyalty Question and the outsized role it will play in the hiring process. In September, OPM released additional guidance to federal agencies, stating that the four essay questions "must be used on *all competitive service job opportunity announcements* [with limited exceptions]," that "*[a]ll agencies* . . . are required to comply with the requirements and implementation of the Merit Hiring Plan," and that "agencies *should immediately* . . . [u]se the four short essay questions." ECF No. 1-4 at 1, 2, 7 (emphasis added). In October, the President issued another executive order directing that each federal agency must establish a Strategic Hiring Committee to approve the filling of vacancies, that this Committee must include high-level senior political appointees, and that "[a]ny Federal hiring shall be consistent with the Merit Hiring Plan." *Ensuring Continued Accountability in Federal Hiring*. Exec. Order No. 14356, 90 Fed. Reg. 48387 (October 15, 2025). And later in October, OPM and the Office of Management and Budget ("OMB") followed that executive order with guidance that doubles-down on the central role of high-level political appointees in the hiring process: they "must ensure that agency hiring is consistent with . . . administration priorities" and "should not ministerially ratify or routinely

defer to the recommendation of others in reviewing and approving new hires, but should instead use [their] independent judgment." ECF No. 1-5 at 2.

The message is clear: if an applicant does not answer the Loyalty Question or does not answer in a way that expresses personal allegiance to the Trump Administration, political appointees will see and review that response (or non-response). Indeed, in an August training session with agencies, an OPM official stated: "[T]his is a very specific priority for this administration to have this information, prior to making a final offer to the candidate." Meyer Decl. ¶ 2.

As of the November 6, 2025 filing of Plaintiffs' complaint, the Loyalty Question had appeared on over 5,800 job postings and appears on more by the day. *See* ECF No. 1-3 ("'Merit Hiring Plan' Essay Tracker," https://usajobsloyaltytests.netlify.app/ (documenting the number of federal job vacancy postings that include the Loyalty Question)).[7] Almost all of the job postings containing the Loyalty Question are open to the general public; both current federal workers and non-federal workers are eligible to apply and must answer it if they do so. The Loyalty Question has been part of the application process for positions as diverse as Nuclear Materials Courier (Dept. of Energy), Air Traffic Control Specialist (Dept. of the Air Force), Meatcutting Worker (Dept. of Defense), Social Worker (Dept. of Defense), Practical Nurse (Dept. of Justice), Electrical Engineering Patent Examiner (Dept. of Commerce), and Crane Operator (Dept. of Transportation). Meyer Decl. Exs. L–R. The Loyalty Question is included in *over 200 job postings* for wildland firefighters and other jobs related to preventing and addressing wildfires. *Id.* Ex. S. In a particularly troubling development, the Loyalty Question is being used on

---

[7] Agencies continued to list new job postings containing the Loyalty Question even amidst the federal government shutdown. In October 2025, after the lapse in appropriations, more than *1,700* jobs postings included the Loyalty Question. ECF No. 1-3 at 54-79.

8

applications for Department of Education positions that are available only because of recent reductions in force. *See, e.g.*, *id.* Ex. T. In other words, after firing existing employees, the agency has now reposted jobs with near-identical duties but with the inclusion of the Loyalty Question.[8] As is true for all civil service positions, the job postings that include the Loyalty Question are positions for which an applicant's *personal* views on the President's policy priorities and executive orders are wholly irrelevant.

### C.    The Loyalty Question Harms Plaintiffs and Their Members.

Plaintiffs—the American Federation of Government Employees ("AFGE"), the National Association of Government Employees ("NAGE"), and the American Federation of State, County and Municipal Employees ("AFSCME")—are three labor unions that collectively represent millions of workers (collectively, "Union Plaintiffs"). Their members include current federal workers, former federal workers, and other non-federal-government employees, in both the public (e.g., state or local government) and private sectors, who may be interested in someday joining the federal workforce. The Union Plaintiffs' missions include protecting and vindicating the rights of the workers they represent, and advocating for those workers, in matters related to federal employment; increasing federal employment opportunities for their members; and assisting their members in making informed decisions about potential federal employment opportunities. Declaration of Everett Kelley ("Kelley Decl.") ¶¶ 2-4, 7-9; Declaration of Lee Sutton ("Sutton Decl.") ¶¶ 3-5, 7; Declaration of Fernando Colón ("Colón Decl.") ¶¶ 2-4, 6. Eliminating the Loyalty Question from federal job applications is highly germane to the Union Plaintiffs' missions to protect and advocate for the workers whom they represent.

---

[8] The above-listed postings are just examples of the thousands of postings for nonpartisan, civil service jobs that have included the Loyalty Question. ECF No. 1-3 is a list of all federal positions, including their department and pay grade, known to have included the Loyalty Question through November 4, 2025.

The Union Plaintiffs brought these claims on behalf of their members. The unions' members include individuals who are interested in positions within the federal civil service and are suffering ongoing and irreparable injuries as a result of the Loyalty Question.

Some of Union Plaintiffs' members have applied for jobs that include the Loyalty Question and have been unlawfully compelled to speak about political issues in answering it. They reasonably fear their application will be disadvantaged or incomplete if they do not answer the Loyalty Question—or if they answer in a manner that is not satisfactory to the Trump Administration. Kelley Decl. ¶¶ 16-17; Sutton Decl. ¶¶ 13-15. For instance, Federal Worker 1 is an AFGE member and former federal employee who lost her job as a statistician at the Department of Education when she was subject to a reduction in force earlier this year. Federal Worker 1 Decl. ¶¶ 2-5. She recently saw a job posting for a near-identical position to the one she had before—but the posting included the Loyalty Question. *Id.* ¶¶ 6-7. Because she believed that failing to answer would harm her employment prospects, she reviewed every executive order the President had issued up to that point (198 of them) and identified one related to charter schools and school choice. *Id.* ¶¶ 11-12. Though this executive order is irrelevant to the position for which she was applying, she thought that she could write about it in a way the Administration could find acceptable. *Id.* But Federal Worker 1 does not support the policy that the executive order advances, so she could not express her full opinion and limited her answer to only parts of the executive order that she could write about in a manner that would curry favor. *Id.*

Similarly, Federal Worker 4 is an AFGE member who currently works at the Department of Veterans Affairs and has been applying to new federal jobs to move closer to her family. Federal Worker 4 Decl. ¶¶ 1-5. Like Federal Worker 1, she too felt compelled to answer the Loyalty Question to enhance her chances of employment. *Id.* ¶¶ 8-10. And she too combed

10

through multiple executive orders to find one about which she could at least partially express a favorable opinion. *Id.* She responded to the Loyalty Question in a manner that she believed the Administration would find acceptable. *Id.*

Other of Union Plaintiffs' members are chilled from speaking and deterred from applying to federal jobs that they are otherwise interested in. For example, Federal Worker 3 is a NAGE member who works at the Department of Veterans Affairs. Federal Worker 3 Decl. ¶¶ 1-3. For months he had been applying to other federal jobs in hopes of higher pay and greater job stability. *Id.* ¶ 4. But once he encountered a posting with the Loyalty Question, he was taken aback, because he believes that the question violates his free speech rights. *Id.* ¶¶ 5-6. He saw multiple job postings that he believed he was qualified for and he otherwise would have applied to, but they included the Loyalty Question so he did not apply because he did not want to share his political views in a job application, and he did not believe he could answer honestly without harming his job prospects. *Id.* ¶¶ 5-10. Likewise, Federal Worker 2 is a military veteran and AFGE member who works at the Department of Education. Federal Worker 2 Decl. ¶¶ 1-4. She loves her job but believes she needs to look for a new one because the Trump Administration is attempting to dismantle her agency. *Id.* ¶¶ 5-6. Federal Worker 2 is committed to public service and has significant expertise with government functions, but she has not applied to any federal positions with the Loyalty Question because she believes it violates American principles— principles she fought for in the U.S. military—and is thus unwilling to answer it. *Id.* ¶¶ 7-10.

Plaintiff Unions have heard from hundreds of additional members expressing concern about the Loyalty Question. Kelley Decl. ¶¶ 12-14; Sutton Decl. ¶¶ 12-13; Colón Decl. ¶¶ 10-12. Those members believe the Loyalty Question, and the information it seeks, is irrelevant to the federal civil service jobs to which they might apply, is aimed at assessing whether applicants are

11

sufficiently loyal to President Trump, and will be used to illegally weed out candidates who are not. *Id.*

## III.    ARGUMENT

Plaintiffs "seeking a preliminary injunction must establish that [they] are likely to succeed on the merits, that [they] are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tip in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The same standard applies to plaintiffs seeking a stay under Section 705 of the APA. *Ass'n of Am. Univs. v. Dep't of Def.*, 792 F. Supp. 3d 143, 164 (D. Mass. 2025). The first factor—likelihood of success—is the "most important." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020). At the preliminary injunction stage, a court must assess "probable outcomes" but "need not conclusively determine the merits of the underlying claims." *Id.* at 93. The second factor— irreparable injury—operates "as a sliding scale, working in conjunction with a moving party's likelihood of success on the merits." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009). The third and fourth factors—balance of equities and public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### A.    Plaintiffs are Likely to Succeed on the Merits.

#### 1.    The Loyalty Question Violates the First Amendment.

Plaintiffs are highly likely to succeed on their First Amendment claim. "[P]olitical belief and association constitute the core of those activities protected by the First Amendment." *Elrod v. Burns*, 427 U.S. 347, 356 (1976) (plurality). The Loyalty Question violates these core principles in four distinct ways. It (a) conditions employment on political patronage; (b) enables and facilitates discrimination on the basis of viewpoint; (c) compels speech on protected topics; and (d) chills protected speech. Because the Loyalty Question infringes on the First Amendment

rights of Plaintiffs' members—and anyone in the general public who wishes to apply for federal

employment—in each of these ways, it can only survive legal challenge if it passes strict or

exacting scrutiny. But the Loyalty Question does not advance any government interest, much

less a compelling one, nor is it narrowly tailored. If Plaintiffs demonstrate a likelihood of success

on any one of these theories, they satisfy the first preliminary-injunction factor. Here, Plaintiffs

can show a likelihood of success on each.

> **a.      The Loyalty Question Unconstitutionally Conditions Federal Employment on Political Patronage.**

The Loyalty Question creates a hiring system where federal job applicants are identifiable

by, and may be selected based on, their professed or perceived political beliefs and loyalties. It is

unconstitutional to "condition[] hiring decisions on political belief . . . unless the government has

a vital interest in doing so." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 78 (1990). To justify

a patronage condition, the government must prove both "an overriding interest . . . of vital

importance" to the government, *Branti v. Finkel*, 445 U.S. 507, 515-16 (1980) (citation omitted),

and that political belief "is an appropriate requirement for the effective performance of the public

office involved," *id.* at 518. It is the government's burden to meet this standard. *Elrod*, 427 U.S.

at 362.

Time and again, the Supreme Court has rejected efforts to condition public employment

on an applicant or employee holding particular political beliefs. *See, e.g.*, *Elrod*, 427 U.S. at 356

(implementing "patronage dismissals" through "the denial of public employment" is an

unconstitutional "inducement"); *Branti*, 445 U.S. at 515 ("If the First Amendment protects a

public employee from discharge based on what he has said, it must also protect him from

discharge based on what he believes."); *Rutan*, 497 U.S. at 78 (extending prohibition on

patronage dismissals to hiring and holding that "conditioning hiring decisions on political belief

13

and association plainly constitutes an unconstitutional condition, unless the government has a vital interest in doing so."); *Heffernan v. City of Paterson*, 578 U.S. 266, 268 (2016) (holding the First Amendment protects against hiring and firing on the basis of even *perceived* political activity and belief).

The Loyalty Question similarly operates as an unconstitutional patronage condition. The Loyalty Question asks applicants how they would "advance" and "implement" President Trump's "Executive Orders and policy priorities" and to "[i]dentify one or two relevant Executive Orders or policy initiatives" and explain how they are "significant to you." ECF No. 1-1 at 10. That is a direct call for the applicant's political views—*i.e.*, what aspects of the current President's agenda do *you* most support and what are *you* prepared to do to advance that agenda? The MHP further ensures that answers to the Loyalty Question will be evaluated in hiring. Responses to the question, or the fact that an applicant declined to answer, are provided to political appointees, who must review the responses before making hiring decisions. ECF No. 1-4. OPM has told agency officials that the Loyalty Question (and other essay responses) are "a very specific priority for this administration . . . prior to making a final offer to a candidate." Meyer Decl. ¶ 2. Especially given the stated goal of the President and Vice President, reiterated in recent calls to fire "Democrat-oriented" civil servants and replace them with "our people," *id.* Ex. U, it is evident that the Loyalty Question's objective is to identify candidates based on their political beliefs—or at least what they're willing to claim are their political beliefs—and favor perceived loyalists in hiring decisions.

The use of the Loyalty Question is quite similar to the patronage system the Supreme Court rejected in *Rutan*. There, the Court held that a program in which the Illinois Governor's Office reviewed the voting records of every applicant during the hiring process imposed on

14

applicants "a significant obligation to support political positions held by their superiors, and to refrain from acting on the political views they actually hold, in order to progress up the career ladder." 497 U.S. at 73. Here, as in *Rutan*, the conditioning of hiring on political loyalty threatens applicants with "significant penalties . . . for the exercise of rights guaranteed by the First Amendment." *Id.* at 74. From a constitutional perspective, it makes no difference whether the applicants actually hold the beliefs they espouse in response to the Loyalty Question, just as in *Rutan* it did not matter if the applicants actually supported the Republican Party. The constitutional violation arises from hiring managers and agency leaders using perceived political opinion as a basis for hiring decisions.

Nor does it matter that the MHP Guidance (though not the subsequent OPM directives) describes answering the Loyalty Question as optional. The Loyalty Question acts as an unconstitutional patronage condition not because it is required but because of how it is used. State employees were not required to vote in *Rutan*, but the use of their party registration and voting history (or even the fact that they did not vote) was just as problematic as conditioning their employment on having voted for Republicans. "What the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly." *Rutan*, 497 U.S. at 77-78. The Loyalty Question uncovers job applicants' views and beliefs about the policies and executive orders of one president, Donald Trump. As detailed above, Plaintiffs' members have felt compelled not only to answer it but to shade their answers in a pro-Trump manner. And answers to the Loyalty Question will be reviewed by politically appointed agency leadership, in an administration open about its desire to replace existing civil servants with loyalists. It requires no leap at all to conclude that implementing the Loyalty

15

Question under the MHP is a form of political patronage, the kind repeatedly held

unconstitutional by the Supreme Court.

> b.  **The Loyalty Question Promotes and Enables Unconstitutional Viewpoint Discrimination.**

The Loyalty Question is also unconstitutional because it enables unconstitutional content-

and viewpoint-based discrimination by hiring managers and political appointees, who have

unbounded discretion to use an applicant's professed or perceived political views in making

hiring decisions. "Content-based laws—those that target speech based on its communicative

content—are presumptively unconstitutional and may be justified only if the government proves

that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert,*

*Ariz.*, 576 U.S. 155, 163 (2015). Indeed, "[d]iscrimination against speech because of its message

is *presumed* to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S.

819, 828 (1995) (emphasis added). A particularly "egregious form of content discrimination" is

viewpoint discrimination, *id.* at 829-30, actions by the government that favor one viewpoint over

another or reflect the "the Government's disapproval of a subset of messages it finds offensive,"

*Iancu v. Brunetti*, 588 U.S. 388, 393 (2019) (citation omitted).

The Loyalty Question is an unconstitutional viewpoint-based regulation. It directly

inquires into political beliefs. And the formulation of the question points in one direction: it asks

only about President Trump's policies, how those policies are meaningful to the applicant

personally, and how the applicant will advance them. Then, it places review of the answers in the

hands of political appointees who are specifically instructed to be involved in hiring decisions.

But the Supreme Court has held that "[i]n the realm of private speech or expression, government

regulation may not favor one speaker over another." *Rosenberger*, 515 U.S. at 828; *see also*

*Iancu*, 558 U.S. at 392-96 (prohibiting registration of "immoral or scandalous" trademarks was

unconstitutional viewpoint discrimination because it allowed examiners to reject marks based on their own perceptions). A court in this district recently held that an executive order was unconstitutional viewpoint discrimination because the government intended to—and did—enforce it only against speakers who voiced pro-Palestinian or anti-Israel views. *See Am. Ass'n of Univ. Professors v. Rubio*, 2025 WL 2777659, at *49 (D. Mass. Sept. 30, 2025). Here, too, the use of the Loyalty Question favors (and disfavors) speakers who voice particular views of the President and his policies. Such arbitrary decision-making based on expressed or perceived political viewpoints is classic viewpoint discrimination, and it is unconstitutional. *See Rosenberger*, 515 U.S. at 829.

The Loyalty Question further enables viewpoint discrimination because of the unfettered discretion given to hiring managers and political appointees in evaluating applicants' answers. The MHP Guidance claims that failure to answer the Loyalty Question will not result in applicants being "disqualified or screened out" and that answers will not be scored or rated; but then it provides no guidelines for how the answers should be used, no mechanism to control or monitor how they are considered, and no way to ensure that political appointees are not simply picking and choosing candidates based on their political beliefs. The Supreme Court has long recognized that granting government officials "unbridled discretion" to make decisions where protected speech is at issue creates an environment ripe for viewpoint discrimination. *See Lakewood v. Plain Dealer Publishing Co.*, 486 US 750, 757-59 (1988). In *Lakewood*, for instance, the Supreme Court struck down, on First Amendment grounds, an ordinance granting a mayor unfettered and unguided discretion to grant or deny licenses for setting up news racks, because it enabled discrimination based on content. *See id*. Here, the unbounded authority of politically-appointed agency leaders to use answers to the Loyalty Question in making hiring

17

decisions is similarly sweeping and permissive. Those agency leaders are granted the discretion to decide which applicant is loyal enough, allowing for the subjective evaluation of expressed viewpoints about the president's policies, and without guidelines to prevent abuse or unconstitutional politically motivated decisions. *See also HM Florida-ORL, LLC v. Governor of Florida*, 137 F.4th 1207, 1223, 1226, 1230 (11th Cir. 2025) ("Laws without discernible standards threaten enforcement that is 'impermissibly based on content or viewpoint.'").

### c.    The Loyalty Question Unconstitutionally Compels Speech.

The Loyalty Question also violates the First Amendment because it unconstitutionally compels the speech of applicants who do not want to share their political opinions or who feel they must mold their answers to preserve their job prospects. The Loyalty Question compels discussion of President Trump and his policies, regardless of the applicant's personal views or desire to express them. This inquiry into, and forced expression of, political beliefs is unconstitutional.

The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *W. Va. State Bd. Of Educ. v. Barnette*, 319 U.S. 624, 633-34 (1943) (Murphy, J., concurring). And the First Amendment generally prohibits the government from "compel[ling] a person to speak its own preferred messages," *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023), or compelling them to "alte[r] the content" of their speech, *Nat'l Instit. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 766 (2018). "Nor does it matter whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include." *303 Creative*, 600 U.S. at 586. "Compelling individuals to mouth support for views they find objectionable violates [a] cardinal constitutional command." *Janus v. AFSCME, Council 31*, 585 U.S. 878, 892 (2018).

18

The Loyalty Question compels the speech of federal job applicants, including Plaintiffs' members, who prefer to not share their political views with the federal government.[9] It makes no difference that answering the Loyalty Question is technically optional. Government pressure to speak, where the failure to speak will have financial or personal consequences, is compelled speech. *See, e.g.*, *Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trs.*, 235 F.3d 1243, 1247 (10th Cir. 2000) ("indirect" government action "rather than a direct punishment" can compel speech in violation of the First Amendment). As discussed, responses to the Loyalty Question are reviewed by agency leadership before any hiring decisions, ECF No. 1-1, and responses are a "very specific priority for this Administration . . . prior to making a final offer." *Id.* ¶ 68. A reasonable applicant would believe their answers (or failure to answer) will affect their hiring prospects. Otherwise, there would be no point to the government including the question in the job posting. Indeed, Plaintiffs' members, including Federal Workers 1 and 4, reasonably felt they had no choice but to provide an answer to the Loyalty Question, despite not wanting to share their political views with the government. Federal Worker 1 Decl. ¶¶ 9-11; Federal Worker 4 Decl. ¶¶ 9-10; *see Barnette*, 319 U.S. at 633-34. And those members tailored their answers to match what they believed the Administration would find acceptable. Federal Worker 1 Decl. ¶ 12; Federal Worker 4 Decl. ¶ 10. This is classic compelled speech. *See, e.g.*, *Nat'l Instit.*, 585 U.S. at 766; *Janus*, 585 U.S. at 893 ("When speech is compelled . . . individuals are coerced into betraying their convictions."); *Harris v. Quinn*, 573 U.S. 616, 647 (2014) ("The government may not . . . compel the endorsement of ideas that it approves.").

---

[9] It does not matter that applicants are not *entitled* to federal employment. Even where an individual "has no entitlement to [a government] benefit," the government "may not deny [that] benefit to a person on a basis that infringes [their] constitutionally protected . . . freedom of speech." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).

#### d.        The Loyalty Question Chills Speech.

Finally, the Loyalty Question unconstitutionally chills the speech of Union members who wish to apply for federal government jobs. "[P]olitical speech [is] at the core of what the First Amendment is designed to protect." *Virginia v. Black*, 538 U.S. 343, 365, (2003). Accordingly, the First Amendment protects against government action or threatened enforcement that causes a "chilling effect" on protected speech and results in "self-censorship." *Counterman v. Colorado*, 600 U.S. 66, 75 (2023); *Am. Ass'n of Univ. Professors v. Rubio*, 780 F. Supp. 3d 350, 376 (D. Mass. 2025). "[I]nformal censorship," threats, "and other means of coercion, persuasion, and intimidation" have long been understood to have the potential to chill constitutionally protected speech. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). Plaintiffs have standing to raise claims for chilled speech when a relevant prohibition or requirement threatens to cause a "cognizable injury." *Meese v. Keene*, 481 U.S. 465, 473 (1987).

As discussed above, the plain language of the Loyalty Question seeks information about applicants' political thoughts and beliefs—speech that is protected by the First Amendment. Based on the Trump Administration's numerous statements about rooting out non-loyalists, Plaintiffs' members are likely to suffer cognizable injuries—including the financial cost of losing their current job and of not being selected for a new position for which they are otherwise qualified—if they indicate that they disagree with the current Administration's policies. As a result, their speech is chilled. Some members who submit applications are self-censoring by withholding certain viewpoints and political perspectives because they understand that their applications or current jobs would be put at risk. *See, e.g.,* Federal Worker 1 Decl. ¶ 12; Federal Worker 4 Decl. ¶ 10. Other members who want to submit complete and honest applications or who, out of principle, will not disclose their protected political thoughts and beliefs, are chilled from speaking and deterred entirely from applying to jobs for which they are otherwise qualified.

20

*See, e.g.,* Federal Worker 2 Decl. ¶¶ 7-10; Federal Worker 3 Decl. ¶¶ 8-9. The Loyalty Question functions to chill speech and coerce applicants to self-censor in contravention of the First Amendment. *See Counterman*, 600 U.S. at 75; *Bantam Books*, 372 U.S. at 67.

> **e.      The Loyalty Question Fails Strict or Exacting Scrutiny.**

The Loyalty Question infringes the First Amendment rights of Plaintiffs' members because it conditions employment on political patronage, facilitates viewpoint discrimination, compels protected speech, and chills protected speech. Government actions resulting in such impingements on First Amendment speech are subject to strict, or exacting, scrutiny—in other words, they can survive challenge only if they advance vital government interests and are narrowly tailored. *See, e.g., Branti*, 445 U.S. at 515-16 (political patronage subject to strict scrutiny); *Reed*, 576 U.S. at 163 (viewpoint discrimination subject to strict scrutiny); *Janus*, 585 U.S. at 906 (compelled speech subject to exacting scrutiny); *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609 (2021) (chilled speech subject to exacting scrutiny).

Here, there simply is no government interest—much less a vital or compelling one—in asking applicants for career federal jobs to identify the President's Executive Orders or policies that are "significant to [them]" and to explain how they would help advance them. An applicant's personal views of the President's policies are entirely unrelated to the effective performance of any career civil service position, *see* 5 U.S.C. § 2301(b)(1), and the Supreme Court has repeatedly considered and rejected justifications for conditioning public employment on political loyalty, *see, e.g.*, *Elrod*, 427 U.S. at 364-65 (government efficiency is not served by screening based on political loyalty); *Rutan*, 497 U.S. at 75 (hiring based on political loyalty does not promote the democratic process). Nor is the Loyalty Question narrowly tailored; in fact, it is not tailored at all. The MHP directs its inclusion on "all Federal job vacancy announcements graded at GS-05 or above," subject to limited exceptions. ECF No. 1-1. The Loyalty Question has

already appeared on thousands of job postings nationwide, including for firefighters, meatcutters, crane operators, and botanists, among many others. And there is hardly any guidance for how the government may use the answers or what role they may play in the application process. The Loyalty Question imposes a broad and irrelevant political condition on federal hiring, does not serve any government interest, is not narrowly tailored, and should be held unconstitutional.

> **2.      The MHP and the MHP Guidance Violate the Administrative Procedure Act.**

The MHP and the MHP Guidance also violate the Administrative Procedure Act because they are arbitrary and capricious and contrary to Constitutional right.

> **a.      The MHP and MHP Guidance Together Are Final Agency Action.**

The Administrative Procedure Act makes reviewable "final agency action." 5 U.S.C § 704. For agency action to be "final," it must (1) "mark the consummation of the agency's decisionmaking process," and (2) be an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotation marks omitted). Agency action is an expansive term, covering almost "every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 478 (2001) (citation omitted).

The MHP and MHP Guidance together are final agency action. As to the first prong, the MHP and MHP Guidance together represent the consummation of OPM's decisionmaking: they direct the use of the Loyalty Question on federal job postings; and, indeed, the Loyalty Question has now appeared on thousands of federal job postings, with more added by the day. There are no further steps for OPM to take to implement the MHP or MHP Guidance with regard to the Loyalty Question. As to the second prong, the MHP and MHP Guidance determine the rights and obligations of, and establish legal consequences for, federal job applicants, who must decide

whether to answer the Loyalty Question; leave it blank and jeopardize their application; or not apply at all to avoid being coerced into political speech. The MHP and MHP Guidance have clear legal consequences, in that they affect the First Amendment rights of federal job applicants, including Plaintiffs' members.[10]

### b.     Use of the Loyalty Question is Arbitrary and Capricious.

The APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary or capricious "if it is not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024). While a Court cannot "substitute its judgment for that of the agency," it must take care to "ensure" that the agency has "offered a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id.* Agency action is arbitrary and capricious if, among other things, "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024).

The MHP and MHP Guidance are arbitrary and capricious both because they are not reasonably explained and because they are substantively unreasonable. In fact, far from being "reasonably explained," the imposition of the Loyalty Question is not explained at all—neither the MHP nor the MHP Guidance offers any explanation as to why they direct the use of the

---

[10] The MHP and MHP Guidance together also determine the obligations of federal agencies to add the Loyalty Question to federal job postings and of hiring managers and political leadership to review the responses to the Loyalty Question in making hiring decisions.

Loyalty Question. The MHP simply says, "[T]o implement Executive Order 14170, all Federal job vacancy announcements graded at GS-05 or above will include [the Loyalty Question]." But OPM never says how the Loyalty Question implements EO 14170 or why it made the decision to disregard decades of past practice and include an essay question on federal job applications that asks applicants to express support for the President's policies. This lack of explanation alone renders the MHP and MHP Guidance unlawful. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515, (2009) ("To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position. An agency may not, for example, depart from a prior policy sub silentio[.]"); *see also Dep't of Com. v. New York*, 588 U.S. 752, 756 (2019) ("The reasoned explanation requirement of administrative law is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public.").

OPM also fails to explain how the Loyalty Question will be used in the hiring process. The MHP Guidance claims that responses "will not be scored or rated" and "must not be used to impose an ideological litmus test on candidates." ECF No. 1-4. But if the Loyalty Question is not scored or rated, how should agencies use it? And if it is not used by agency leadership to test political allegiance to President Trump, what other purpose does it possibly serve? OPM never says. *See Ohio*, 603 U.S. at 292 (requiring "rational connection" between facts found and decision adopted); *Dep't of Com.*, 588 U.S. at 785 (noting that in reviewing agency justifications, courts are "not required to exhibit a naiveté from which ordinary citizens are free") (internal citations omitted).

The result of OPM's action—lacking as it is in explanation, clarity, or transparency—is a process in which applicants' responses inevitably will be used differently by different agencies

and even within agencies, depending on the whims of the hiring manager and political leadership. *See Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996) ("[A]n agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so."). This is the very definition of arbitrariness—and it is only compounded by the fact there is no rhyme or reason as to which postings include the Loyalty Question. To cite but one example, between November 4 and November 6, 2025, the Department of Agriculture posted seven job openings for GS-5/9 Consumer Safety Inspectors in seven different states. Five of those identical postings—in New Jersey, Virginia, Pennsylvania, Iowa, and Alabama—include the Loyalty Question. Meyer Decl. Ex V. Two postings—in Florida and Oklahoma—do not. *Id.* Ex. W. This arbitrariness means that some applicants will be subject to First Amendment violations while others are not. *See Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 985 F.3d 472, 479 (5th Cir. 2021) (noting that a "bedrock principle of administrative law [is] that an agency must treat like cases alike").

On a substantive level, the Loyalty Question is arbitrary and capricious because it makes an applicant's *personal* political views part of the career civil service hiring process. Not only is this a factor that Congress did not intend OPM to consider in the federal hiring process, but it is *the opposite* of what Congress directs in federal employment. *See Melone*, 100 F.4th at 29 (agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider"). Congress has made clear that federal personnel management must follow merit system principles, 5 U.S.C. § 2301, including that "selection and advancement should be determined solely on the basis of relative ability, knowledge, and skill, after fair and open competition," *id.* § 2301(b)(1). The Loyalty Question turns Congress's design on its head.

The Loyalty Question is also substantively unreasonable because it seeks information—and requires agencies to consider information—that is entirely irrelevant for career civil service jobs. A civil servant's responsibility is to discharge their job duties, regardless of their personal political views, so a civil servant's personal views of an EO or policy initiative are categorically irrelevant. Moreover, the vast majority of federal jobs—including the vast majority in which the Loyalty Question appears—have nothing to do in substance with the President's EOs or signature policy initiatives. OPM's decision to include the Loyalty Question on these civil service job postings is "so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise." *Atieh v. Riordan*, 727 F.3d 73, 75-76 (1st Cir. 2013).

Finally, OPM's actions are arbitrary and capricious because OPM has "entirely failed to consider an important aspect of the problem." *Melone*, 100 F.4th at 29. OPM failed to consider how the Loyalty Question violates applicants' First Amendment rights by compelling them to speak and share their political views; failed to consider how including the Loyalty Question would harm the government's ability to attract, recruit, and retain well-qualified candidates; and, most importantly, failed to consider how the Loyalty Question would harm the American public due to the loss of a professional, nonpartisan, merit-based civil service. These are unquestionably important aspects of the federal hiring process.

The MHP and MHP Guidance are the very definition of arbitrary and capricious action, and, as such, they violate the APA.

   **c.**  **The Loyalty Question is Contrary to Constitutional Right.**

The APA requires courts to "hold unlawful and set aside" agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). "An analysis of whether agency action violates the APA because it is contrary to constitutional right mirrors the analysis of whether the agency action violates the relevant constitutional provision." *Nat'l Educ.*

*Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149, 197 (D.N.H. 2025). Courts in this circuit

recognize that where plaintiffs are likely to succeed on a First Amendment claim at the

preliminary injunction stage, "it follows that they are likely to succeed on their contrary-to-

constitutional-right APA claim." *Id.*; *see also R.I. Latino Arts v. Nat'l Endowment for the Arts*,

777 F. Supp. 3d 87, 103, 106-10 (D.R.I. 2025) (same). Here, too, Plaintiffs are likely to succeed

on their § 706(2)(B) claim for the same reasons, detailed above, that they are likely to succeed on

their First Amendment claim. *Supra* Part III.A.1.

### B.    Plaintiffs Face Irreparable Harm Absent Injunctive Relief.

To obtain a preliminary injunction or a Section 705 stay under the APA, plaintiffs must

demonstrate that they are "likely to suffer irreparable harm in the absence of preliminary relief."

*Winter*, 555 U.S. at 20. It is well established that "[t]he loss of First Amendment freedoms, for

even minimal periods of time, unquestionably constitutes irreparable injury." *Cuomo*, 592 U.S. at

19 (quoting *Elrod*, 427 U.S. at 373).

Here, the Loyalty Question violates the First Amendment rights of Plaintiffs' members

for all of the reasons discussed above. This categorically constitutes irreparable harm, and, where

plaintiffs have established a concrete, ongoing constitutional injury, "[t]here is no need for an

extensive analysis of [the irreparable harm] element of the preliminary injunction inquiry."

*Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 15 (1st Cir. 2012). Because

"plaintiffs have made a strong showing of likelihood of success on the merits of their First

Amendment claim, it follows that the irreparable injury component of the preliminary injunction

analysis is satisfied as well." *Id.* In the absence of injunctive relief, new First Amendment

violations will transpire on a daily basis. Over the past three months, even amidst the

government shutdown, federal agencies added hundreds of new job applications that contain the

Loyalty Question each week. ECF No. 1-3 at 53-79. Each time an employee faces an

unconstitutional patronage condition or viewpoint discrimination, is compelled to speak about President Trump's policy initiatives, or is chilled from applying to a new job or answering the Loyalty Question truthfully, new harm is inflicted that cannot otherwise be remedied.

### C.    The Balance of Equities and the Public Interest Favor a Preliminary Injunction.

The balance of the equities and the public interest also weigh heavily in Plaintiffs' favor. *Nken*, 556 U.S. at 435 (explaining that these factors merge when the government opposes a preliminary injunction). Absent preliminary relief, the Loyalty Question will appear on more federal job postings by the day, agencies will continue to use applicants' responses to the Loyalty Question in hiring decisions, and Plaintiffs' members will continue suffering First Amendment injuries. Plaintiffs have a substantial interest in remedying this unconstitutional harm.

On the other side of the ledger, the government has no interest in continuing to use the Loyalty Question. As an initial matter, "it is always in the public interest to prevent the violation of a party's constitutional right." *Dorce v. Wolfe*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020). But here, the case for preliminary relief is even stronger, because the government has never articulated *any purpose* for the Loyalty Question. OPM does not identify any interest served by the Loyalty Question, much less a lawful one. Nor could it, because the Loyalty Question is wholly irrelevant to career civil service hiring.

### D.    This Court Has Jurisdiction Over Plaintiffs' First Amendment and APA Claims.

This court has subject matter jurisdiction over Plaintiffs' First Amendment and APA claims under 28 U.S.C. § 1331, and the Civil Service Reform Act ("CSRA") does not divest that jurisdiction. Although the Supreme Court has held that the CSRA's preclusive effect applies when a "covered employee" challenges a "covered employment action," *Elgin v. Dep't of Treasury*, 567 U.S. 1, 14 (2012), Plaintiffs here are not "covered employees" and are not

challenging a "covered employment action." They are not challenging a personnel action at all. Instead, Plaintiffs assert *constitutional and APA claims* challenging a government-wide policy. This Court plainly has jurisdiction over those claims, as numerous courts have concluded. *See, e.g.*, *Somerville Pub. Sch. v. McMahon*, 139 F.4th 63, 72 (1st Cir. 2025) (district court had jurisdiction over unions' constitutional and APA challenges), *administratively stayed sub. nom.*, *McMahon v. New York*, 125 S.Ct. 2643 (2025); *AFGE v. U.S. Off. of Pers. Mgmt.*, 2025 WL 900057 (N.D. Cal. Mar. 24, 2025) (same); *AFGE v. Trump*, 2025 WL 1482511 (N.D. Cal. May 22, 2025), *aff'd*, 2025 WL 1541714 (9th Cir. May 30, 2025) (same); *Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.*, 2025 WL 1865971 (D. Md. July 7, 2025) (same).

The Ninth Circuit's recent opinion on CSRA channeling—which, as the First Circuit has recognized, the Supreme Court implicitly affirmed[11]—is directly on point. In *AFGE v. Trump* ("*AFGE*"), two of the same federal employee unions that are plaintiffs here (as well as other plaintiffs) brought constitutional and APA challenges to the Trump Administration's widespread reductions-in-force (RIFs). Even though a RIF itself is a personnel action, the Ninth Circuit held that union plaintiffs' claims, aimed at government-wide directives and not at particular agency personnel actions, were not channeled. The Court explained that "the CSRA does not allow for review of Plaintiffs' constitutional and statutory claims at all." *Am. Fed'n of Gov't Emps. v. Trump*, 139 F.4th 1020, 1033 (9th Cir. 2025). Therefore, the Court concluded, it was "unlikely that Congress intended for the CSRA to preclude review for parties not even covered by that statute who allege claims outside the [CSRA administrative fora's] jurisdiction." *Id.*

---

[11] Although the Supreme Court stayed the injunction at issue in *AFGE*, the First Circuit has noted that because the Supreme Court issued a stay on the merits, this "indicates that the Supreme Court concluded that the district court likely had jurisdiction to make that decision." *New York v. Kennedy*, 155 F.4th 67, 75 (1st Cir. 2025). Therefore, the First Circuit stated that, "in issuing its interim order in *AFGE*, the Supreme Court likely decided that the CSRA did *not* funnel the dispute at issue" through the CSRA. *New York*, 155 F.4th at 75.

The argument for this Court's jurisdiction is even stronger here. Not only are Plaintiffs bringing constitutional and APA claims, like in *AFGE*, but for Plaintiffs whose members are chilled from speaking and deterred from applying for federal jobs, there is no underlying personnel action at all. And even Plaintiffs' members who have applied to federal positions—and have experienced different First Amendment harms—are not challenging any individual hiring decision. Instead, Plaintiffs allege that the use of the Loyalty Question in job postings—separate from and prior to any subsequent hiring decision—compels Plaintiffs' members to speak on protected topics. This case is not about a particular hiring decision; it's about First Amendment injuries that occur independent of any personnel decision. As a result, the claims are not channeled. *See, e.g.*, *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 369 (D.D.C. 2020) (finding jurisdiction over a federal employee's "challenge to defendants' allegedly unconstitutional interference with her First Amendment rights, distinct from and antecedent to her experiencing a covered personnel action"); *Weaver v. U.S. Info. Agency,* 87 F.3d 1429, 1434 (D.C. Cir. 1996) (holding that district court had jurisdiction over federal employee's "pre-enforcement attack on a regulation restricting employee speech"); *see also United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995) (allowing union challenge to government-wide ban prohibiting federal employees from receiving honoraria and holding ban violated union members' First Amendment rights).

The familiar *Thunder Basin* factors —which courts use to assess whether Congress intended a special statutory review scheme to impliedly preclude jurisdiction over particular claims—strongly confirm this court's jurisdiction over Plaintiffs' claims. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212) (1994). Under *Thunder Basin* "step one," a court determines whether Congressional intent to "allocate[] initial review to an administrative body . . . is fairly

discernible in [a] statutory scheme." *Id.* at 207. While the CSRA establishes a "comprehensive and integrated" scheme for reviewing a covered "*personnel action* taken against federal employees," *United States v. Fausto*, 484 U.S. 439, 454 (1988) (emphasis added), or challenging "prohibited personnel practices," *see* 5 U.S.C. § 1214 (channeling such practices to the Office of Special Counsel), as noted above, Plaintiffs do not challenge a *personnel action* or *personnel practice* at all but a government-wide policy that compels political speech from some job applicants and chills political speech from others, regardless of whether they are current federal employees and regardless of whether they are eventually subject to some employment consequence.[12]

Nor have Plaintiffs brought a labor relations claim against agencies with whom they have collective bargaining agreements. *See* 5 U.S.C. ch. 71 (channeling certain claims to the Federal Labor Relations Authority). Plaintiffs do not have a collective bargaining relationship with OPM, *see* 5 U.S.C. § 7111(a) (establishing union's exclusive representative status in regard to a specific agency), and OPM is not the employer of prospective candidates for federal positions for purposes of labor-management relations, *see* 5 U.S.C. § 7103(11). On the contrary, Plaintiffs are bringing a First Amendment and APA challenge on behalf of *all* of their members—many of whom are *not* federal employees but are simply interested in applying for federal jobs. These critical differences distinguish this case from those that are channeled to the CSRA's administrative review schemes. The CSRA's review schemes simply have no bearing here.

This Court has jurisdiction under *Thunder Basin* "step one" for the additional, independent reason that the CSRA's review scheme is no longer functioning as Congress

---

[12] The CSRA's channeling of certain adverse actions to the Merit Systems Protection Board ("MSPB") is similarly inapplicable, as Plaintiffs' claims do not relate to any adverse employment actions against existing employees. *See* 5 U.S.C. § 7512.

intended, which undermines Congress's implied intent to channel claims via the CSRA. *See, e.g.*, *Nat'l Ass'n of Immigr. Judges v. Owen*, 139 F.4th 293, 299 (4th Cir. 2025); *Elev8 Baltimore, Inc.*, at *18 (finding jurisdiction and noting that "the administrative channels may be presently unavailable.").[13]

But even if this Court were to find that the CSRA generally allocates initial review of certain claims to an administrative body, *Thunder Basin* "step two" leaves no doubt that this court has jurisdiction. The question at "step two" is "whether the *particular claims* brought were of the type Congress intended to be reviewed within this statutory structure." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 186 (2023) (internal citations omitted) (emphasis added). Three considerations aid this inquiry: (1) could precluding judicial review "foreclose all meaningful judicial review of the claim"; (2) is the claim "wholly collateral to [the] statute's review provisions"; and (3) is the claim "outside the agency's expertise"? *Id.* The answer to each question is "yes."

As to the first consideration, preclusion here would foreclose all meaningful judicial review. As explained, no CSRA administrative forum can review Plaintiffs' constitutional and APA claims. Moreover, judicial review of the constitutional claim would come too late to be

---

[13] As the Fourth Circuit recently noted, "Congress intended for the Civil Service Reform Act to strip district courts of jurisdiction *only* if federal employees were otherwise able to receive adequate and independent review of their claims." *Nat'l Ass'n of Immigr. Judges*, 139 F.4th at 299 (emphasis added). "Congress left little doubt about the importance of an independent MSPB and Special Counsel [and FLRA] free from *any control or direction by the President.*" *Id.* at 306 (internal citations omitted). But that independence no longer exists. President Trump has fired the Chair of the Merit Systems Protection Board, the Chair of the FLRA, and the Special Counsel—and he has done so in admitted contravention of the CSRA's for-cause removal protections. *See Am. Fed'n of Gov't Emps., AFL-CIO v. United States Off. of Pers. Mgmt.*, 2025 WL 2633791, at *12-14 (N.D. Cal. Sept. 12, 2025). "Congress enacted the CSRA on the bedrock principle that the members of [the CSRA agencies] would be protected from removal on political grounds," *Owen*, 139 at 307—because that bedrock principle has collapsed, so too has Congress's design.

meaningful. The Supreme Court's *Axon* decision is directly on point. In *Axon*, the plaintiffs, who were subject to enforcement proceedings before administrative law judges in two federal agencies, challenged the constitutionality of those proceedings in district court. *Id.* at 182-83. Even though the plaintiffs' constitutional claims could have been heard by a federal appellate court after the agency proceedings, the Supreme Court held that "a problem remains, stemming from the interaction between the alleged injury and the timing of review." *Id*. at 191. The problem was that plaintiffs alleged "a here-and-now-injury," one that "is impossible to remedy once the proceeding is over," meaning that "[j]udicial review of [plaintiffs'] structural constitutional claims would come too late to be meaningful." *Id*. Those concerns apply with even greater force here: each time Plaintiffs' members encounter a job posting that includes the Loyalty Question, they suffer a "here-and-now" First Amendment injury, one that, by definition, "unquestionably constitutes irreparable injury." *Cuomo*, 592 U.S. at 19.

The second and third considerations at *Thunder Basin* "step two" also favor jurisdiction. Plaintiffs seek to vacate a government-wide policy because that policy violates their members' First Amendment rights and the APA. As explained above, those are not CSRA-related claims, are wholly collateral to the CSRA's review provisions, are not claims over which any CSRA administrative fora have any expertise, and in fact are not even claims for which those fora have jurisdiction or can provide relief. *See AFGE*, 139 F.4th at 1032. This court has, and should exercise, jurisdiction over Plaintiffs' claims.

### E.    A Stay and Preliminary Injunction Are Necessary and Appropriate Remedies.

This Court should both (1) exercise its authority under 5 U.S.C. § 705 to stay the MHP, insofar as it directs the inclusion and use of the Loyalty Question in federal civil service hiring; and (2) exercise its equitable authority to preliminarily enjoin the implementation, requirement,

or use of the Loyalty Question in federal civil service hiring, and the reliance on answers to the Loyalty Question in any manner.

A court addressing an APA claim may stay the challenged agency action(s) pending judicial review when "necessary to prevent irreparable injury." 5 U.S.C. § 705; *California v. Kennedy*, No. CV 25-12019-NMG, 2025 WL 2807729, at *3 (D. Mass. Oct. 1, 2025). "[C]ourts routinely stay already-effective agency action under Section 705." *Ass'n of Am. Univs.*, 792 F. Supp. 3d at 182 (quotations omitted). Here, Section 705 relief is warranted because the MHP and MHP Guidance violate the APA on several grounds, and Plaintiffs otherwise satisfy the requirements for a stay. Indeed, for reasons described *supra* at Part III.A.1, a stay is "necessary to prevent irreparable injury," 5 U.S.C. § 705, especially the irreparable First Amendment injuries visited upon Plaintiffs' members by the Loyalty Question and its implementation, *see Cuomo*, 592 U.S. at 19. This Court should therefore stay the MHP and MHP Guidance, to the extent it directs the inclusion and use of the Loyalty Question in federal hiring.

In addition to a Section 705 stay, this Court should enter preliminary injunctive relief to ensure that Plaintiffs' members are protected from the Loyalty Question while this litigation is pending. In crafting equitable relief, "courts must consider what is necessary, what is fair, and what is workable," while limiting such relief to administering "complete relief between the parties." *Ass'n of Am. Univs.*, 792 F. Supp. at 182 (quotations omitted); *see also Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025). Here, Plaintiffs' members have applied, are applying, and will apply for jobs across the federal government. Kelley Decl. ¶ 9; Sutton Decl. ¶ 9; Colón Decl. ¶ 7. It is impossible to know in advance the federal jobs for which union members will apply, so it is difficult to conceive of how "complete relief" for Plaintiffs could be achieved without enjoining the implementation, requirement, or use of the Loyalty Question in *all* federal civil service job

34

postings, and reliance on answers to the Loyalty Question in any manner. But even if the government could somehow create two postings for every job—one without the Loyalty Question for Plaintiffs' members and one with the Loyalty Question for everyone else—such an approach would exacerbate, not solve, the harms to Plaintiffs' members. Hiring managers could continue to screen candidates for ideological alignment and Defendants would retain the ability to discriminate against Plaintiffs' members relative to other federal job applicants who answered the Loyalty Question.

Under these circumstances, enjoining the use of the Loyalty Question in all federal job postings is the only way to prevent irreparable and widespread harm, including First Amendment injuries, to Plaintiffs' members. *See Chicago Women in Trades v. Trump*, 2025 WL 3034056, at *6 (N.D. Ill. Oct. 30, 2025) ("[T]he Court—keeping in mind that 'complete relief' is a narrower concept than 'universal relief'—concludes that enjoining all enforcement of the [challenged provision] is justified by the 'necessities of the particular case.'" (citing *Casa*, 606 U.S. at 854)). The more appropriate and straightforward remedy is to prohibit the use of the Loyalty Question while this case is pending.

IV.    **CONCLUSION**

For the reasons set forth above, the Court should grant Plaintiffs' motion and issue the requested Section 705 Stay and preliminary injunction.

3117700

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), Plaintiffs believe oral argument will assist the Court and so respectfully request the opportunity to be heard.

Respectfully submitted,

KEKER, VAN NEST & PETERS LLP

Dated: November 19, 2025          By:   */s/ Warren A. Braunig*
                                                    Warren A. Braunig*
                                                    Sara Fitzpatrick*
Charlotte J. Kamai*
Cara R. Meyer*
633 Battery Street
San Francisco, CA 94111-1809
Telephone: (415) 391 5400
wbraunig@keker.com
sfitzpatrick@keker.com
ckamai@keker.com
cmeyer@keker.com
*Counsel for Plaintiffs*

Tsuki Hoshijima (BBO # 693765)
Elena Goldstein*
Webb Lyons**
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Telephone: (202) 991 0159
thoshijima@democracyforward.org
egoldstein@democracyforward.org
wlyons@c.democracyforward.org**
**Of Counsel*
*Counsel for Plaintiffs*

Ori Lev*
Jacek Pruski*
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Avenue NW Suite #163
Washington, D.C. 20006
Telephone: (202) 579-4582
ori.lev@protectdemocracy.org
jacek.pruski@protectdemocracy.org
*Counsel for Plaintiffs*

Rushab B. Sanghvi*
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street, NW
Washington, DC 20001
Telephone: (202) 639-6426
sanghr@afge.org
*Counsel for Plaintiff American Federation
of Government Employees, AFL-CIO (AFGE)*

Matthew S. Blumin*
AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO
1625 L Street NW, Washington DC, 20036
Telephone: (202) 775-5900
mblumin@afscme.org
*Counsel for Plaintiff American Federation of State,
County, and Municipal Employees, AFL-CIO
(AFSCME)*

Sarah Suszczyk*
AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO
159 Burgin Parkway
Quincy, MA 01269
Facsimile:(617) 376-0285
Ssuszczyk@nage.org
*Counsel for Plaintiff National Association of
Government Employees, Inc. (NAGE)*

*Admitted pro hac vice

3117700

## CERTIFICATE OF SERVICE

I certify that this document is being filed through the Court's electronic filing system, which serves counsel for other parties who are registered participants as identified on the Notice of Electronic Filing (NEF). Any counsel for other parties who are not registered participants are being served by first class mail.

*/s/Warren A. Braunig*
Warren A. Braunig

38

3117700