# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.,*<br><br>    *Plaintiffs,*<br><br>v.<br><br>SCOTT KUPOR, in his official capacity as Director of the Office of Personnel Management, *et al.,*<br><br>    *Defendants.* | No.: 1:25-cv-13305 |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND FOR STAY UNDER 5 U.S.C. § 705

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

FACTUAL AND LEGAL BACKGROUND ...................................................................... 4

I.     OPM's Merit Hiring Plan ......................................................................................... 4

II.    Plaintiffs' Lawsuit ................................................................................................... 7

STANDARD FOR RELIEF .............................................................................................. 8

ARGUMENT ..................................................................................................................... 8

I.     Plaintiffs cannot show a likelihood of success on the merits because they cannot establish jurisdiction over their claims .................................................................................... 9

       A.     Plaintiffs cannot establish Article III standing. ............................................. 9

       B.     District Court Jurisdiction over Plaintiffs' claims is precluded by the CSRA and FSL-MRS .......................................................................................................... 15

              1.     Congress intended to preclude district court jurisdiction. ................. 16

              2.     Plaintiffs' claims are of the type Congress intended to be reviewed within the FSL-MRS scheme. ............................................................... 21

       C.     Plaintiffs have failed to challenge final agency action reviewable under the APA. ........... 24

II.    Plaintiffs cannot establish irreparable harm ...................................................... 26

III.   The balance of equities tips in Defendants' favor. ............................................ 28

IV.    Relief should be limited to the members of Plaintiff-Unions that have standing to challenge the policy priorities question. ........................................................................ 29

CONCLUSION ................................................................................................................ 30

## TABLE OF AUTHORITIES

**Cases**

*AFGE v. Sec'y of the Air Force,*
716 F.3d 633 (D.C. Cir. 2013) ................................................................................ *passim*

*AFGE, AFL-CIO v. Ezell,*
No. 25-10276-GAO, 2025 WL 470459 (D. Mass. Feb. 12, 2025) ....................... 9, 15, 18

*AFGE, AFL-CIO v. U.S. Off. of Pers. Mgmt.,*
770 F. Supp. 3d 1215 (N.D. Cal. 2025) ................................................................. 13

*Allscripts Healthcare, LLC v. DR/Decision Res., LLC,*
592 F. Supp. 3d 1 (D. Mass. 2022) ........................................................................ 8

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump,*
929 F.3d 748 (D.C. Cir. 2019) ............................................................................... *passim*

*American Federation of Government Employees, AFL-CIO v. Trump,*
139 F.4th 1020 (9th Cir. May 30, 2025) ................................................................ 19

*Amoco Prod. Co. v. Vill. of Gambell,*
480 U.S. 531 (1987) ............................................................................................... 28

*Axon Enter., Inc. v. Fed. Trade Comm'n,*
598 U.S. 175 (2023) ............................................................................................... *passim*

*Benisek v. Lamone,*
585 U.S. 155 (2018) ............................................................................................... 26

*Bennett v. Spear,*
520 U.S. 154 (1997) ............................................................................................... 25

*Cafeteria & Rest. Workers Union, Loc. 473, AFL-CIO v. McElroy,*
367 U.S. 886 (1961) ............................................................................................... 28

*Carducci v. Regan,*
714 F.2d 171 (D.C. Cir. 1983) ............................................................................... 20

*Charlesbank Equity Funds II v. Blinds To Go, Inc.,*
370 F.3d 151 (1st Cir. 2004) .............................................................................. 8, 26

*Conservation L. Found., Inc. v. Acad. Express, LLC,*
129 F.4th 78 (1st Cir. 2025) .................................................................................. 10

*Dep't of the Air Force Carswell Air Force Base, Tex. (Activity) & AFGE AFL-CIO Loc. 1364 (Union),*
35 F.L.R.A. 754 (Apr. 27, 1990) ........................................................................... 22

*Evans v. Thompson,*
518 F.3d 1 (1st Cir. 2008) ...................................................................................... 15

*Fed. L. Enf't Officers Ass'n v. Ahuja,*
62 F.4th 551 (D.C. Cir. 2023) ............................................................................... 23

*Filebark v. U.S. Dep't of Transp.,*
555 F.3d 1009 (D.C. Cir. 2009) ............................................................................ 20

*Food & Drug Admin. v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) .................................................................................................9, 13, 14

*Fornaro v. James*,
  416 F.3d 63 (D.C. Cir. 2005) ..............................................................................................20

*Friends of Merrymeeting Bay v. U.S. Dep't of Com.*,
  810 F. Supp. 2d 320 (D. Me. 2011) .....................................................................................25

*FTC v. Standard Oil Co.*,
  449 U.S. 232 (1980) ............................................................................................................25

*Gonzalez-Droz v. Gonzalez-Colon*,
  573 F.3d 75 (1st Cir. 2009)....................................................................................................8

*Graham v. Ashcroft*,
  358 F.3d 931 (D.C. Cir. 2004) ................................................................................16, 17, 20

*Heckler v. Ringer*,
  466 U.S. 602 (1984) ............................................................................................................23

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ............................................................................................................10

*Hunt v. Wash. State Apple Advert. Comm'n*,
  790 F. Supp. 3d 63 (D. Mass. 2025) ...................................................................................10

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
  110 F.4th 295 (1st Cir. 2024) ................................................................................................9

*Jalbert v. SEC*,
  327 F. Supp. 3d 287 (D. Mass. 2018) ..................................................................................21

*Jarkesy v. SEC*,
  803 F.3d 9 (D.C. Cir. 2015)............................................................................................16, 24

*Mass. Corr. Officers Federated Union v. Baker*,
  567 F. Supp. 3d 315 (D. Mass. 2021)...................................................................................28

*Matos ex rel. Matos v. Clinton Sch. Dist.*,
  367 F.3d 68 (1st Cir. 2004)...................................................................................................26

*Meese v. Keene*,
  481 U.S. 465 (1987) ............................................................................................................14

*N.Y. Republican State Comm. v. Sec. & Exch. Comm'n*,
  799 F.3d 1126 (D.C. Cir. 2015).............................................................................................15

*Nat'l Treasury Emps. Union Chapter 61 & U.S. Dep't of the Treasury Internal Revenue Serv. Albany Dist.*,
  39 F.L.R.A. 476 (Feb. 12, 1991) .....................................................................................19, 24

*Nken v. Holder*,
  556 U.S. 418 (2009) ..........................................................................................................8, 28

*Office of Personnel Management v. American Federal Government Employees*,
  145 S. Ct. 1914 (2025)..........................................................................................................13

*Peoples Fed. Sav. Bank v. People's United Bank,*
    672 F.3d 1 (1st Cir. 2021) ........................................................................................8

*Sampson v. Murray,*
    415 U.S. 61 (1974) ..................................................................................................28

*Smith v. Bayer Corp.,*
    564 U.S. 299 (2011) ................................................................................................29

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ................................................................................................29

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ................................................................................................16

*Trump v. American Federation of Government Employees,*
    606 U.S.---, 145 S. Ct. 2635 (2025) ......................................................................11

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025) ................................................................................................29

*U.S. Dep't of Health & Hum. Servs. v. Fed. Lab. Rels. Auth.,*
    833 F.2d 1129 (4th Cir. 1987) ................................................................................22

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.,*
    517 U.S. 544 (1996) ..................................................................................................9

*United States v. Fausto,*
    484 U.S. 439 (1988) ..........................................................................................16, 17

*Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.,*
    645 F.3d 26 (1st Cir. 2011) ......................................................................................8

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ..................................................................................................8

*Winter v. Nat. Res. Def. Counsel, Inc.,*
    555 U.S. 7 (2008) ................................................................................................8, 28

*Wreal, LLC v. Amazon.com, Inc.,*
    840 F.3d 1244 (11th Cir. 2016) ..............................................................................26

**Statutes**

5 U.S.C. § 704 ................................................................................................................25

5 U.S.C. § 705 ............................................................................................................7, 9

5 U.S.C. § 2301 ................................................................................................................2

5 U.S.C. § 2301(b) ....................................................................................................14, 17

5 U.S.C. § 2301(b)(2) ..............................................................................................*passim*

5 U.S.C. § 2302(b) ..................................................................................................*passim*

5 U.S.C. § 2302(a) ..................................................................................................17, 18

5 U.S.C. § 7103(a)(9) ....................................................................................................24

5 U.S.C. § 7103(a)(9)(B) ........................................................................................................23

5 U.S.C. § 7104(d) ................................................................................................................21

5 U.S.C. § 7703(b) ................................................................................................................17

28 U.S.C. § 1331 ...................................................................................................................15

## Regulations

Reforming the Federal Hiring Process and Restoring Merit to Government Service,
    Exec. Order No. 14,170, 90 Fed. Reg. 8621 (Jan. 20, 2025)............................................ 1, 4, 22

Implementing the President's "Department of Government Efficiency" Workforce Optimization
    Initiative, Exec. Order No. 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025) ..............................2, 11

## Other Authorities

Off. of Personnel Mgmt., *Merit Hiring Plan* (2025),
    https://www.opm.gov/chcoc/transmittals/2025/Merit%20Hiring%20Plan%205-29-
    2025%20FINAL.pdf ................................................................................................................*passim*

Off. of Pers. Mgmt., *Merit Hiring Plan Frequently Asked Questions* (May 29, 2025),
    https://www.opm.gov/policy-data-oversight/hiring-information/merit-hiring-plan-
    resources/merit-hiring-plan-frequently-asked-questions/ .................................................7, 11

Off. of Pers. Mgmt., *Additional Merit Hiring Plan Guidance on Using the Four Short Essay Questions* (2025),
    https://content.govdelivery.com/accounts/USOPM/bulletins/3e5f668.............................*passim*

U.S. Merit Systems Protection Bd., *Frequently Asked Questions about the Lack of Quorum Period and
    Restoration of the Full Board* (Nov. 14, 2025),
    https://www.mspb.gov/FAQs%20Absence%20of%20Board%20Quorum%2011-14-25.pdf......20

## INTRODUCTION

Since being reelected, President Trump has worked to streamline and modernize the federal workforce. As part of that effort, the President issued Executive Order 14,170 on January 20, 2025, directing the Office of Management and Budget and the Office of Personnel Management to help develop a federal hiring plan implementing the Order's directives. The result was OPM's issuance of a guidance memo titled the Merit Hiring Plan on May 29. Off. of Personnel Mgmt., *Merit Hiring Plan* (2025), 10, https://www.opm.gov/chcoc/transmittals/2025/Merit%20Hiring%20Plan%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%20FINAL.pdf ("MHP"). Relevant here, the MHP modified the process for assessing applicants for certain civil service jobs by including four optional, short-essay questions designed to prompt short narrative responses from applicants. Plaintiffs, three federal employee unions, brought suit on November 6 challenging one of those questions in particular: "How would you help advance the President's Executive Orders and policy priorities in this role? Identify one or two relevant Executive Orders or policy initiatives that are significant to you, and explain how you would help implement them if hired." *Id.* at 10 ("policy priorities question"). And on November 19—more than five months after the MHP was issued—Plaintiffs moved for a preliminary injunction, arguing that the question violates the First Amendment and the Administrative Procedure Act. But Plaintiffs can show neither district court jurisdiction over their complaint nor risk of irreparable harm from the question, so their preliminary injunction motion should be denied.

The policy principles question, as one part of the MHP, is intended to effectuate Executive Order 14170's directive to develop a federal hiring plan. Consistent with the Order, the MHP directs federal agencies to include all four short-essay questions in competitive service job opportunity announcements for positions rated GS-05 and above, subject to limited exceptions. Agencies may also exempt certain positions from this requirement. The MHP further clarifies how the short-essay questions are to be used:

- Responses are to be neither scored nor rated; the short-essay questions are intended to permit candidates to provide additional information about themselves and their motivation for applying for the position.

- Vacancy announcements are to inform candidates that their responses are not required and will not be scored.

- Agencies are not to use applicants' responses to assess whether they are qualified for the position, and are not to use responses as an "ideological litmus test."

- Applicants are not required to answer any of the questions, and will not be disqualified if they do not.

- Agencies' use of the questions must conform to the Merit System Principles set forth at 5 U.S.C. § 2301, one of which requires that "applicants for employment should receive fair and equitable treatment in all aspects of personnel management without regard to political affiliation . . . and with proper regard for their privacy and constitutional rights." 5 U.S.C. § 2301(b)(2).

Despite these qualifications, Plaintiffs argue that any use of the policy priorities question should be preliminarily enjoined as an allegedly improper means for agencies to assess the political leanings of applicants, allowing them to make hiring decisions based on the narrative responses that applicants voluntarily choose to (or choose not to) provide. Their motion should be denied on at least two grounds.

First, they cannot show a likelihood of success on the merits of their claims, as they lack Article III standing and their claims are statutorily channeled away from district court review under the Civil Service Reform Act of 1978 ("CSRA") and the Federal Service Labor-Management Relations Statute ("FSL-MRS"). On July 8, 2025, the Supreme Court granted the government's application for a stay of a district court's preliminary injunction in *Trump, et al. v. AFGE, et al.*, No. 24A1174, a broad challenge to reduction-in-force ("RIF") actions across the Executive Branch, including OPM's role in implementing the President's Executive Order 14210 through a Workforce Memorandum it issued jointly with the Office of Management and Budget. In relevant part, the Court explained that "the Government is likely to succeed on its argument that the Executive Order and Memorandum are

2

lawful[.]"  And concurring in the grant of stay, Justice Sotomayor explained that challenged Executive Order "directs agencies to plan [RIFs] 'consistent with applicable law,' . . . and the resulting joint memorandum from [OMB and OPM] reiterates as much."  So too here.  OPM's guidance materials to agencies makes clear that they must not use the short-essay questions as an ideological "litmus test" and must comply with core civil service principles.  Thus, Plaintiffs cannot satisfy the required elements of standing to assert claims against OPM challenging other agencies' actual or potential use of the policy priorities question.

Likewise, as to channeling.  As this Court held in February in denying a preliminary injunction motion by these very same Plaintiffs in their challenge to OPM's Deferred Resignation Program, claims materially analogous to those they assert here are exclusively channeled through the CSRA's review scheme (for employees) and that of the FSL-MRS (for federal labor unions that represent those employees).  *See AFGE, et al. v. Ezell, et al.*, Civ. No. 25-10276-GAO (Feb. 12, 2025) (slip op.).  Under the FSL-MRS in particular, Plaintiffs can assert these very claims before the Federal Labor Relations Authority ("FLRA"), and from there to a federal court of appeals, if necessary.  Thus, their claims fall outside of district court jurisdiction, and they cannot show a likelihood of success on the merits for that reason.

Second, Plaintiffs cannot show a likelihood of irreparable harm absent the requested preliminary injunction.  At the threshold, their decision to wait more than five months from OPM's issuance of the MHP on May 29, 2025, before seeking a preliminary injunction belies any suggestion of an emergent need for such extraordinary relief and their motion should be denied for that reason alone.  Beyond that, their claims represent the sort of quintessential employment disputes that cannot suggest irreparable harm.  That one of their three claims arises under First Amendment does not change that conclusion, as the First Amendment injuries they allege — are not substantiated and would not be traceable to OPM's guidance regarding the policy priorities question in any event.

For those reasons, the Court should deny Plaintiffs' motion for preliminary injunction.

## FACTUAL AND LEGAL BACKGROUND

### I.    OPM's Merit Hiring Plan

On January 20, 2025, President Trump issued Executive Order 14,170 ("the EO ") directing the Assistant to the President for Domestic Policy, in consultation with the Directors of the Office of Management and Budget (OMB) and the Office of Personnel Management (OPM), to develop a Federal Hiring Plan aimed at instituting a number of policies and priorities with respect to civil service hiring and recruitment. *See* Reforming the Federal Hiring Process and Restoring Merit to Government Service, Exec. Order No. 14,170, 90 Fed. Reg. 8621 (Jan. 20, 2025). Among other directives, the EO directs that the Federal Hiring Plan shall "prevent the hiring of individuals who are unwilling to defend the Constitution or to faithfully serve the Executive Branch." *Id.* § 2.

Following issuance of the President's EO, the White House Domestic Policy Council and OPM issued the "Merit Hiring Plan" in the form of a May 29, 2025, memorandum sent to the heads and acting heads of all federal agencies. This memorandum describes the Merit Hiring Plan as an effort by the Administration to "bring[] to the Federal workforce only highly capable Americans dedicated to the furtherance of American ideals, values, and interests," that must achieve seven specific goals, the first two of which state that:

1.    Prioritize recruitment of individuals committed to improving the efficiency of the Federal government, passionate about the ideals of our American republic, and committed to upholding the rule of law and the United States Constitution;

2.    Prevent the hiring of individuals based on their race, sex, or religion, and prevent the hiring of individuals who are unwilling to defend the Constitution or to faithfully serve the Executive Branch[.]

*See* MHP at 1.

As part of the Administration's effort to achieve those goals with respect to recruitment and hiring, the Merit Hiring Plan directs agencies to add standard language to all job opportunity announcements emphasizing that "candidates should be committed to improving the efficiency of the Federal government, passionate about the ideals of our American republic, and committed to upholding the rule of law and the United States Constitution." *See id.* at 9. The MHP also directs agencies to include "four short, free-response essay questions" in all Federal job announcements. *See id.* One of the four questions that the MHP directs agencies to include asks "[h]ow would you help advance the President's Executive Orders and policy priorities in this role? Identify one or two relevant Executive Orders or policy initiatives that are significant to you, and explain how you would help implement them if hired." *Id.* at 10. The MHP sets forth no metrics by which responses are to be evaluated; nor does it explicitly state that applicants must respond to each question. The only requirements for these narrative responses are that they cannot exceed 200 words per question and that the applicant must certify that "they are using their own words, and did not use a consultant or AI (such as a large language model [LLM])." *See id.*

On June 23, 2025, OPM issued additional guidance clarifying the intended use of the short-essay questions set forth in the MHP June 23 Additional Guidance.[1] The June 23 Additional Guidance reiterated that "teachers, Wage Grade employees, and seasonal workers" are exempt from use of the short-essay questions, but also emphasized that "[a]gencies may exempt other positions from use of the questions in their discretion, where they determine that such an exemption is appropriate for the position." June 23 Additional Guidance. It likewise emphasized that while use of the short-essay

---

[1] *See* Off. of Pers. Mgmt., *Additional Merit Hiring Plan Guidance on Using the Four Short Essay Questions* (2025), https://content.govdelivery.com/accounts/USOPM/bulletins/3e5f668 ("June 23 Additional Guidance").

questions is encouraged, "it is not a requirement."  *Id.*  And it further emphasized several important qualifications on use of the questions:

- "Answers to [the] questions are not scored or rated."

- "Agencies should treat responses to [the] questions in the same way they would treat the submission of a cover letter."

- "The questions give candidates an opportunity to provide additional information about themselves, their background, and dedication to public service, but . . . must not be used to impose an ideological litmus test on candidates."

- "If an applicant does not answer the questions along with their application, they will not be disqualified or screened out."

- "During the hiring process, answers to the . . . questions will be reviewed only by the hiring manager and agency leadership (or a designee), as part of an application packet forwarded to the [hiring] manager and later to agency leadership if the candidate is recommended for selection."

- "Hiring managers and agency leaders or designees must only use the questions in accordance with Merit System Principles, and should additionally be mindful of Prohibited Personnel Practices."

*Id.*

Further, on September 2, 2025, OPM issued another guidance document titled "Merit Hiring Plan Frequently Asked Questions" to assist agencies with implementing the MHP memorandum, as clarified by the June 23 Additional Guidance.  The FAQ provides answers to four questions regarding the four short-essay questions. These questions and answers are reproduced in full below:

**Q25 - Do the four short essay questions have to be included in every job opportunity announcement?**
Response: The four short essay questions (Constitution, Efficiency, Executive Orders, Work Ethic) must be used on all competitive service job opportunity announcements open to the public graded at GS-05 or above, except for job announcements for teacher, Wage Grade, and seasonal positions. While it is not a requirement to use these questions for competitive merit promotion hiring (both internal and external), agencies are encouraged to do so. Agencies may exempt other positions from use of the questions in their discretion, where they determine that such an exemption is appropriate for the position. Agencies should keep documentation in the case file as to why such an exemption was granted.

**Q26 - How are applicant answers to the 4 essay questions used?**
Response: Answers to these questions are not scored or rated. Agencies should treat responses to these questions in the same way they would treat the submission of a cover letter. The questions give candidates an opportunity to provide additional information about themselves, their background, and dedication to public service, but must not be used as a means of determining whether the candidate fulfills the qualifications of a position. The questions also must not be used to impose an ideological litmus test on candidates. If an applicant does not answer the questions along with their application, they are not disqualified or screened out.

**Q27 - Who should review applicant answers to the 4 essay questions?**
Response: Answers to the four essay questions are reviewed only by the hiring manager and agency leadership (or a designee), as part of an application packet forwarded to the manager and later to agency leadership if the candidate is recommended for selection. Hiring managers and agency leaders or designees must only use the questions in accordance with Merit System Principles, and should additionally be mindful of Prohibited Personnel Practices.

**Q28 - Are agencies required to include the 4 short essay questions for Senior Technical/Senior Leader (ST/SL) positions?**
Response: Yes, these positions are included in this requirement.

Off. of Pers. Mgmt., Merit Hiring Plan Frequently Asked Questions at 7-8 (May 29, 2025),

https://www.opm.gov/policy-data-oversight/hiring-information/merit-hiring-plan-

resources/merit-hiring-plan-frequently-asked-questions/ ("MHP FAQ").

## II.    Plaintiffs' Lawsuit

Plaintiffs American Federation of Government Employees, AFL-CIO; American Federation

of State, County, and Municipal Employees, AFL-CIO; and National Association of Government

Employees filed this suit on November 6, 2025, on behalf of their members. Compl. ¶ 26. Plaintiffs

raise three claims challenging the White House and OPM's joint directive to all federal agencies to

include the policy priorities question in certain civil service job applications. Plaintiffs' first claim

alleges that the question violates the First Amendment; the second and third claims allege violations

of the Administrative Procedure Act ("APA"). *Id.* Plaintiffs filed the instant motion for a preliminary

injunction on November 19, 2025, citing an ongoing constitutional injury for which they seek

preliminary injunctive relief and a stay under 5 U.S.C. § 705.

## STANDARD FOR RELIEF

A preliminary injunction "is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2021) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)).  A movant may be awarded such an extraordinary remedy only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Counsel, Inc.*, 555 U.S. 7, 22 (2008).  A preliminary injunction should not be issued "based only on a possibility of irreparable harm." *Id.*  To establish entitlement to an injunction, Plaintiffs bear the burden of establishing that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm absent preliminary relief, (3) the balance of the equities favors them, and (4) an injunction is in the public interest. *Allscripts Healthcare, LLC v. DR/Decision Res., LLC*, 592 F. Supp. 3d 1, 3 (D. Mass. 2022).  The last two factors "merge when the Government is the opposing party" opposing the preliminary injunction.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Irreparable harm "constitutes a necessary threshold showing for an award of preliminary injunctive relief," *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009) (quoting *Charlesbank Equity Funds II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004)), and is "the basis for injunctive relief." *Voice of the Arab World, Inc.*, 645 F.3d at 32 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

## ARGUMENT

Plaintiffs cannot meet the demanding standard governing motions for preliminary relief.  They cannot show a likelihood of success on the merits of their claims; they cannot establish standing, and their claims are statutorily channeled away from district court review in any event.  Likewise, they cannot show irreparable harm absent entry of a preliminary injunction.  The Court should thus deny Plaintiffs' preliminary injunction motion.

I.    **Plaintiffs cannot show a likelihood of success on the merits because they cannot establish jurisdiction over their claims.**

Plaintiffs cannot show a likelihood of success on the merits of their claims because they fall outside of district court jurisdiction for at least two reasons.  First, Plaintiffs cannot establish Article III standing to assert their claims.  Second, their claims are channeled away from district court review under both the CSRA and the FSL-MRS.

A.  **Plaintiffs cannot establish Article III standing.**

Plaintiffs allege three harms purportedly attributable to the policy priorities question.  First, they argue that unidentified members have applied for job postings that included the question, which compelled those members to "speak about political issues in answering it," thereby violating their First Amendment right to freedom of speech.  *See* Pl. Mem. of Pts. and Auth. in Supp. of Motion for Stay Under 5 U.S.C. § 705 and for Prelim. Inj. (ECF 40), at 10-11 ("Pl. Mot.").  Second, they argue that certain of their members have been "chilled from speaking and deterred from applying to federal jobs," thereby violating the First Amendment by chilling speech.  *See id.* at 11.  Third, they assert that they have heard concerns from members that the question serves as a vehicle for viewpoint discrimination, potentially injuring their chances of being hired for advertised positions.  *See id.* at 11-12.  None of these alleged injuries help Plaintiffs establish Article III standing.

Standing requires that plaintiffs be not just "mere bystander[s]," but have a "personal stake in the dispute."  *See AFGE, AFL-CIO v. Ezell,* Civ. A. No. 25-10276-GAO, 2025 WL 470459, at *1 (D. Mass. Feb. 12, 2025) (quoting *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024)).  As labor unions representing federal employees and applicants for employment, Plaintiffs can only proceed here by showing associational or organizational standing.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.,* 110 F.4th 295, 308 n.7 (1st Cir. 2024) (citing *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544 (1996)).  To do so, each Plaintiff must show that "(1) its members would

otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Conservation L. Found., Inc. v. Acad. Express, LLC,* 129 F.4th 78, 86 (1st Cir. 2025) (quoting *Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977)), *remanded,* 790 F. Supp. 3d 63 (D. Mass. 2025). Plaintiffs have not shown that they satisfy those requirements.

As to the first element, Plaintiffs have not established that their members would have standing to challenge the policy priorities question in district court. As a threshold matter, it is far from clear how many of Plaintiffs' members could even show that they have been affected in any way by the question: they may not have applied for any job posting that included the question, or were not dissuaded from applying from a job posting because it included the question. And even for those members that allegedly applied for a job posting that included the question, Plaintiffs offer no reason to believe that their answers to the question, or their decision not to answer the question, had any effect on their application. More to the point, Plaintiffs offer no evidence to suggest that any agency has used the question as the sort of "loyalty" litmus test they characterize it as, much less in a way that penalized any of their members' hiring chances. Indeed, any such use of the question or any answers submitted by applicants in response to it would contradict OPM's guidance to agencies. As OPM has made clear, the questions "must not be used to impose an ideological litmus test on candidates[,]" and no applicants will be "disqualified or screened out[]" if they opt not to answer any of the questions. *See, e.g.,* June 23 Additional Guidance. Quite to the contrary, OPM has emphasized that agencies' use of the questions (if any) must comply with the Merit System Principles set forth in the CSRA's Chapter 23, which requires, among other things, that "[a]ll employees and applicants for employment should receive fair and equitable treatment in all aspects of personnel management without regard to political affiliation[.]" 5 U.S.C. § 2301(b)(2). In short, Plaintiffs provide no basis to suggest that any of their

members has suffered any injury arguably traceable to the question; their unsupported suggestion that the question might be used against them as an illegal litmus test—contrary to OPM's explicit guidance to agencies—cannot satisfy Article III standing's injury-in-fact or traceability elements.

For similar reasons, neither Plaintiffs themselves nor any of their members could satisfy those standing elements as to Defendants here. Plaintiffs sue OPM, its Director (in his official capacity), and the United States. But their theory of liability does not support standing to sue these Defendants. OPM's guidance to agencies makes clear how the policy priorities question is and is not to be used in the hiring process. It is akin to a cover letter, to provide applicants "an opportunity to provide additional information about themselves, their background, and dedication to public service[.]" *See* June 23 Additional Guidance. It "must not be used to impose an ideological litmus test on candidates." *Id.* Likewise, OPM has made clear to agencies that "[h]iring managers and agency leaders or designees must only use the questions in accordance with Merit System Principles, and should additionally be mindful of Prohibited Personnel Practices." *See* MHP FAQ. Under analogous circumstances, the Supreme Court granted a stay of a district court preliminary injunction against OPM in *Trump v. American Federation of Government Employees*, 606 U.S.---, 145 S. Ct. 2635, 2635 (2025) (mem.), that had enjoined defendants including OPM from implementing Executive Order No. 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025). Finding that "the Government is likely to succeed on its argument that the Executive Order and [joint Memorandum from the Office of Management and Budget and OPM] are lawful" and that "the other factors bearing on whether to grant a stay are satisfied," the Court stayed the district court's injunction. Concurring in the grant of stay, Justice Sotomayor wrote that the Executive Order "directs agencies to plan reorganizations and reductions in force 'consistent with applicable law,' . . . and the resulting joint memorandum from [OMB and OPM] reiterates as much." *Trump*, 145 S. Ct. at 2635 (Sotomayor, J.) So too here, where OPM's guidance makes clear that agencies are not to use any of the short-essay questions as a litmus test. So

if Plaintiffs or their members has any justiciable Article III dispute with any federal agency—and there is no evidentiary basis to believe they do at this stage—it is not with OPM. Plaintiffs thus cannot show standing to sue Defendants.

And even were it otherwise, none of Plaintiffs' members could show standing to challenge the policy priorities question in district court. Any alleged use of the question by an agency as a political "loyalty" or "litmus" test in hiring—which would run counter to OPM's guidance to agencies, *see* June 23 Additional Guidance—would be subject to legal challenge as a Prohibited Personnel Practice under the CSRA's Chapter 23, 5 U.S.C. § 2302(b). And as "employee[s], former employee[s], or applicant[s] for employment," Plaintiffs' members cannot bring such challenges directly in district court in the first instance; by statute, they generally must do so before the Office of Special Counsel ("OSC"), which is statutorily empowered under the CSRA to investigate alleged Prohibited Personnel Practices and, where warranted, seek corrective action on behalf of injured employees or applications from the Merit Systems Protection Board ("MSPB"). *See id.* § 1214(a)(3). Thus, for any of Plaintiffs' members that might be able to make out an injury-in-fact traceable to an agency's use of the question, there is no recourse in district court without first exhausting their remedies before the OSC (and potentially the MSPB); without such recourse in district court, no member of any Plaintiff can satisfy Article III standing's redressability element.

Nor can Plaintiffs satisfy the second element of associational standing, germaneness. Plaintiffs address this element only in passing, explaining that as unions representing federal employees and applicants, eliminating the policy priorities question from federal job applications is "highly germane" to their mission. *See* Pl. Mot. at 9. Plaintiffs argue that their members are "suffering ongoing and irreparable harms" from the question, but as to their stake in the matter, they broadly allege that prohibiting federal agencies from using the question in job postings—whatever that might entail for

each agency, each job posting, and each set of applicants—is relevant to their "missions to protect and advocate for the workers whom they represent." *Id.* That is not enough.

In *Office of Personnel Management v. American Federal Government Employees*, the Supreme Court granted a stay of the district court's preliminary injunction for lack of associational or organizational standing. 145 S. Ct. 1914 (2025) (mem.), *granted stay pending appeal*, *AFGE, AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 770 F. Supp. 3d 1215 (N.D. Cal. 2025), *appeal dismissed,* Nos. 25-1677, 25-2637, 25-5875, 2025 WL 2976744 (9th Cir. Sep. 29, 2025). In the underlying district court decision, the court found standing for unions to bring claims on behalf of terminated probationary employees whose removals were alleged to have been "directed" by OPM. The district court held that the organizational plaintiffs had standing based on the imperilment of their missions and diversion of resources the firings caused. *Off. of Pers. Mgmt.*, 770 F. Supp. 3d at 1226. The Supreme Court, in staying the court's preliminary injunction, held that neither theory was sufficient to support standing. *See Off. of Pers. Mgmt.*, 145 S. Ct. at 1914.

And in *Hippocratic Medicine*, the Supreme Court rejected an argument by various medical associations that they had associational standing by claiming that the FDA had "impaired" their "ability to provide services and achieve their organizational missions" by approving the abortion-inducing drug mifepristone. 602 U.S. at 394 (citation omitted).

> Like an individual, an organization may not establish standing simply based on the intensity of the litigant's interest or because of strong opposition to the government's conduct, . . . no matter how longstanding the interest and no matter how qualified the organization, . . . . A plaintiff must show far more than simply a setback to the organization's abstract social interests.

*Id.* (internal citations omitted). Plaintiffs in this case base their claim to standing on the same generic "mission impairment" and "opposition to government conduct" arguments that the Supreme Court found insufficient in *Hippocratic Medicine.*

In support of their argument here, Plaintiffs state that they "have standing to raise claims for chilled speech when a relevant prohibition or requirement threatens to cause a 'cognizable injury.'" Pl. Mot. at 20 (quoting *Meese v. Keene*, 481 U.S. 465, 473 (1987)). But they have suffered no cognizable injury. *Cf. Meese*, 481 U.S. at 476-77 (holding that an individual claimant had established standing to bring a First Amendment claim where the Department of Justice's prospective enforcement of a statute against his display of films labeled "political propaganda" chilled his speech). Plaintiffs claim only that the policy priorities question interferes with their mission to represent and advocate for federal workers, *see* Pl. Mot. at 9, and as the Supreme Court explained in *Hippocratic Medicine*, the mere impairment of an organization's mission or provision of services "does not work to demonstrate standing." 602 U.S. at 394.

Finally, Plaintiffs' members' right to express their political views (or not to do so) is not germane to Plaintiffs' missions to advocate for their members in labor-relations disputes with the federal government because neither members' employment nor their employment opportunities are impaired by the policy priorities question. The merit system principles, 5 U.S.C. § 2301(b), and prohibited personnel practices, *id.* § 2302(b), prohibit the unfair and inequitable treatment of employees based on their political affiliation and discrimination against any employee or applicant for employment in any personnel action—which includes appointment to a new position—based on their political affiliation. The June 23 Additional Guidance expressly directs that agencies "must only use the question[] in accordance" with these statutory provisions and may not disqualify or "screen out" any candidates on the basis of their response or non-response to the question. *See* June 23 Additional Guidance. As such, Plaintiffs cannot show any alleged injury-in-fact that is germane to their labor-relations mission. For the question to have caused such injury-in-fact, an agency would have to take an action that contravenes OPM guidance. Plaintiffs have not alleged that any agency has done so.

For these reasons, Plaintiffs have failed to establish associational standing to challenge the policy priorities question.

**B. District Court Jurisdiction over Plaintiffs' claims is precluded by the CSRA and FSL-MRS.**

Plaintiffs' claims fall outside of district court jurisdiction for an additional reason: they are personnel and/or labor claims that are jurisdictionally channeled away from district court under the CSRA and the FSL-MRS. As federal employee labor unions, Plaintiffs must pursue their claims under the FSL-MRS framework, which provides for administrative review by the Federal Labor Relations Authority ("FLRA") followed by judicial review in the courts of appeals. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*AFGE*") (ordering a jurisdictional dismissal of a federal-employee-union suit because of the comprehensive statutory scheme governing federal employment review, the FSL-MRS). The legal basis for this divestiture is settled: "While the authority of the federal courts comes from Article III of the Constitution, the existence of the lower federal courts, including this court, and the extent of [its] jurisdiction depend entirely on statutory grants from Congress." *Evans v. Thompson*, 518 F.3d 1, 5 (1st Cir. 2008). Thus, "Congress has great leeway to expand or restrict the jurisdiction of the lower federal courts." *Id.* at 6.

Congress has broadly empowered the judiciary to hear "claims 'arising under' federal law" "by way of 28 U.S.C. § 1331's grant of jurisdiction." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023). Nonetheless, "[a] special statutory review scheme, . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Id.* Thus, when a statute sets out "a particular procedure and time period" for challenging agency actions, a plaintiff may be precluded from relying on a district court suit. *See N.Y. Republican State Comm. v. Sec. & Exch. Comm'n*, 799 F.3d 1126, 1135–36 (D.C. Cir. 2015). That includes arbitrary and capricious challenges under the APA. *See AFGE*, 929 F.3d at 756; *Ezell*, 2025 WL 470459, at *2 (citing *AFGE*, 929 F.3d at 748).

Congress can preclude district court review explicitly, *Axon*, 598 U.S. at 185 ("[P]roviding in so many words that district court jurisdiction will yield."), or implicitly. Relevant here, in cases of implicit preclusion, Congress impliedly divests district courts of jurisdiction "by specifying a different method to resolve claims about agency action." *Id.* To resolve an implied preclusion question, the Court must determine whether "(i) such intent is 'fairly discernible in the statutory scheme,' and (ii) the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'" *Jarkesy v. SEC*, 803 F.3d 9, 15 (D.C. Cir. 2015) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994)). These can be considered the two steps of a *Thunder Basin* analysis of implied preclusion.

**1. Congress intended to preclude district court jurisdiction.**

The first step, Congress's intent to preclude, is well satisfied here: Congress established detailed, complementary statutory schemes for adjudicating disputes relating to federal employment and federal labor relations. Taken as a whole, it is "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *United States v. Fausto*, 484 U.S. 439, 445 (1988). That scheme satisfies the first step for discerning implied preclusion.

Together, the FSL-MRS and CSRA provide for "administrative and judicial review" of disputes between employees and their federal employers and disputes between unions representing those employees and the federal government. *AFGE*, 929 F.3d at 752 (discussing the FSL-MRS); *see Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) (discussing the CSRA more broadly). The two schemes reflect Congress's considered determination that most federal labor and employment disputes must first be administratively exhausted before the employing agency and the applicable administrative review board—either the Merit Systems Protection Board ("MSPB") for employment disputes or the FLRA for labor disputes. Judicial review, if any, is available only in a court of appeals.

16

*See AFGE*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105, 7123(a), (c)); *Graham*, 358 F.3d at 934 (citing *Fausto*, 484 U.S. at 448–50); *see also* 5 U.S.C. § 7703(b) (providing for judicial review in the Federal Circuit or other court of appeals).

"Congress typically chooses . . . review in a court of appeals following the agency's own review process" when designing an implicit preclusion scheme. *Axon*, 598 U.S. at 185. That is exactly what this scheme includes. Accordingly, as the D.C. Circuit has repeatedly recognized, the CSRA precludes jurisdiction in the district courts over federal employee and federal union disputes. *See AFGE*, 929 F.3d at 754. This "enormously complicated and subtle scheme to govern employee relations in the federal sector" does not permit bypass by suing in district court. *See id.* at 755 (quoting *AFGE v. Sec'y of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013) ("*Air Force*")).

Plaintiffs argue that preclusion is not clear from the statutory scheme because the individuals that have been or will be subject to the policy priorities question are not "covered employees" and are not challenging a "covered employment action" or challenging a "personnel action" at all. Pl. Mot. at 28-29. At the threshold, that premise is incorrect: applicants for federal employment in most agencies fall within the statutory definition of "employee" in the CSRA's Chapter 23. *See* 5 U.S.C. § 2301(b)(2) (providing that "employees and applicants for employment should receive fair and equitable treatment in all aspects of personnel management . . ."); *id.* § 2302(a) (providing that "prohibited personnel practices" in "personnel action[s]" shall apply "with respect to an employee in, or applicant for, a covered position in an agency . . ."). And hiring decisions fall within the statutory definition of "personnel action." *Id.* § 2302(a)(2)(A)(i). So a legal dispute over aspects of the hiring process falls squarely within the CSRA's administrative-judicial review scheme. *See id.* §§ 7701(a), 7703.

Plaintiffs' argument is incorrect for an even more important reason here: as federal employee unions, they are "labor organization[s]" within the meaning of the FSL-MRS. *See id.* § 7103(a)(4). And even if Plaintiffs themselves are not challenging "covered employment action" in the context of the

CSRA more broadly, they are challenging what amounts to alleged "prohibited personnel practices" under the FSL-MRS. *See id.* §§ 2302(a)(1), 2302(b)(1)(E) (A "prohibited personnel practice" includes any "personnel action" taken, recommended, or approved that "discriminate[s] for or against any employee or applicant for employment on the basis of . . . political affiliation, as prohibited under any law, rule, or regulation[.]"); *and see id.* § 2302(a)(2) (A "personnel action" includes "an appointment" "with respect to an employee in, or applicant for, a covered position in an agency . . ."). Thus, even if Plaintiffs could show Article III standing to challenge the policy priorities question on behalf of potentially aggrieved members, Congress intended that they be able to do so exclusively through the procedures provided in the FSL-MRS. *See id.* § 7121(d) ("An aggrieved employee affected by a prohibited personnel practice *under section 2302(b)(1)* of this title which also falls under the coverage of the negotiated grievance procedure may raise the matter under a statutory procedure or the negotiated procedure, but not both." (emphasis added)); *see also Sec'y of the Air Force*, 716 F.3d 633 (affirming the district court's dismissal of complaint by a national union and several members raising an APA challenge to the Air Force's imposition of a dress code for certain civilian employees as precluded by the CSRA and FSL-MRS).

This Court previously held in a case in February of this year that "the FSL-MRS 'provides the exclusive procedures by which federal employees and their bargaining representatives may assert federal labor-management relations claims.'" *Ezell*, 2025 WL 470459, at *2 (quoting *AFGE*, 929 F.3d at 755). The Court walked through the *Thunder Basin* analysis, finding both that (1) Congress intended the FSL-MRS to be the exclusive forum for disputes between unions representing federal employees and the federal government, and (2) the two APA claims raised by plaintiffs in that case were the type of claims Congress intended for review within the FLS-MRS framework. *See id.* (holding that all three *Thunder Basin* factors weighed in favor of finding that Congress intended to preclude jurisdiction over plaintiffs' APA claims). Plaintiffs' claims are materially analogous here, with the addition of a singular

First Amendment claim that likewise would be reviewable by the FLRA. *See, e.g., Nat'l Treasury Emps. Union Chapter 61 (Union) & U.S. Dep't of the Treasury Internal Revenue Serv. Albany Dist. (Agency)*, 39 F.L.R.A. 476 (Feb. 12, 1991) (assessing an Arbitrator's decision as to whether a federal employee's First Amendment rights were violated when his employing agency prohibited him from advertising for his previously approved outside employment activity).

Against that weight of precedent, Plaintiffs cite *American Federation of Government Employees, AFL-CIO v. Trump*, 139 F.4th 1020 (9th Cir. May 30, 2025), for the proposition that "it was 'unlikely that Congress intended for the CSRA to preclude review for parties not even covered by that statute who allege claims outside the MSPB's and FLRA's jurisdiction.'" Pl. Mot. at 29 (quoting *AFGE*, 139 F.4th at 1033).[2]  Plaintiffs' argument is misplaced for at least two related reasons.  First, their claims here—all of which hinge on the theory that the policy priorities question constitutes a political or ideological "loyalty" test for federal employment—fall squarely within the ambit of both the CSRA and the FSL-MRS as alleged "prohibited personnel practices."  Plaintiffs, as federal employee unions, can raise those challenges before the FLRA, and the administrative-judicial review route through the FLRA represents the exclusive review scheme.  Second, Congress intended to preclude district court review of claims brought by "labor organizations" based on alleged "prohibited personnel practices." Here, Congress clearly intended that any such claims, raised on behalf of union members by their labor organizations, should be raised in the context of a labor-relations dispute reviewable in the first

---

[2] Plaintiffs acknowledge that the Supreme Court stayed the preliminary injunction at issue in that case, Pl. Mot. at 29 n.11 but suggest that because the Court decided the Government's stay application (in favor of the Government) on grounds other than jurisdictional channeling, it "likely decided" that the plaintiffs' claims there were not required to proceed under the CSRA.  *Id.*  The Supreme Court's decision to stay the preliminary injunction on a basis other than jurisdictional channeling, without addressing channeling in its concise decision, provides no reason to infer that it "likely decided" that channeled was not required. *Id.*

instance by the FLRA. *See AFGE,* 929 F.3d at 755 ("The scheme 'provides the exclusive procedures by which federal employees and their bargaining representatives may assert federal labor-management relations claims.' . . . Thus, we can fairly discern that Congress intended the statutory scheme to be exclusive with respect to claims within its scope." (quoting *Air Force,* 716 F.3d at 638)).

Furthermore, federal courts have consistently held that federal employees cannot challenge employment actions by bringing APA claims. *See Filebark v. U.S. Dep't of Transp.,* 555 F.3d 1009, 1010 (D.C. Cir. 2009) ("We have long held that federal employees may not use the Administrative Procedure Act to challenge agency employment actions."); *Fornaro v. James,* 416 F.3d 63, 66–67 (D.C. Cir. 2005); *Graham,* 358 F.3d at 933-35; *Carducci v. Regan,* 714 F.2d 171, 172 (D.C. Cir. 1983). This is because Congress, through the CSRA and related employment statutes, has carefully constructed a system for review and resolution of federal employment disputes, intentionally providing—and intentionally not providing—particular forums and procedures for particular claims. Thus, courts have held that this comprehensive employment scheme preempts judicial review under the APA even when that scheme provides no judicial relief—in other words, "what you get under the CSRA is what you get." *See Fornaro,* 416 F.3d at 67.

Plaintiffs also argue that this Court has jurisdiction under the first step of the *Thunder Basin* analysis because the MSPB is currently unable to function. Pl. Mot. at 32. That assertion is factually incorrect, as the MSPB's quorum has been restored, U.S. Merit Systems Protection Board, *Frequently Asked Questions about the Lack of Quorum Period and Restoration of the Full Board* (Nov. 14, 2025), https://www.mspb.gov/FAQs%20Absence%20of%20Board%20Quorum%2011-14-25.pdf (stating the MSPB's quorum was restored on October 28, 2025), and would be able to function at the administrative judge level even without a quorum. More importantly here, though, it is beside the point, as Plaintiffs can proceed before the FLRA, which can currently exercise all of its authorities as

vacancies to not impair its operation. *See* 5 U.S.C. § 7104(d). Therefore, this forum is fully available to Plaintiffs.

**2. Plaintiffs' claims are of the type Congress intended to be reviewed within the FSL-MRS scheme.**

The second part of the *Thunder Basin* analysis, which courts use to assess whether claims are "of the type" Congress intended for review within the statutory scheme, underscores that Congress impliedly precluded jurisdiction over Plaintiffs' claims here. To assess whether Congress's preclusion scheme reaches these claims, the Court must consider "three considerations designed to aid in that inquiry, commonly known now as the *Thunder Basin* factors." *Axon*, 598 U.S. at 185-86. The factors are: (1) "could precluding district court jurisdiction foreclose all meaningful judicial review of the claim"; (2) "is the claim wholly collateral to the statute's review provisions"; and (3) "is the claim outside the agency's expertise?" *Id.* at 186 (citation modified). These "considerations" are ultimately merely guideposts to "best . . . understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." *Id.* And it is critical to remember that a plaintiff may not "repackage[]" its claim "under the heading of an APA claim" to "exempt it from the exclusive channeling regime Congress prescribed." *Jalbert v. SEC*, 327 F. Supp. 3d 287, 299 (D. Mass. 2018). It is the content of the claim that matters—not how a plaintiff frames it.

Plaintiffs bring three claims. First, Plaintiffs allege that the policy priorities question compels speech, chills speech, and conditions federal employment on the expression of particular political viewpoints, Compl. ¶ 128; is not narrowly tailored to serve a legitimate government interest, *id.* ¶ 129; and thus violates the First Amendment, *id.* ¶ 130. Second, Plaintiffs assert an arbitrary and capricious claim—alleging that the policy priorities question violates a directive of Congress not to use personal and political views as a factor in federal hiring, *id.* ¶ 138, causes agencies to consider irrelevant information, *id.* ¶ 139, is implemented arbitrarily by the agencies, *id.* ¶ 140, lacks a reasoned

explanation, *id.* ¶¶ 141-44, 146, and fails to consider adverse effects. *Id.* ¶¶ 145, 147. Third, they assert an excess of statutory authority argument for appropriations. *Id.* ¶¶ 152–58. All are precluded under the *Thunder Basin* factors.

First, the scheme provides for meaningful judicial review of these claims. This is so even if the statutory scheme Congress has established does not permit the review of claims before Plaintiffs alleged "'here-and-now' First Amendment injury" occurs. Pl. Mot. at 33. *See also AFGE*, 929 F.3d at 755. Indeed, meaningful judicial review is still available for purposes of this prong even if the statutory scheme "ma[kes] it *impossible* to obtain particular forms of review or relief." *Id.* at 756. As the D.C. Circuit in *AFGE* acknowledged, even if the Plaintiffs here "may not prevail" using the grievance procedures provided by the FSL-MRS "or would prefer to challenge" the policy priorities question "'by some other means,' such as an APA suit in district court, . . . 'that does not mean their claims may be brought outside the [FSL-MRS's] exclusive remedial scheme.'" *Id.* (quoting *Air Force*, 716 F.3d at 638). Indeed, just as in *AFGE* and *Air Force*, review is available for Plaintiffs as federal employee unions, and they may bring their challenges—whether to a particular agency's use of the policy priorities question, the MHP, or E.O. 14,170—before the FLRA via the administrative options provided in the FSL-MRS. The FLRA frequently hears cases where agency actions are evaluated for consistency with the merit system principles. *See, e.g., Dep't of the Air Force Carswell Air Force Base, Tex. (Activity) & AFGE AFL-CIO Loc. 1364 (Union),* 35 F.L.R.A. 754 (Apr. 27, 1990). Similarly, Plaintiffs could challenge individual agencies' use (if any) of the question and seek an order from the FLRA that they remove it from their job announcements as violative of the merit systems principles. *See AFGE*, 929 F.3d at 757. The FLRA may also interpret statutes outside of the FLS-MRS, and its interpretation can and has been reviewed on appeal and may be afforded some level of circuit court deference. *See, e.g., U.S. Dep't of Health & Hum. Servs. v. Fed. Lab. Rels. Auth.,* 833 F.2d 1129, 1135 (4th Cir. 1987) ("Although this matter involves the Authority's interpretation of statutes other than its enabling act,

we perceive that the interpretation bears directly on the 'complexities' of federal labor relations and we accordingly defer to the Authority's rulings."). And even if the FLRA were to determine that it could not address Plaintiffs' claims, a circuit court could do so on appeal. *See AFGE*, 929 F.3d at 758 ("[T]he Supreme Court has explained that [i]t is not unusual for an appellate court reviewing the decision of an administrative agency to consider a constitutional challenge to a federal statute that the agency concluded it lacked authority to decide, . . . and we recently elaborated that it is of no dispositive significance whether the agency has the authority to rule on constitutional claims so long as the claims can eventually reach an Article III court fully competent to adjudicate them." (citation omitted)).

Second, Plaintiffs' claims are not "wholly collateral" to the FSL-MRS's review provisions. The Court must "examine whether the action 'at bottom' seeks a substantive determination that falls within the statutory regime's exclusive scope." *Fed. L. Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 563 (D.C. Cir. 2023) (quoting *Heckler v. Ringer*, 466 U.S. 602, 614 (1984)). As the Supreme Court explained in *Axon*, a claim may be sufficiently collateral when the "claims do not relate to the subject of the [administrative] actions." *Axon*, 598 U.S. at 193. There, the Court noted that structural "separation-of-powers claims" brought against the administrative agency were entirely unrelated to the "auditing practices" and "business merger" that constituted the subject matter of the agency actions. *See id.* Nor were they related to the "procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Id.*

No such distinction exists here. Plaintiffs' claims against the policy priorities question center on what clearly falls within the definition of a "grievance"—encompassing complaints by "any labor organization concerning any matter relating to the employment of an employee." 5 U.S.C. § 7103(a)(9)(B). Federal agencies' compliance with the Merit System Principles set forth in the CSRA's Chapter 23 lie at the heart of the FSL-MRS and the CSRA writ large. The plain language of the FSL-MRS clearly contemplates that the type of claim Plaintiffs raise here falls within the definition of

"grievance" and is reviewable through the FLRA's administrative process for handling such complaints by unions.[3] Whether the question is unlawful or unconstitutional would not be wholly collateral to the FLRA's review. *See, e.g., Nat'l Treasury Emps. Union Chapter 61 (Union) & U.S. Dep't of the Treasury Internal Revenue Serv. Albany Dist. (Agency),* 39 F.L.R.A. 476 (Feb. 12, 1991).

Finally, the FLRA may bring its expertise to bear on many of the questions raised, particularly as they relate to labor-relations issues. In *AFGE*, the unions challenged several Executive Orders issued by the President that they claimed violated the Take Care Clause and the First Amendment, among other challenges. *See AFGE*, 929 F.3d at 753. The D.C. Circuit clarified that "[t]he question we must ask is whether agency expertise may be 'brought to bear on' the claims, not whether the expertise is essential." *See id.* at 760 (quoting *Jarkesy*, 803 F.3d at 29). Here, the FLRA's expertise will be important for determining whether the policy priorities question violates the Plaintiffs' collective bargaining agreements with each of the agencies that employs the question and interpreting the FLS-MRS. Whether or not the FLRA can rule on Plaintiffs' constitutional and APA claims is not dispositive, as an appellate court *can* review those claims after Plaintiffs' have exhausted the administrative process that Congress intended such claims to be channeled through. Given each of these factors, Plaintiffs' claims are of the type that Congress intended to be channeled through the FLRA, and they thus fall outside of the Court's jurisdiction.

### C. Plaintiffs have failed to challenge final agency action reviewable under the APA.

Even if Plaintiffs' claims were not precluded under the comprehensive schemes set forth in the CSRA and the FSL-MRS, their APA claims would still fail because the MHP and June 23

---

[3] A "grievance," as defined by the FLS-MRS, encompasses "any complaint . . . (B) by any labor organization concerning any matter relating to the employment of any employee; or (C) by any employee, labor organization, or agency concerning . . . (i) the effect or interpretation, or a claim of breach, of a collective bargaining agreement; or (ii) any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment." 5 U.S.C. § 7103(a)(9).

Additional Guidance are not final agency action subject to judicial review under the APA. The APA subjects "final agency action" to judicial review. 5 U.S.C. § 704. To qualify as a reviewable "final" agency action, the challenged action must both mark the consummation of the agency's decision-making process and be one by which "rights or obligations have been determined" or from which "legal consequences [may flow]." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation omitted). Under the second prong, agency action typically has legal consequences where it has the status of law and immediate compliance with its terms is expected. *FTC v. Standard Oil Co.*, 449 U.S. 232, 239-40 (1980).

Even if Plaintiffs could establish that MHP and June 23 Additional Guidance reflected the consummation of OPM's decision-making process, it would be of no consequence since the MHP and June 23 Additional Guidance constitute intra-governmental directives to Executive Branch agencies. While it may be the end of OPM's process, no "rights or obligations" could be determined until, at minimum, an agency includes the policy priorities question in a job posting. And no "legal consequences" could flow until, at a minimum, an agency presents the question to Plaintiffs' members. *See Friends of Merrymeeting Bay v. U.S. Dep't of Com.*, 810 F. Supp. 2d 320, 327 (D. Me. 2011) (finding that an interagency consultation did not qualify as final agency action and that legal consequences did not flow until one of the agencies issued a subsequent final agency action). Further, the MHP and June 23 Additional Guidance are not finally determinative as to whether the policy priorities question will appear on a particular job posting. As described in the "Merit Hiring Plan Frequently Asked Questions" above, agencies may exempt use of the questions in their discretion. *See supra* at 5-6. Here, no legal consequences arise until an agency decides whether to include the policy priorities question in the job posting for a position. Accordingly, because the MHP and June 23 Additional Guidance do not, individually or in concert, determine any rights or obligations, and no legal obligations flow from their existence in absence of other agency action, Plaintiffs cannot succeed under the APA and their request for a temporary restraining order should be denied.

## II.    Plaintiffs cannot establish irreparable harm.

Likewise, Plaintiffs cannot show that they face irreparable harm absent the requested preliminary injunction.  Recall the nature of the alleged injuries attributable to the policy priorities question: alleged instances of compelled speech by unspecified members in completing federal job applications, alleged instances of unspecified members being chilled or deterred from applying for jobs or answering questions in their preferred way, and alleged instances of members being concerned about potential viewpoint discrimination.  *See* Pl. Mot. at 10-12.  None of these alleged injuries constitutes irreparable harm.  As a threshold matter, the five-month-delay between issuance of the MHP and Plaintiffs' decision to seek a preliminary injunction dispels any suggestion of such harm.  And even aside from that substantial delay, Plaintiffs' claims constitute employment disputes that rarely if ever allow for a showing of irreparable harm.

Establishing a realistic prospect of irreparable harm is a requirement for parties seeking preliminary injunctions in this Circuit.  "In most cases . . . irreparable harm [constitutes] a *necessary threshold showing* for [an] award[] [of] preliminary injunctive relief."  *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004) (emphasis added).  The burden of establishing irreparable harm "rests squarely [with] the movant."  *Charlesbank Equity Fund II*, 370 F.3d at 162.

A movant's demonstration of irreparable harm is subject to rebuttal by the non-moving party.  Claims of irreparable harm can be rebutted by a showing that the movant unnecessarily delayed their motion for preliminary relief.  "[A] party requesting a preliminary injunction must generally show reasonable diligence."  *Benisek v. Lamone*, 585 U.S. 155, 159 (2018).  Delay between the imposition of the harm of which a movant complains and the filing of a motion for a preliminary injunction undercuts the credibility of a movant's need for urgent relief.  *See Charlesbank Equity Fund II*, 370 F.3d at 163; *see also Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("Indeed, the very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a

plaintiff's rights before a case can be resolved on its merits. . ..  For this reason, our sister circuits and district courts within this Circuit and elsewhere have found that a party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm." (collecting cases) (internal citations omitted)).

Here, OPM issued the MHP on May 29, 2025.  Plaintiffs did not file their complaint until November 6 (ECF No. 1) and then waited another two weeks, until November 19, to move for a preliminary injunction (ECF Nos. 39, 40).  Delaying any legal challenge to the policy priorities question by more than five months does not suggest that the question's inclusion in the MHP caused irreparable harm to Plaintiffs.  At a minimum, their argument of irreparable harm is undermined by the almost two-week delay between the filing of their complaint and the motion for preliminary injunction.

Beyond those delays in seeking preliminary relief, Plaintiffs' irreparable harm argument fails on the nature of their underlying claims, which represent a core federal employment dispute.  To be sure, Plaintiffs do not rest their motion on an alleged loss of employment or potential employment by their members attributable to the policy priorities question, but on the bare assertion that the question's inclusion violates of their members' First Amendment rights and thus constitutes *per se* irreparable harm. But the right that Plaintiffs seek to vindicate is not their members' right to free speech but rather their right to apply and receive apolitical consideration for federal employment. Ultimately, Plaintiffs' alleged harm amounts to alleged loss of employment or opportunities for employment, not the right to speak freely (or not at all) about their political beliefs.

Furthermore, Plaintiffs are unable to establish that any agency used their members' response or failure to respond to the policy priorities question to engage in political discrimination or take any adverse action with respect to their candidacy for federal employment. Nor would they be able to at this stage, as agencies are prohibited from doing so by the merit system principles (5 U.S.C. §

2301(b)(2)), the prohibited personnel practices provisions of the CSRA (*id.* § 2302(b)(3), (b)(10)), and OPM's own guidance (*i.e.*, the June 23 Additional Guidance).

"[I]t is well settled that the loss of employment is not considered irreparable for the purposes of an injunction." *See Mass. Corr. Officers Federated Union v. Baker*, 567 F. Supp. 3d 315, 327 (D. Mass. 2021) (holding that correctional officers' loss of employment for refusing the COVID-19 vaccine was not an irreparable harm); *see also Sampson v. Murray,* 415 U.S. 61, 92 n.68, 94 (1974) (holding that movants for preliminary injunction against the termination of employment must show a "genuinely extraordinary situation" warranting injunctive relief). Here, Plaintiffs do not even allege that their members have actually been passed over (or face the prospect of being passed over) for job opportunities as a result of the policy priorities question. Nor can they, as the loss of employment, and less so employment *opportunities*, is not an irreparable harm.

## III.    The balance of equities tips in Defendants' favor.

The balance of equities and public interest also weigh against Plaintiffs. These final two factors of the preliminary injunction analysis merge where relief is sought from the government. *Nken*, 556 U.S. at 435. "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)).

The government's interest, and therefore the public interest, weighs heaving in favor of the government's discretion in administering its hiring and recruitment processes. It is "the well-established rule that the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs[.]'" *Sampson*, 415 U.S. at 83 (citing *Cafeteria & Rest. Workers Union, Loc. 473, AFL-CIO v. McElroy*, 367 U.S. 886, 896 (1961)). Plaintiffs must make "a showing of irreparable injury sufficient in kind and degree to override these factors cutting against the general availability of preliminary injunctions in Government personnel cases." *Id.* at 84. Here, Plaintiffs have not

established a direct and irreparable injury to their mission or any of their interests as organizations representing individuals claiming First Amendment harms. As such, the balance of equities favors the Defendants and the public's interest in the government's administration of its own personnel systems.

## IV.    Relief should be limited to the members of Plaintiff-Unions that have standing to challenge the policy priorities question.

Finally, if the Court is inclined to grant Plaintiffs' motion, it should limit any injunction to the members that Plaintiffs have identified and that have standing to challenge the policy priorities question. The Court cannot directly grant a universal injunction. *Trump v. CASA, Inc.,* 606 U.S. 831, 856 (2025) ("*CASA*"). Nor can it indirectly do so by extending relief to nonparties who are represented by a party, other than through class certification under Rule 23 or properly established associational standing. Plaintiffs have not sought or obtained class certification, and they have submitted affidavits from pseudonymous members for standing purposes. *Smith v. Bayer Corp.,* 564 U.S. 299, 315 (2011) ("[A] properly conducted class action . . . can come about in federal courts in just one way—through the procedure set out in Rule 23."); *Summers v. Earth Island Inst.,* 555 U.S. 488, 497-500 (2009) ("[T]he Court has required plaintiffs claiming [an] organizational standing to identify members who have suffered the requisite harm."). Plaintiffs cannot end-run all three of those limits—*CASA*, Rule 23, and associational standing requirements—by obtaining an injunction barring the government from employing the policy priorities question in the job applications of members whose membership is unknown to the government.

Limiting a remedy to the members Plaintiffs have identified for standing purposes appropriately leaves the breadth of the remedy Plaintiffs can receive in its own hands. Therefore, should this Court grant Plaintiffs' motion, Plaintiffs should be required to identify those members to which this Court's relief should apply. Nothing prevents Plaintiffs from naming as many of its members as it wishes so that each member can benefit from any relief the Court orders. Likewise, nothing prevents Plaintiffs' members from seeking to litigate this case as a class action. What courts

cannot do is enjoin the entire government from including the policy priorities question in any job announcements under which any of Plaintiffs' members might potentially apply when the government does not know who those members are, because Plaintiff has not identified them. The Court should make clear that Defendants are enjoined from employing the question only as to members that Plaintiffs choose to identify to the government for purposes of standing.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied.

Dated:  December 3, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

CHRISTOPHER HALL
Assistant Director, Federal Programs Branch

*/s/ Ryan M. Underwood*
RYAN M. UNDERWOOD
Trial Attorney (D.C. Bar No. 1656505)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-1952
E-mail: ryan.m.underwood2@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2025, I caused the foregoing to be electronically filed with Clerk of Court using the CM/ECF system, which sent such notice to any individuals and entities who have entered appearances in this case to date, pursuant to the Court's ECF system.

　/s/ RYAN M. UNDERWOOD
Ryan Underwood
Trial Attorney (D.C. Bar No. 1656505)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-1952
E-mail: ryan.m.underwood2@usdoj.gov