UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 25-13305-GAO

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, and NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES, INC.,
Plaintiffs,

v.

SCOTT KUPOR, in his official capacity as Director of the Office of Personnel Management, OFFICE OF PERSONNEL MANAGEMENT, and THE UNITED STATES OF AMERICA,
Defendants.

OPINION AND ORDER
September 11, 2026

O'TOOLE, D.J.

The plaintiffs in this civil action—several labor unions—have sued the U.S. Office of Personnel Management ("OPM"), its director, Scott Kupor, and the United States to challenge the lawfulness of a question that has appeared in thousands of job applications to fill vacancies with the federal civil service. The question asks, in relevant part, that the applicant "[i]dentify one or two relevant Executive Orders or policy initiatives that are significant to [the applicant], and explain how [the applicant] would help implement them if hired." (Compl., Ex. A at 10 (dkt. no. 1-1).) The plaintiffs assert that the challenged question violates the Administrative Procedures Act ("APA") and the First Amendment to the United States Constitution because it seeks to assess the applicant's "loyalty" to the administration of President Donald J. Trump.

Pending before the Court is the plaintiffs' motion for preliminary relief. First, pursuant to § 705 of the APA, the plaintiffs urge the Court to temporarily stay the implementation and use of the challenged question in federal service applications during the pendency of this litigation.

Second, the plaintiffs seek a preliminary injunction preventing the defendants from considering any applicant's response to the question—or lack thereof—in connection with federal civil service hiring decisions.

For the reasons discussed below, at this stage of the litigation, the plaintiffs have met their burden to show that: (1) they are likely to succeed on the merits of their claim that the challenged question violates the APA; (2) that their members would likely suffer irreparable harm without a stay; (3) that the balance of equities tips in their favor; and, (4) that the issuance of a temporary stay is in the public interest.[1] Accordingly, the motion is GRANTED IN PART, and a stay under § 705 of the APA shall issue.

Conversely, the motion is DENIED insofar as it seeks a preliminary injunction. The requested injunction would enjoin the defendants from relying in any manner on an applicant's answers to the contested question. The requested injunction would thus effectively restrain the defendants' conduct when reaching hiring decisions in individual cases. The plaintiffs, however, repeatedly emphasize that this dispute does not concern individual personnel decisions involving their members. Indeed, the plaintiffs contend that the challenged question causes their members' constitutional injuries regardless of any ensuing personnel decision. Accordingly, the requested injunction would not redress the injuries alleged. The plaintiffs therefore lack Article III standing to pursue the requested preliminary injunction.

[1] The plaintiffs are three labor unions: the American Federation of Government Employees ("AFGE"), the largest federal labor union, representing approximately 800,000 federal civilian employees in every state in the United States, including Massachusetts; the American Federation of State, County, and Municipal Employees, a national labor union and "unincorporated membership association" and the "largest trade union of public employees" in the nation with 1.4 million members in 46 states, including Massachusetts; and, the National Association of Government Employees, a national labor organization affiliated with the Service Employees International Union including nearly 75,000 federal employees, operating in 43 states, including Massachusetts. (See Compl. ¶¶ 16–25.)

## I. Background

The challenged question was introduced as part of OPM's response to Executive Order 14170, titled "Reforming the Federal Hiring Process and Restoring Merit to Government Service," which was signed by President Trump on January 20, 2025. Exec. Order No. 14,170, 90 Fed. Reg. 8621 ("Executive Order"). The Executive Order's stated policy goals include "significantly improving" "broken, insular, and outdated" "hiring practices" by "making" the federal government's "recruitment and hiring processes more efficient and focused on serving the Nation." Id. § 1. To achieve those stated ends, the Executive Order directs several agencies and officials, including OPM, to develop a "Federal Hiring Plan that brings to the Federal workforce only highly skilled Americans dedicated to the furtherance of American ideals, values, and interests." Id. § 2.

On May 29, 2025, the then-Acting Director of OPM and the White House Domestic Policy Council issued the Merit Hiring Plan ("MHP"), a memorandum addressed to all heads and acting heads of executive departments and agencies setting forth certain reforms "to implement Executive Order 14170." (See Compl., Ex. A at 9.) Relevant here, the MHP provides that "all Federal job vacancy announcements graded at GS-05 or above will include four short, free-response essay questions."[2] (Id.) The plaintiffs challenge the third of those essay questions, which the Court shall accordingly refer to as Question Three. It reads in full:

[2] "The General Schedule (GS) classification and pay system covers the majority of civilian white-collar Federal employees (about 1.5 million worldwide) in professional, technical, administrative, and clerical positions." General Schedule Overview, OPM.gov, available at https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/general-schedule/ (last visited Sept. 8, 2026). The General Schedule consists of fifteen grades, GS-1 being the lowest and GS-15 being the highest. Id. "Agencies establish (classify) the grade of each job based on the level of difficulty, responsibility, and qualifications required. Individuals with a high school diploma and no additional experience typically qualify for GS-2 positions; those with a Bachelor's degree for GS-5 positions; and those with a Master's degree for GS-9 positions." Id.

> How would you help advance the President's Executive Orders and policy priorities in this role? Identify one or two relevant Executive Orders or policy initiatives that are significant to you, and explain how you would help implement them if hired.

(Id. at 10.) Further guidance related to Question Three followed.

On June 23, 2025, OPM issued a notice entitled "Additional Merit Hiring Plan Guidance on Using the Four Short Essay Questions." The notice purports to clarify the proper scope and use of the free-form essay questions, including Question Three, in agency hiring practices. It cautions that "[h]iring managers and agency leaders or designees must only use the questions in accordance with Merit System Principles, and should additionally be mindful of Prohibited Personnel Practices." (Compl., Ex. B at 3 (dkt. no. 1–2).) Accordingly, among other limitations, the notice requires that applicants' responses "must not be used as a means of determining whether the candidate fulfills the qualifications of a position" or "to impose an ideological litmus test." (Id.) The notice further directs that applications should be given instructions that although "responses" to the essay questions "are not required and will not be scored," applicants are nevertheless "encourage[d] . . . to thoughtfully address each question." (Id.)

On September 2, 2025, OPM published additional guidance in the form of a document titled "Merit Hiring Plan Frequently Asked Questions." (Compl., Ex. D (dkt. no. 1–4).) As is relevant here, the document includes the question "Do the four short essay questions have to be included in every job opportunity announcement"? The guidance states in response:

> The four short essay questions (Constitution, Efficiency, Executive Orders, Work Ethic) must be used on all competitive service job opportunity announcements open to the public graded at GS-05 or above, except for job announcements for teacher, Wage Grade, and seasonal positions. While it is not a requirement to use these questions for competitive merit promotion hiring (both internal and external), agencies are encouraged to do so.
>
> Agencies may exempt other positions from use of the questions in their discretion, where they determine that such an exemption is appropriate for the position. Agencies should keep documentation in the case file as to why such an exemption was granted.

(Id. at 7–8.) The plaintiffs suggest that, since the MHP's publication, Question Three has appeared on thousands of postings for federal job vacancy announcements. In some instances, the plaintiffs say, certain agencies have "fir[ed] existing employees," only to "repost[] jobs with near-identical duties but with the inclusion of" Question Three. (Mem. of P. & A. in Supp. of Mot. for Stay under 5 U.S.C. § 705 & for Prelim. Inj. ("Pls.' Mem.") at 9 (dkt. no. 40).) In addition, the plaintiffs posit that the MHP's requirement that "agency leadership, or their designees . . . be involved throughout the full hiring process," (Compl., Ex. A at 9), means that "political appointees" will review applicants' responses to Question Three before a final hiring decision is made, (Pls.' Mem. at 6).

The complaint reduces to the contention that Question Three and the related guidance ("MHP Guidance") "unconstitutionally politiciz[e] the career employee hiring process," (Compl. ¶ 69), thereby violating the APA and the First Amendment to the United States Constitution. By the present motion for preliminary relief, the plaintiffs seek a stay under § 705 of the APA to temporarily prevent the use and implementation of Question Three in all federal civil service applications during the pendency of this litigation. They also seek a preliminary injunction to prevent the defendants from considering any applicant's response to Question Three in connection with federal civil service hiring decisions. The defendants, by contrast, urge the Court to deny the motion on three main grounds, two of which challenge the Court's jurisdiction over the plaintiffs' claims. Accordingly, that is where the Court begins. See, e.g., Pagán v. Calderón, 448 F.3d 16, 26 (1st Cir. 2006) (explaining that before reaching the merits, a "federal court must satisfy itself as to its jurisdiction, including a plaintiff's Article III standing to sue").

## II. Standard of Review

"Under § 705 of the APA, district courts have authority to enjoin the implementation of a regulation and stay its effect when 'necessary to prevent irreparable injury' to the plaintiff."

California v. Kennedy, 802 F. Supp. 3d 273, 281 (D. Mass. 2025) (quoting 5 U.S.C. § 705). That is so even where, as here, the challenged agency action has already taken effect. In that circumstance, § 705 allows courts to temporarily "suspend[] the effect" of the administrative action. Cf. Nken v. Holder, 556 U.S. 418, 429–30 & n.1 (2009). Such relief "is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).

"The standard of review for relief under 5 U.S.C. § 705 is the same as the standard of review for preliminary injunctions." See, e.g., Nw. Immigrant Rts. Project v. USCIS, 496 F. Supp. 3d 31, 45 (D.D.C. 2020). Accordingly, the plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." Winter, 555 U.S. at 20. "The first two factors are the most important," Together Emps. v. Mass Gen. Brigham Inc., 32 F.4th 82, 85 (1st Cir. 2022), and the last two factors "merge when the Government is the party opposing the preliminary injunctions," Nken, 556 U.S. at 435. In ascertaining whether the plaintiffs have made the required showing, the Court "take[s] as true" well-pleaded factual allegations in the complaint "and uncontroverted affidavits filed in support of the motion." Elrod v. Burns, 427 U.S. 347, 350 n.1 (1976) (plurality opinion).

A. Likelihood of Success on the Merits

"To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." Sindicato Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2012) (quoting Respect Me. PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010)). In this preliminary posture, however, the Court "need not predict the eventual outcome on the merits with absolute assurance." Sierra Club v. U.S. Army Corps of Eng'rs, 997 F.3d 395, 404 (1st Cir. 2021) (quoting Ross-Simons

of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996)). Instead, at this stage, the Court's "conclusions as to the merits of the issues presented . . . are to be understood as statements of probable outcomes." Capen v. Campbell, 134 F.4th 660, 666 (1st Cir. 2025) (quoting Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 6 (1st Cir. 1991)).

The defendants advance three principal arguments why, in their view, the plaintiffs are not likely to succeed on the merits of their claim. First, the defendants assert that the plaintiffs lack Article III standing because they have failed to satisfy the requirements of associational standing. Second, the defendants aver that the plaintiffs' claims are "jurisdictionally channeled" away from the federal district courts under the Civil Service Reform Act ("CSRA") and the Federal Service Labor-Management Relations Statute ("FSLMRS"). Third, the defendants argue that the MHP and MHP Guidance are not properly determined to be final agency action under the APA.

*i. Associational Standing*

The Court begins with the defendants' contention that the plaintiffs lack Article III standing. See, e.g., Pagán, 448 F.3d at 26. A plaintiff "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" Murthy v. Missouri, 603 U.S. 43, 58 (2024) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)). "At the preliminary injunction stage . . . the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." Id. (quoting Winter, 555 U.S. at 22). Further, "[f]or standing purposes," the Court "accept[s] as valid the merits of [the plaintiffs'] legal claims." FEC v. Cruz, 596 U.S. 289, 298 (2022) (citing Warth v. Seldin, 422 U.S. 490, 500 (1975)). Accordingly, in analyzing the plaintiffs' standing, the Court "must assume" that Question Three violates the APA and "unconstitutionally burdens" the plaintiffs' members' First Amendment rights. See id.

Organizational plaintiffs, such as the labor unions here, "may establish 'associational standing' to sue in a 'representational capacity.'" Doe v. Trump, 157 F.4th 36, 47 (1st Cir. 2025) (quoting Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977)), cert. denied, No. 25-899, 2026 WL 1871309 (U.S. June 30, 2026). To do so, "the organization must show that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" Id. (quoting Hunt, 432 U.S. at 343).

To satisfy the first element of associational standing at this juncture, an organizational plaintiff must show that it is likely to succeed in establishing that "at least one of its members would have [Article III] standing to sue as an individual." See Animal Welfare Inst. v. Martin, 623 F.3d 19, 25 (1st Cir. 2010). The inquiry for individual standing consists of three "irreducible" elements: injury in fact, traceability, and redressability. See, e.g., Lujan, 504 U.S. at 560. Thus, here, an organizational plaintiff must clearly show that it is likely to succeed in showing that one of its members has suffered an injury in fact that is both traceable to each defendant and likely to be redressed by the requested relief. The Court concludes that, in relying on the declaration of Federal Worker 4, AFGE has shown that it is likely to establish the first element of associational standing.[3]

First, the injury-in-fact requirement. Whether the plaintiffs are likely to succeed in establishing that Federal Worker 4 has suffered a cognizable injury in fact turns not on whether

[3] The Court previously granted the plaintiffs' motion to file under pseudonyms certain member declarations in support of the instant motion. See Am. Fed'n of Gov't Emps. v. Kupor, Case No. 25-CV-13305-GAO, 2026 WL 2210891, at *1 (D. Mass. July 31, 2026). Accordingly, the Court refers to each member declarant using the pseudonym indicated in his or her corresponding declaration.

she "will likely be denied the job" she applied for, but rather whether Question Three "reasonably leads [her] to believe [she] must conform [her] conduct to its standards." See Ozonoff v. Berzak, 744 F.2d 224, 229–30 (1st Cir. 1984) (Breyer, J.).

Federal Worker 4 has been employed at the U.S. Department of Veterans Affairs for over two years, and recently, she has "applied broadly" to at least ten "similar" roles with "different federal agencies." (See Decl. of Fed. Worker 4 in Supp. of Pls.' Mot. for Prelim. Inj. ¶¶ 3–6 (dkt. no. 50).) "Many of the job postings" to which Federal Worker 4 applied included Question Three. (See id. ¶¶ 7–8.) Federal Worker 4 "did not want to answer" Question Three because she prefers not "to talk about politics at work" and does not "agree with most of what President Trump is doing." (Id. ¶¶ 8–9.) Nevertheless, Federal Worker 4 "decided to answer [Question Three] anyway" because she "was afraid" that "not answering—or answering in a way that is not favorable to President Trump—would hurt [her] applications." (Id. ¶ 10.)

Federal Worker 4's interpretation of Question Three as asking her to "talk about politics" is a reasonable one. The plain language of Question Three calls for the applicant's personal views on a political topic, (see Compl., Ex. A at 10 (calling for identification of "Executive Orders or policy initiatives that are significant to *you*" (emphasis added)), and directly links that personal view to the duties of the desired civil service job, (see id. (calling for explanation of "how you would help implement [Orders or initiatives] if hired")). Indeed, the defendants implicitly recognize the reasonableness of such an interpretation insofar as the MHP Guidance states that answers to Question Three and the other free-form essay questions should not be used as "an ideological litmus test." (See Compl., Ex. B at 3.) Notably, as far as the Court can discern from the present record, this limitation stated in the MHP Guidance does not appear in the text of Question Three as it is presented to civil service applicants.

From the foregoing reasonable interpretation proffered, it follows that Federal Worker 4 could reasonably "think it necessary to avoid acting in ways that may show 'disloyalty' as described in" Question Three. Cf. Ozonoff, 744 F.2d at 230. Federal Worker 4 thus reasonably understood the plain language of Question Three to call for a statement of her own personal political views as part of the applications for the federal civil service positions to which she applied. That identified harm is a cognizable injury in fact. Cf. id. at 228 (explaining, in the context of a First Amendment vagueness challenge, that "likely 'chilling effect' of an apparent speech-related job qualification constitutes a real injury" where "the plaintiff's interest in getting or keeping a job is real").

Turning to the second element, traceability. Traceability is essentially a "causation element." Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc., 958 F.3d 38, 47 (1st Cir. 2020). The plaintiffs must therefore clearly show that they are likely to succeed in demonstrating that Federal Worker 4's injury in fact is traceable (1) to the challenged agency action and (2) to the defendants named in this action. As to the first showing, Question Three is plainly the cause of the identified harm because, for the reasons just discussed, it can be reasonably understood to inquire into an applicant's personal political views, and the record indicates that the question at issue has appeared in thousands of federal civil service applications, including the applications filled out by Federal Worker 4. That an applicant may "opt not to answer" Question Three is of no moment. (Defs.' Mem. of L. in Opp'n to Pls.' Mot. for Prelim. Inj. and for Stay under 5 U.S.C. § 705 ("Defs.' Opp'n") at 10 (dkt. no. 57).) For the standing inquiry: "an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred." See Cruz, 596 U.S. at 297 (collecting cases); cf. Rutan v. Republican Party of Ill., 497

U.S. 62, 72 (1990) (explaining that government's assertion that "employee petitioners and cross-respondents had no legal entitlement to promotion, transfer, or recall" was "beside the point").

Moreover, the Court concludes that the plaintiffs are likely to succeed in demonstrating that Federal Worker 4's injury in fact is likely traceable to the named defendants: OPM, Scott Kupor in his official capacity as director of OPM, and the United States. Question Three is one of the reforms expressly established by the MHP as part of OPM's implementation of the Executive Order. OPM is the agency that issued the MHP and MHP Guidance at the President's direction, see Executive Order § 2, and Kupor is the current director of that agency. Finally, each defendant here belongs to one of the permissible categories of defendants properly named in an APA action. See 5 U.S.C. § 703 (providing that "action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer"). The plaintiffs are thus likely to succeed in establishing the traceability element.

Redressability is the third and last element of Federal Worker 4's individual standing. "To determine whether an injury is redressable, a court will consider the relationship between 'the judicial relief requested' and the 'injury' suffered." California v. Texas, 593 U.S. 659, 671 (2021) (quoting Allen v. Wright, 468 U.S. 737, 753 n.19 (1984)). "[A] plaintiff's remedy must be 'limited to the inadequacy that produced [the] injury in fact.'" Gill v. Whitford, 585 U.S. 48, 66 (2018) (quoting Lewis v. Casey, 518 U.S. 343, 357 (1996)). When "the plaintiff is himself an object of the action (or forgone action) at issue[,] . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." Lujan, 504 U.S. at 561–62. A plaintiff "seek[ing] forward-looking declaratory or injunctive relief" must identify an "ongoing injury or a sufficient threat that the injury will recur." Roe v. Healey, 78 F.4th 11, 21 (1st Cir. 2023).

By the present action, the plaintiffs seek various forms of relief. First, they ask the Court to declare that Question Three violates the First Amendment and the APA and to "hold unlawful and set aside" the MHP insofar as it "directs the inclusion and use of [Question Three] in federal civil service hiring," on both a temporary and permanent basis. (See Compl., Request for Relief ¶¶ A–C.) The record before the Court indicates that the defendants have implemented Question Three in thousands of applications for federal civil service jobs. There is, moreover, no indication that OPM or other agencies intend to alter that practice.

If the Court were to declare that Question Three is unconstitutional and vacate it pursuant to § 706 of the APA, the question would no longer appear in federal civil service job applications. In that case, neither current nor prospective federal civil service employees would be faced with a purportedly unconstitutional inquiry into their individual personal political views, thereby remedying the identified harm.

That same logic extends to the requested stay under § 705, which would have the same effect of vacating the agency action, but only on a temporary basis. See Wages & White Lion Invs., L.L.C. v. FDA, 16 F.4th 1130, 1144 (5th Cir. 2021) (explaining that a stay under § 705 "suspend[s] *administrative* alteration of the *status quo*" (emphasis in original) (quoting Nken, 556 U.S. at 430 n.1)); accord 5 U.S.C. § 705 (authorizing, in relevant part, "the reviewing court" to "issue all necessary and appropriate process" "to preserve status or rights pending conclusion of the review proceedings" "to the extent necessary to prevent irreparable injury"). The plaintiffs are thus likely to succeed in establishing that Federal Worker 4's injury in fact is likely redressable by the requested declaratory relief and the requested stay and vacatur under the APA. See, e.g., Make the Rd. N.Y. v. Noem, No. 25-5320, 2025 WL 3563313, at *17 (D.C. Cir. Nov. 22, 2025) ("Stays and vacatur are well-established remedies for unconstitutional and unlawful agency action.").

In addition to the requested stay, however, the plaintiffs also ask the Court to enjoin the defendants—on both a preliminary and permanent basis—from "rel[ying] on answers to [Question Three] in any manner," (Pls.' Mem. at 34), and "from retaining the contents of applicants' answers to [Question Three]," (Compl., Prayer for Relief ¶ D). Unlike the other forms of relief sought, the requested injunction would go beyond simply preventing the implementation of Question Three in civil service applications. But the plaintiffs have not clearly shown that they are likely to succeed in establishing that their members' asserted harms are likely redressable by such an injunction, temporary or permanent.

Critically, the plaintiffs expressly disavow the defendants' claim that this action is a challenge to particular personnel decisions. In the plaintiffs' words, "[t]his case is about speech, not employment actions." (See, e.g., Reply Br. in Supp. of Pls.' Mot. for Stay under 5 U.S.C. § 705 and for Prelim. Inj. at 13 (dkt. no. 60).) The requested injunction, by contrast, would effectively wade into the agency decision-making process by seeking to enjoin the defendants' conduct as it relates to individual candidates or particular applications. The relief would not redress the harms at issue here, which "occur independent of any personnel decision." (Pls.' Mem. at 30.) Consequently, at this juncture, the plaintiffs have not made a clear showing that they are likely to succeed in establishing that their members' identified harms are redressable by the requested preliminary injunction. See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 603 U.S. 799, 831 (Kavanaugh, J., concurring) (explaining that vacatur has "long" been "recognized" as the "usual relief when a court holds that agency rules are unlawful"); see also TransUnion LLC v. Ramirez, 594 U.S. 413, 436 (2021) ("[A] plaintiff must 'demonstrate standing separately for each form of relief sought.'" (quoting Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 185 (2000))).

To summarize, thus far the Court has concluded that the plaintiffs have clearly shown that they are likely to succeed in establishing that Federal Worker 4, a member of AFGE, has Article III standing to sue as an individual. Accordingly, the plaintiffs have shown that AFGE is likely to succeed in establishing the first element of associational standing.

Turning to the second element of associational standing, the plaintiffs argue that they are likely to succeed in establishing that AFGE's organizational purpose is germane to the interests that the plaintiffs seek to protect by pursuing the instant action. According to its National President, AFGE's organizational interests include "ensuring fair employment and promotion *opportunities* for its members" "by filing employee complaints on behalf of union members and engaging in nationwide litigation to protect union members' interests." (Decl. of E. Kelley in Supp. of Pls.' Mot. for Prelim. Inj. ¶ 7 (emphasis added) (dkt. no. 44).) That stated interest is germane to the plaintiffs' challenge to the MHP's reforms to the application process for federal civil service jobs, and thus, the plaintiffs have shown that they are likely to succeed in establishing the second element of associational standing.

Lastly, there appears to be no real dispute between the parties that neither the requested stay under § 705 nor the claims asserted in the complaint requires the direct participation of individual members of the organizations. The gravamen of the claims asserted "turns on a question of law which is not particular to each member" of the organizations, cf. Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R., 906 F.2d 25, 35 (1st Cir. 1990) (citing UAW v. Brock, 477 U.S. 274, 287 (1986)), and thus does not "require individualized proof" from the plaintiffs' members, see Doe, 157 F.4th at 48 (adjudicating challenge to executive order on constitutional and APA grounds). Accordingly, the plaintiffs have clearly shown that AFGE is likely to succeed in establishing the third and final element of the associational standing inquiry.

Because the plaintiffs have clearly shown that AFGE is likely to succeed in establishing the required elements of associational standing, at this preliminary juncture, the Court "need not consider the other theories of standing raised." See Biden v. Nebraska, 600 U.S. 477, 489 (2023); Murthy, 603 U.S. at 61 ("[F]or every defendant, there must be at least one plaintiff with standing to seek an injunction."); see also Capen, 134 F.4th at 667–68. Of course, the ongoing burden to establish Article III standing at all remaining stages of this action—with the corresponding "manner and degree of evidence required"—will remain with the plaintiffs. See, e.g., Lujan, 504 U.S. at 561.

*ii. CSRA Channeling*

The defendants next argue the Court lacks jurisdiction for the additional, independent reason that the CSRA and FSLMRS preclude initial judicial review of the plaintiffs' claims. The CSRA establishes an "'integrated scheme of administrative and judicial review' for aggrieved federal employees," Elgin v. Dep't of Treasury, 567 U.S. 1, 13 (2012) (quoting United States v. Fausto, 484 U.S. 439, 445 (1988)), which "provides the exclusive mechanism for challenging adverse personnel actions in federal employment," Rodriguez v. United States, 852 F.3d 67, 82 (1st Cir. 2017). A plaintiff so aggrieved must therefore "rely on the 'variety of causes of action and remedies' created by the CSRA and 'may not circumvent the Act's requirements and limitations by resorting to the catchall APA to challenge agency employment actions.'" Am. Fed'n of Gov't Emps. v. Sec'y of Air Force, 716 F.3d 633, 636 (D.C. Cir. 2013) (quoting Grosdidier v. Chairman, Broad. Bd. of Governors, 560 F.3d 495, 497 (D.C. Cir. 2009)).

"[C]omprehensive" though it is, the CSRA's channeling requirement "does not necessarily extend to every claim concerning agency action." Axon Enter., Inc. v. FTC, 598 U.S. 175, 185–86 (2023) (quoting Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 208 (1994)). Rather, to determine

if initial judicial review is appropriate, the Court must consider whether the claims asserted are "of the type Congress intended to be reviewed" within the statutory regime. Id. at 186 (quoting Thunder Basin, 510 U.S. at 212). That consideration turns on three "factors": "First, could precluding district court jurisdiction 'foreclose all meaningful judicial review' of the claim?" Id. (quoting Thunder Basin, 510 U.S. at 212–13). Second, "is the claim 'wholly collateral to [the] statute's review provisions'?" Id. (alteration in original) (quoting Thunder Basin, 510 U.S. at 212). Third, "is the claim 'outside the agency's expertise'?" Id. (quoting Thunder Basin, 510 U.S. at 212). The first "factor recognizes that Congress rarely allows claims about agency action to escape effective judicial review," and the remaining two take into account the purpose of channeling provisions: "to give the agency a heightened role in the matters it customarily handles, and can apply distinctive knowledge to." Id.

Here, the defendants argue that the plaintiffs are challenging "what amounts to alleged 'prohibited personnel practices' under the FSL-MRS," and that Congress has channeled initial review of such claims away from the district courts. (See Defs.' Opp'n at 18 (quoting 5 U.S.C. § 2302(a)(1).) After all, the defendants observe, the FSLMRS prohibits any "'personnel action' taken, recommended, or approved that 'discriminate[s] for or against any employee or applicant for employment on the basis of . . . political affiliation, as prohibited under any law, rule, or regulation[.]'" (Id. (alterations in original) (quoting 5 U.S.C. § 2302(b)(1)(E)).) The plaintiffs counter that because their members' injuries occur "regardless of whether they are eventually subject to some employment consequence," (Pls.' Mem. at 31), the claims asserted "do not challenge a *personnel action* or *personnel practice* at all," (id. (emphasis in original)), and therefore are not of the type that Congress intended to channel under the CSRA.

The Court concludes that the plaintiffs are likely to succeed in demonstrating that their claims are not subject to channeling and that initial judicial review is thus proper. Beginning with factor two—whether the claims are wholly collateral to the statutory review provisions—the plaintiffs ask the Court to vacate the MHP insofar as it instructs executive agencies to broadly implement Question Three in federal civil service vacancy applications. They do not, however, seek to remedy an identified personnel decision against any one of their members. Put another way, there is no "personnel practice" at issue. In fact, under the plaintiffs' theory, even a civil service employee who receives a promotion would suffer a constitutionally based injury alleged if faced with Question Three when completing the relevant application. Thus, nothing presently before the Court tends to suggest that the claims asserted are simply a "vehicle by which [the plaintiffs] seek to reverse" an adverse employment action or otherwise obtain an employment benefit. See Elgin, 567 U.S.at 22. In that respect, this action differs markedly from other cases where courts have found channeling under the CSRA to be appropriate. See, e.g., id. at 7–8 (seeking, *inter alia*, reinstatement to former positions in competitive service with backpay and benefits); Zummer v. Sallet, 37 F.4th 996, 1002, 1008–09 (5th Cir. 2022) (seeking, *inter alia*, reversal of suspension from federal employment); Nyunt v. Chairman, Broad. Bd. of Governors, 589 F.3d 445, 448 (D.C. Cir. 2009) (seeking, *inter alia*, front pay and benefits for relief from unlawfully denied promotion withing federal agency).

Next, as to factor three, the absence of a challenged adverse employment action tends to support the conclusion that the plaintiffs' claims fall outside the agencies' expertise. Without a "personnel practice" for the agency to review, the claims alleged are not of the type that the agency "customarily handles." See Axon, 598 U.S. at 186. To be sure, the underlying facts alleged involve federal civil service jobs and employees, which are often featured in agency proceedings pursuant

to the CSRA. But the legal questions that predominate in this case "do not require 'technical considerations of [agency] policy.'" See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 491 (2010) (alteration in original) (quoting Johnson v. Robison, 415 U.S. 361, 373 (1974)). On the contrary, they turn on the constitutionality of Question Three *per se*—not the lawfulness of its application in one particular case or another. It follows that the agency's "distinctive knowledge" in the employment context is of limited import. See Axon, 598 U.S. at 186; cf. Elgin, 567 U.S. at 22–23 (explaining that agency expertise factor may favor preclusion where claims present "preliminary questions unique to the employment context [that] may obviate the need to address the constitutional challenge"). This Court, in turn, is "at no disadvantage" when it comes to "answering" such "standard questions" of administrative and constitutional law. See Free Enter. Fund, 561 U.S. at 491.

Factor one—whether precluding district court jurisdiction would foreclose all meaningful judicial review—is comparatively less conclusive. As the defendants note, the CSRA review scheme provides for appellate review of the agency's decision in the Federal Circuit, which of course is "an Article III court fully competent to adjudicate" the plaintiffs' constitutional claims. See Elgin, 567 U.S. at 17. The plaintiffs, on the other hand, counter that judicial review in the Federal Circuit "would come too late to be meaningful" because their alleged injuries are "here-and-now" constitutional harms. (Pls.' Mem. at 33 (quoting Axon, 598 U.S. at 191).) The Court need not reach the question whether the claims here are the type of "structural constitutional claims" that the Supreme Court has said may present a "problem" with respect to the "timing of review." See Axon, 598 U.S. at 191. Even assuming appellate review in the Federal Circuit would not present a timing problem, initial judicial review is proper because the Court concludes that the plaintiffs' claims are not "of the type" that Congress intended to be channeled. As previously

noted, the harms asserted here turn on questions of constitutional law that are wholly collateral to the CSRA's review scheme and that fall plainly outside the agency's expertise. Cf. id. at 186 (explaining that factors may point in "different directions" and that the "ultimate question is how best to understand what Congress has done"). They are thus properly adjudicated by this Court in the first instance.

*iii. Final Action*

The defendants also contend that the defendants are not likely to succeed on the merits of their claims because the MHP and MHP Guidance are not properly determined to be final agency action. See 5 U.S.C. § 704 (authorizing judicial review of "final agency action"). Agency action "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," see 5 U.S.C. § 551(13); 5 U.S.C. § 701(b)(2), and it is final where "the agency has completed its decisionmaking process," and "the result of that process is one that will directly affect the parties," Trafalgar Cap. Assocs., Inc. v. Cuomo, 159 F.3d 21, 35 (1st Cir. 1998) (quoting Franklin v. Massachusetts, 505 U.S. 788, 797 (1992)).

Here, the plaintiffs are likely to succeed in showing that the MHP and MHP Guidance are final agency action. The MHP established the challenged language and substance of Question Three, and the MHP Guidance appears to articulate the question's intended scope and use. Accordingly, from the vantage of the administrative record before the Court, it appears that OPM has completed its decisionmaking process with respect to Question Three. Indeed, the defendants all but concede that the MHP and MHP Guidance are the "end of OPM's process." (Defs.' Opp'n at 25.) Nevertheless, they say that the MHP and MHP Guidance are not properly determined to be final agency action because "in [the] absence of other agency action," "no legal obligations flow from" them. (Id.) That is, in the defendants' view, they are "not finally determinative as to whether

the policy priorities question will appear on a particular job posting." (Id.) As previously mentioned, however, the plaintiffs have proffered evidence that Question Three has appeared on thousands of civil service job applications posted to USAJOBS.[4] What is more, several of the plaintiffs' members have proffered declarations stating that they have encountered Question Three in applying to federal civil service vacancies and detailing the alleged harm they have suffered as a result. Thus, the current record tends to show that OPM has reached the end of its decision-making process with respect to the MHP and related guidance, and the plaintiffs' members—as demonstrated by the case of Federal Worker 4—claim to have been harmed by facing the results of that process, namely Question Three.

The plaintiffs are thus likely to succeed in establishing that Question Three is final agency action under the APA.

*iv. Contrary to Constitutional Right*

The Court now turns to the question whether the plaintiffs are likely to succeed on the merits of their claims that Question Three violates the APA because it is contrary to the plaintiffs' members' First Amendment rights. The APA provides, in relevant part, that a reviewing court "shall . . . hold unlawful and set aside agency action" that is "found to be" "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). Here, the plaintiffs argue, *inter alia*, that Question Three violates the First Amendment because it: (1) acts as a "patronage condition" (2) enables viewpoint discrimination, (3) compels protected speech, and (4) chills protected speech. Therefore, in the plaintiffs' view, Question Three must be set aside under the APA as contrary to a constitutional right.

[4] USAJOBS is an online platform run by the federal government where, among other things, federal civil service job vacancies are announced.

"[P]olitical belief and association constitute the core of those activities protected by the First Amendment." Rutan, 497 U.S. at 69 (alteration in original) (quoting Elrod, 427 U.S. at 356). That is why the government bears a "heavy burden" to demonstrate that an inquiry "about an individual's beliefs and associations" is "necessary to protect a legitimate state interest." Baird v. State Bar of Ariz., 401 U.S. 1, 6–7 (1971). Moreover, "[n]arrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—'[b]ecause First Amendment freedoms need breathing space to survive.'" Ams. for Prosperity Found. v. Bonta, 594 U.S. 595, 609 (2021) (alteration in original) (finding unconstitutional regulation requiring disclosure of tax-exempt organizations' donor information (quoting NAACP v. Button, 371 U.S. 415, 433 (1963))). Thus, "even a 'legitimate and substantial' governmental interest 'cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.'" Id. (quoting Shelton v. Tucker, 364 U.S. 479, 488 (1960)).

The plaintiffs are likely to succeed in showing that Question Three is neither related to an important government interest nor narrowly tailored to promote that interest.[5] The defendants seem to proffer as the important interest at stake the government's "discretion in administering its hiring and recruitment processes." (Defs.' Opp'n at 28.) It is true that, in some cases, an employee's political "allegiance" may be a proper consideration where "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." See Branti v. Finkel, 445 U.S. 507, 518–19 (1980). But that is not the case in the context of civil service positions because the CSRA expressly prohibits employment decisions made on

[5] The plaintiffs argue that strict or exacting scrutiny applies. The defendants, by contrast, do not squarely address the question. Because the parties have not fully briefed the issue, for purposes of the plaintiffs' motion for preliminary relief, the Court assumes without deciding that exacting scrutiny applies because, on the present record, the plaintiffs are likely to succeed in demonstrating that Question Three fails under either standard.

the basis of an employee or candidate's "political affiliation." See 5 U.S.C. § 2302(b)(1)(E). Here, the government has not articulated why or how political allegiance is "an appropriate requirement for the effective performance" of civil service jobs, see Branti, 445 U.S. at 518, yet for the reasons already detailed in connection with Federal Worker 4's individual standing, the plaintiffs' members reasonably interpret Question Three to call for the applicant's personal political views. The plaintiffs are thus likely to succeed in showing that there is no legitimate governmental interest in inquiring into the political beliefs of applicants to federal civil service vacancies.

For similar reasons, the plaintiffs are likely to succeed in demonstrating that Question Three is not narrowly tailored. By its own plain terms, the MHP applies to "Federal job vacancy announcements graded at GS-05 or above," (Compl., Ex. A at 9), and the present record tends to support the plaintiffs' contention that Question Three has appeared on thousands of applications for vacancies with the federal civil service. Further, according to the plaintiffs, civil service jobs so graded include "Air Traffic Control Specialist," "Nuclear Materials Courier," and "Crane Operator," among others. (See Pls.' Mem. at 8.) Because the government has not proffered a reason why political allegiance is "an appropriate requirement for the effective performance" of these and similar federal civil service jobs, the plaintiffs are likely to succeed in demonstrating that Question Three is not narrowly tailored. See Branti, 445 U.S. at 518.

The first of the Winter factors—likelihood of success on the merits—favors entering the requested stay under § 705 of the APA because the plaintiffs are likely to succeed in demonstrating that Question Three violates the APA as contrary to a constitutional right. "In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." Fortuño, 699 F.3d at 10.

B. Irreparable Harm

The second Winter factor "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of" the requested relief. Winter, 555 U.S. at 22 (emphasis in original). "[I]rreparable injury is presumed upon a determination that the movants are likely to prevail on their First Amendment claim." Fortuño, 699 F.3d at 11. That presumption obtains here because the plaintiffs have shown that they are likely to succeed on the merits of their claim that the MHP violates the APA as contrary to the First Amendment.

The defendants raise two arguments to attempt to rebut that presumption. First, they contend that the plaintiffs are not likely to succeed in establishing this factor because, in the defendants' view, the loss of an employment opportunity does not qualify as an irreparable harm. However, the plaintiffs claim that the asserted First Amendment injury occurs whenever an applicant is faced with Question Three, "independent of any personnel decision," (Pls.' Mem. at 30), because Question Three is an impermissible governmental inquiry into the applicant's political views and beliefs. The defendants' argument thus misapprehends the nature of the harms alleged and, accordingly, does not rebut the presumption of irreparable harm.

Second, the defendants rely on what they characterize as the months-long "delay" between the issuance of the MHP and the filing of this action. This case presents complex issues of constitutional law, and the defendants have not shown that any perceived delay by the plaintiffs was undertaken in bad faith. What is more, the plaintiffs moved for preliminary relief within weeks of commencing this action. Cf. Fortuño, 699 F.3d at 16 (rejecting delay argument where action commenced within seven-and-a-half months). Thus, any purported delay by the plaintiffs does not, alone, tip the scales in favor of the defendants on this factor.

For these reasons, the irreparable-harm factor also favors the plaintiffs' request for a stay under § 705 of the APA.

### C. Balance of Harms and Public Interest

Finally, the Court must balance the "relative hardships" to each party if a temporary stay were issued and consider "the effect, if any, that [a stay] or the lack of one may have on the public interest." Grant v. Trial Ct. of Mass., 137 F.4th 1, 4 (1st Cir. 2025) (quoting Russomano v. Novo Nordisk Inc., 960 F.3d 48, 52 (1st Cir. 2020)). Where, as here, the government is the party opposing preliminary relief, these factors "merge." Does 1-6 v. Mills, 16 F.4th 20, 37 (1st Cir. 2021) (quoting Nken, 556 U.S. at 435). The issuance of a temporary stay under § 705 of the APA would not harm the government's identified interest because, as discussed *supra*, the CSRA prohibits personnel decisions based on political affiliation. The plaintiffs, on the other hand, are likely to succeed in establishing that Question Three violates the APA as contrary to a constitutional right, and thus, absent the requested stay, their members would likely suffer First Amendments harms. The public, in turn, has a strong interest in preventing what the plaintiffs have shown is likely to be determined to be unconstitutional conduct on the part of the executive branch. Accordingly, here, too, the balance tips in favor of the plaintiffs.

## III. Conclusion

For the foregoing reasons, the plaintiffs' Motion for a Stay under 5 U.S.C. § 705 and for a Preliminary Injunction (dkt. no. 39) is GRANTED in part and DENIED in part.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge